1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

         Plaintiff,

   vs.              CRIMINAL ACTION NO:  1:10CR78-1

HERBERT DEVAUGHN,
also known as Wop,

         Defendant.

               - - -

    Testimony had in the Trial of the above styled action on August 23, 2011, at 1:30 p.m., before Honorable Irene M. Keeley, Judge, at Clarksburg, West Virginia.

APPEARANCES:

FOR THE GOVERNMENT:   ZELDA E. WESLEY, ESQUIRE
                       Assistant United States Attorney
                       320 West Pike Street - Suite 300
                       Clarksburg, West Virginia   26302
                       304-623-7030

FOR THE DEFENDANT:    ROGER D. CURRY, ESQUIRE
                       Curry Amos & Associates
                       1414 Country Club Road
                       P.O. Box 3040
                       Fairmont, West Virginia   26554
                       304-368-1000

The defendant was present in person.

Proceedings recorded by stenomask, transcript produced by official court reporter.

LINDA L. BACHMAN, CCR, CVR, OFFICIAL COURT REPORTER
P.O. BOX 969, CLARKSBURG, WEST VIRGINIA   26302-0969
304-622-0177

2

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| (For the Government) | | | | |
| Jolie Lang | 3 | 67 | 74 | |
| Staci Taylor | 76 | 97 | | |
| David DeBerry | 101 | 110 | | |
| Debra Lynn Bolden | 113 | 124 | | |

| EXHIBITS | ADMITTED |
|----------|----------|
| Government Exhibit Number 15A | 26 |
| Government Exhibit Number 16B | 33 |
| Government Exhibit Number 22 | 48 |
| Government Exhibit Number 22A | 51 |
| Government Exhibit Number 26 | 54 |
| Government Exhibit Number 26A | 61 |
| Government Exhibit Number 28 | 63 |
| Government Exhibit Number 28A | 65 |
| Government Exhibit Number 2 | 83 |
| Government Exhibit Number 15 | 86 |
| Government Exhibit Number 17 | 89 |
| Government Exhibit Number 19 | 91 |
| Government Exhibit Number 23A | 92 |
| Government Exhibit Number 25A | 94 |
| Government Exhibit Number 27A | 95 |
| Government Exhibit Number 29A | 97 |

3

Lang - Direct

P R O C E E D I N G S

(08-23-2011, 1:30 o'clock p.m., defendant present)

THE COURT:  The Government may now present its case-in-chief.  Ms. Wesley, you may call your first witness.

MS. WESLEY:  Jolie Lang.

THE COURT:  All right.  Jolie Lang.

(Pause)

THE COURT:  Ms. Lang, please approach the front of the courtroom to the Clerk standing here in the red jacket and she will administer the oath to you before you take the witness stand.

JOLIE LANG, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness stand.  The witness is Jolie Lang, L-a-n-g.

THE COURT:  Could you spell her first name for the jury, please?

THE CLERK:  J-o-l-i-e.

THE COURT:  Thank you.

MS. WESLEY:  May I proceed, Your Honor?

THE COURT:  Yes.

MS. WESLEY:  Thank you.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.   Ms. Lang,how old are you?

A.   I'm 27.

4

Lang - Direct

Q.    And are you presently employed?

A.    I am.

Q.    And where do you work?

A.    I work at Nissan of Paducah.  A car dealership, Nissan
of Paducah.

Q.    And where is that located?

A.    In Paducah, Kentucky.

Q.    And previous to working at Nissan Paducah, where were
you employed?

A.    At a gas station called The Easy Shop.

Q.    And where do you presently reside, in which city and
state, ma'am?

A.    I live in Paducah, Kentucky.

Q.    And how long have you resided in Paducah, Kentucky?

A.    Since September 1st, 2010, almost a year.

Q.    And prior to residing in Kentucky, where did you
reside?

A.    In Morgantown, West Virginia.

Q.    And how long did you reside in Morgantown, West
Virginia?

A.    Around four years.

Q.    And while you were residing in--in Morgantown, West
Virginia did you use any type of illegal drugs?

A.    I did.

Q.    Heroin, did you use heroin?

5

Lang - Direct

A.   Yes.

Q.   Okay.  Please explain to the jurors how--how do you or
how did you use heroin?

A.   From--when I used heroin I used it in a needle.

Q.   You actually would inject it in your veins?

A.   Correct.

Q.   And are there other ways that people can use heroin,
other than inject it in their veins?

A.   Yes.

Q.   What are some of the other ways?

A.   You can snort it, you know, through your nose or I've
heard of people who smoke it.  I don't--those are the ways I
know.

Q.   For individuals who use heroin by injecting it in their
veins, based upon your experience, did you think that they
have a more severe addiction to heroin?

A.   I believe they do.

Q.   What type of feeling does one have when they're using
heroin?

A.   I don't understand your question exactly.

Q.   How did you feel when you used heroin?

A.   As soon as I did the heroin?

Q.   Yes.

A.   At first, is that what you mean, when I first started
using--

Lang - Direct

Q.    Yes ma'am.

A.    --because it's different.  When I first started using

it gave me energy.  It gave me the desire to go out and do

things.  It just made me feel good.  I mean it just got me

high.  I felt good.

Q.    Did that change for you at some time?

A.    It did.

Q.    And approximately how long were you using heroin before

it changed?

A.    I don't remember.

Q.    What were some of the changes later when you were using

heroin?

A.    I believe I--like once I became really addicted to it,

I didn't get high any more.  I chased the high and I just

didn't get sick.

Q.    I'm sorry?  What was that?

A.    I just did not get sick.

Q.    What do you mean you didn't get sick?

A.    Well, if I didn't have it I would be sick for it.

Q.    And what would happen if you would be sick?

A.    Okay.  If I was--when I was sick my body would hurt all

over.  It would ache.  My legs wouldn't lay still.  They

were constantly kicking.  I would sweat.  I'd have diarrhea.

My nose would run.  I didn't have patience.  I would just

scream at people.  I had no desire to do anything but get

Lang - Direct

high and I would do anything to get high.

Q.   So based upon all that clearly, you know, you had an addiction to heroin, is that correct?

A.   I did.

Q.   When did you first start using heroin?

A.   In 2007.

Q.   And how did you start using heroin?

A.   I don't understand what you mean.

Q.   Did you use some other drug prior to using heroin?

A.   I did, yes.

Q.   And what was that?

A.   Originally I started using Oxycontin.

Q.   And Oxycontin is a pill?

A.   It is a pill.

Q.   Okay.  And why did you stop using Oxycontin and start using heroin?

A.   Well, I lived in Tennessee and I had to move up here and I didn't know where to get Oxycontin up here but I had a brother, who I moved in the house with, and he already knew how to get heroin and so he just hooked me up with heroin so I wouldn't be sick from Oxycontin.

Q.   And then your heroin addiction began?

A.   Yes.

Q.   Did you get the same feeling from Oxycontin that you got from heroin?

Lang - Direct

A.    Similar.  It took less at fir--you know, it took less heroin and it was cheaper at first.

Q.    What was cheaper at first?

A.    The heroin, because I didn't have to do as much heroin to get what I got from the Oxycontin.

Q.    How often were--were you using heroin?

A.    Daily.

Q.    What type of quantities were you using daily?

A.    When are you talking about?

Q.    Well, did you use a stamp?  How much heroin would you use in a day?

A.    Well, I mean it started out a lesser amount then it ended, so that's what I don't understand.

Q.    When you first started using heroin how much were you using in a day?

A.    When I first started using heroin I would use--I would just use a stamp.  I didn't even have to use a whole stamp when I first started using heroin.

Q.    Okay.  And--and what's a stamp?

A.    I don't--I mean, a stamp is how it comes in.  It's a single bag of hero--it's like--it's a bag of heroin.  It's just called a stamp.

Q.    And as your addiction progressed how much heroin did you require in a day?

A.    In a day, I could use up to two or three bundles in a

Lang - Direct

day.

Q.   And do you know how many stamps are in a bundle?

A.   Ten.

Q.   So 20 to 30 stamps in a day basically?

A.   If I could get it, yes.

Q.   Now do you know someone known to you as Wop?

A.   I do.

Q.   And how did you first meet Wop?

A.   I met him through a boy named Right.

Q.   And what were the circumstances of you first meeting him?

A.   What do you mean, what were the circumstances?

A.   What were you doing when you first met him?

A.   Trying to get drugs.

Q.   And what was Wop doing?

A.   He had drugs.

Q.   Did he have drugs to sell?

A.   Yes.

Q.   Do you know Wop by any name other than Wop?

A.   No, just Wop.

Q.   And where was this--I'm sorry, you said his name was Right?

A.   Right.  Correct.  That's right.

Q.   Where--where was Right when you first saw him with Wop?

A.   The first time I remember meeting Wop with Right was at

Lang - Direct

Jesse James' house.

Q.   And where was that, if you know?

A.   Sabraton area of Morgantown.

Q.   Okay.  And were you alone?

A.   No.

Q.   Who were you with?

A.   My husband.

Q.   Okay.  And what is your husband's name?

A.   Todd Lang.

Q.   And how did you know that you could go to this location
and obtain heroin?

A.   'Cause that's where we would go to to get heroin.

Q.   So what happened when you got there?

A.   I-I mean I got heroin.  I went through Jesse James and
then he went to Right and then I got the drugs.

Q.   Okay.  Do you recall about how much you got on that
occasion?

A.   No, I don't recall.

Q.   Okay.  And at some point in time after that first time
that you got heroin, did you develop a relationship with
this Wop where you were able to get heroin on a regular
basis?

A.   Eventually.

Q.   And how did that occur?

A.   I just--after seeing him through someone else I

Lang - Direct

eventually got his number myself.  I just asked him for it.

Q.    You asked who for the number?

A.    Wop for his number.

Q.    What would be the reason you would ask for his number?

A.    So I could go directly to him and buy drugs instead of having to use other people.

Q.    And is there a benefit from buying your drugs directly from Wop rather than going through other people?

A.    I know that it's not going to be tampered with beforehand or I know I'm not going to get charged a middle-man fee for doing it.

Q.    Can you explain that to--to the jurors?  What do you mean "middle-man fee"?  What happens?

A.    Well, because the person that I would go through, this middle-man, they would be addicted to heroin also so they would want to make something for them so they wouldn't be sick and then to fix me up.  It's like--it's just known.

Q.    So whatever you were buying, they would take a piece off and then give you what's left?

A.    Or they would charge me more or they would get a bag. If you were getting a bundle, they would get a bag out of doing it or like I say, they would raise the price so that they could buy their own or you just--they probably did all of it too, you know, and you had to hook them up.  It was just--whatever you agreed upon.

Lang - Direct

Q.   And so you--you asked for Wop's number directly so you could cut out the middle person?

A.   Correct.

Q.   Okay.  And did he provide you with his phone number?

A.   He did.

Q.   Okay.  And after that happened, did you contact him directly?

A.   Yes.

Q.   Okay.  Approximately when did that occur?

A.   I don't remember exactly.

Q.   Okay.  How long ago was it?  I mean I know you don't know the exact date but in time periods of--

A.   I want to say 2009.

Q.   Okay.

A.   Early 2009.

Q.   Early 2009?

A.   Uh-huh (yes).

Q.   And when you developed this relationship with him that you can go to him directly, where would you meet him at?

A.   It was different places, but the first time I met him was at Right's house.

Q.   Okay.  And then after that, where would you meet him?

A.   I went to Pittsburgh often to meet him at first, at very first.

Q.   Okay.  And where would you go in Pittsburgh?

13

Lang - Direct

A.    To the area that he lived but I don't--I don't know
what that actual area is called.

Q.    Okay.  And we've talked about Wop.  Do you see Wop
seated in this courtroom today?

A.    Yes.

Q.    What is he wearing?

A.    A plaid button-down shirt.

        MS. WESLEY:  Your Honor, may the record reflect
that Ms. Lang has identified the defendant as Wop?

        THE COURT:  She said a plaid button-down shirt?

        MS. WESLEY:  I'm sorry.  I thought it was plaid
too from glancing.

        THE WITNESS:  Oh, okay.  Sorry.  It's striped.  I
just--I just barely looked.  I just barely looked.  It's
striped and it's got some sort of a thing over the shoulder.
That--that's Wop right there, sitting there.

        THE COURT:  All right.  The record may reflect
that she has identified the defendant.

BY MS. WESLEY:

Q.    And when--before you would go to Pittsburgh to meet
with him, how--how would that come to be?  Would you have to
call him or was it a regular routine?

A.    Oh, I had to call him.  Yes.

Q.    And when you would go to Pittsburgh to meet him, what
type of quantities were you buying?

Lang - Direct

A.   Bricks.  If I went to Pittsburgh I got bricks.  A brick.

Q.   A brick?

A.   Uh-huh (yes).

Q.   And do you know how many stamps are in a brick?

A.   Fifty (50).

Q.    And how much would you pay for a brick?

A.   I don't remember at first.  I don't remember.

Q.   And when you first started dealing with Wop directly, did you start off going to Pittsburgh or is that something that occurred later in your relationship?

A.   I met him in Morgantown a few times before I went to Pittsburgh.

Q.   Okay.  And where would some of the locations be that you would meet him in Morgantown?

A.   I--like I said, at Right's house and then just random. You just call somebody and you decide a place to meet.  I mean it can be anywhere, on the side of the street.  It could be at the Sheetz gas station, just--wherever he's close to is where you go.

Q.   How often was he in town?

A.   When he first started coming--when I first met Wop, he was--he was in town often but towards the end it was a lot more.  I don't know how often actually.

Q.   And about how often were you going to him to obtain

Lang - Direct

heroin?

A.   At first?

Q.   Yes.

A.   I'd say a couple times a week.

Q.   And initially what type of quantities were you buying from him?

A.   Single bags, up to a bun at first.

Q.   Okay.  And--and that's a couple times a week?

A.   Correct.

Q.   And at what point in time--at some point in time did your quantities that you were buying from him increase?

A.   They did.

Q.   And was there anything going on in your life that corresponded with the increased quantities?  Why--why did it increase?

A.   Well, just--I mean, honestly, eventually prices went down and I mean I had a husband who was also addicted to it and we were trying to take care of both of us so we would hook people up.  We become middle men so we could get high. I mean we would become middle men, so we would buy more and sell it so that way we made our profit so we could get high.

Q.   And so when you and your husband basically became middle men how much were you buying from--

A.   We would buy a brick at a time.

Q.   A brick at a time?

16

Lang - Direct

A.    Uh-huh (yes).

Q.    And when you're buying the brick at a time, are you getting them from--in Morgantown or are you going up to Pittsburgh?

A.    At first we went up to Pittsburgh and then eventually it--it all came down to Morgantown.

Q.    Approximately how many times did you travel to Pittsburgh?

A.    I don't know.  I don't even know approximately; quite a few times.

Q.    And what happened so that you could purchase it from him brick quantities in Morgantown?

A.    Wop eventually just started coming down to Morgantown and he had--you know, he would have quantity amount on him.

Q.    And at some point in time--you said the prices came down for the bricks?

A.    They did.

Q.    When they came down do you recall how much you were paying for a brick?

A.    I don't--I believe--I'm wanting to say like five hundred dollars or maybe--maybe four hundred and fifty or four hundred.  It depended.  There was more--I mean Wop wasn't my number one person but if I remember correctly it was anywhere between four to five hundred dollars.

Q.    Okay.  Now at this time--at this point in time, you

Lang - Direct

said he wasn't your number one person?

A.   No.

Q.   Do you know other people who were selling heroin in this area?

A.   Yes.

Q.   Okay.  And do you know where they were from, these individuals?

A.   Most of them, yes.

Q.   Were they from West Virginia?

A.   Not most--no.

Q.   Were they from Pennsylvania?

A.   Yes.

Q.   Do you know if they were associate--associated with Wop in any way?

A.   I--I--yeah, I know if they were or not.

Q.   I'm sorry?

A.   I know the answer to your question, yes.

Q.   They were associated with him--with Wop?

A.   Well, through another person I went through, one day we were talking about Wop and it was his--

         MR. CURRY:  Objection.  Hearsay.

         THE COURT:  Sustained.

BY MS. WESLEY:

Q.   Do you have first-hand knowledge as to whether or not there was connection between Wop and the other individuals

Lang - Direct

from Pittsburgh?

A.   They didn't--they weren't in connection together, no.
If that's what you're asking, no.  Wop did it by himself.

Q.   Now do you know someone named Justin or Katie?

A.   Yes.

Q.   And how is it that you know them?

A.   They used to buy drugs from me.

Q.   And at some point in time--you said this all started in
2009.  At some point in time did you stop getting drugs
from--from Wop?

A.   Did I stop?

Q.   Yes.

A.   I wouldn't say I stopped.  I had other people that I
did--I didn't go--Wop wasn't my first person I would chose
to go through.

Q.   At some point in time, did he become your--your first
person, your primary source for--for heroin?

A.   Towards the very end, yes.

Q.   Okay.  And--and why was that?

A.   He was always around or his people were always around
and he had the same product as everybody else and he charged
the same amount and he was easy to get a hold of.

Q.   And was he--at this point in time are you getting it
still directly from Wop?

A.   No.

Lang - Direct

Q.   Okay.  Then how were you getting it?

A.   I called Wop's phone and I would meet whoever Wop sent for him.

Q.   And who were some of the people that he sent?

A.   Justin and Katie at first; his girlfriend.

Q.   Do you know who his girlfriend was?

A.   Grace.  Some boys.  There was a boy named Dale, who was a local Morgantown boy and then he had some Pittsburgh boys, Ty, Jules and a little--a young boy.

Q.   Do you know the young boy's name?

A.   I don't know his name.

Q.   Okay.  And so you would call Wop on the phone and then he would send someone else?

A.   Yeah, that's right.

Q.   And when you would meet these other people, where would you meet them at?

A.   Wherever.

        THE COURT:  Wait a--just a moment.  They--I would ask Court Security to try to ascertain why the courtroom just shook.  Thank you.  Ladies and Gentlemen, I don't think you need to be worried about anything but I will get to the bottom of why that happened.  We're not used to earthquakes here in West Virginia so I don't think that's what it was but I don't want anybody speculating that we might have had one.  All right.  Thank you.  Go ahead.

Lang - Direct

BY MS. WESLEY:

Q.   Were you--these individuals that you made the purchases from for Wop--

A.   Uh-huh (yes).

Q.   --who would establish the price, how much you would pay for the heroin?

A.   Wop.

Q.   And would he do it with you or would he do it with the people who came and sold you or actually delivered the heroin to you?

A.   I mean it was supposed to be a set amount.  I think, maybe once or twice, I believe the person raised the amount on me but, I mean, it was just, going through Wop this is how much it cost.  That was it.

Q.   So you knew basically, because of your relationship, how much you were going to have to pay for heroin from Wop?

A.   Correct.

          COURT SECURITY:  They've been moving stuff in the basement that caused--

          THE COURT:  They what?

          COURT SECURITY:  They have been advised that it's disturbing the Court proceedings.  They're moving something downstairs.

          THE COURT:  All right, Ladies and Gentlemen, no earthquake.  Somebody's moving something in the basement and

Lang - Direct

since it's moving the courtroom, they're going to stop.  Go
ahead.

BY MS. WESLEY:

Q.    Did you ever purchase Wop's heroin from a trailer?

A.    Yes.

Q.    Who resided in that trailer?

A.    There was two different trailers, Justin and Katie and
then there was a boy named Dale.

Q.    And where were the trailers located?

A.    Justin and Katie's was in a trailer park, Bluegrass and
Dale's was Granville I believe is what it's called.  It was
just like a street of trailers.  It wasn't really a trailer
park.

Q.    Okay.  When you got to the point that you were, you
know, buying, what's the most amount of heroin you ever
purchased from Wop?

A.    I would say probably--the most amount would probably be
six bundles, which would have been a brick and a bundle, 60
bags.

Q.    And where was that?

A.    In Morgantown.  I don't--I don't have a specific
location of that particular instance.

Q.    Did--you mentioned that Wop had a girlfriend?

A.    Yes.

Q.    Approximately how many times did you get heroin from

Lang - Direct

his girlfriend?

A.   Multiple.  I don't know.

Q.   And where would you meet the girlfriend at?

A.   Oftentimes at the Mall in Westover, but anywhere.

Q.   Do you know where Wop stayed when he was in Morgantown?

A.   At first at Justin and Katie's and then at an apartment that was his girlfriend's friend or something.

Q.   Do you know where it was located?

A.   Yes.  I mean I don't--I could drive there.  I don't necessarily know what the street is called.  I don't.  It was if you got off the Sabraton exit and you went away from Morgantown, it was the very first road on the left-hand side of the street.

Q.   Now at some time, Ms. Lang, did you agree to become a confidential informant for the Mon Valley Drug Task Force?

A.   Yes.

Q.   And what was the reason that you agreed to become what we refer to as a CI?

A.   To help my husband.

Q.   Your husband had some--some legal troubles?

A.   He did.

Q.   And do you know a--a Dale Brown?

A.   Yes.

Q.   And when you were working as a confidential informant, did you make a drug purchase from Dale Brown?

Lang - Direct

A.   Yes.

Q.   And how do you know Dale Brown?

A.   I met him through my brother Jesse.

Q.   And who arranged for you to make that undercover drug purchase when you were working as a CI from Dale Brown?  Or how did it come to be that you were making that purchase from Dale Brown?

A.   I still don't know what you mean, how did it come to be?

Q.   Okay.  Why--who--who put you and Dale Brown together so that you could make that buy?

A.   Nobody put--I mean, I knew Dale Brown and I knew that Wop had somebody staying at Dale's house and Dale had product at his house.

Q.   So was Dale Brown working for Wop at this time, if you know?

A.   I weren't say Dale was working for Wop, no, because there was another boy at Dale's house who had the stuff.

Q.   Okay.  Do you know the other boy's name?

A.   Ty.

Q.   When you were working as a CI, did you make any undercover purchases at the McDonald's in Westover?

A.   Yes.

Q.   And how many undercover drug buys did you make from that particular area?

Lang - Direct

A.   Two.

Q.   And who was the first one from?

A.   Dale.

Q.   Okay.  And prior to meeting Dale on that occasion, did you speak to anyone on the phone?

A.   Wop.

Q.   And what was the purpose of you speaking to Wop on the phone prior to that--

A.   So I could tell Wop what I needed and he could send whomever with what I needed to meet me.

Q.   So you--you actually contacted Wop about making--purchasing heroin?

A.   Yes.

Q.   And ultimately he sent Dale; is that what happened?

A.   Yes.

Q.   Why did you hesitate?

A.   Because I--I think it wasn't supposed to be Dale but that's who showed up, was Dale.

Q.   Who do you think was supposed to show up?

A.   I think it was supposed to be a boy named Ty, but it--it was Dale.

Q.   Do you know this boy named Ty?

A.   I just--I just know him from when I would go to Dale's house and run inside and get stuff.  I don't know him personally, no.

Lang - Direct

Q.   Now prior to--to actually meeting with Dale and getting this heroin, did you meet with anyone from law enforcement?

A.   This particular time you're talking about?

Q.   Yes.

A.   Yes.

Q.   And what happened when you actually met with the law enforcement officers?

A.   I made a phone call or--yeah, I made a phone call. They recorded my phone call.  I made a phone call to Wop.  I said, Wop, I need to get something.  He said, what?  How much?  And then he told me where to go.

Q.   And so Wop actually decided where the deal was going to take place?

A.   Yes.

Q.   And you, of course, have had an opportunity to--to listen to--

          MS. WESLEY:  May I approach this witness, Your Honor?

          THE COURT:  Yes.

BY MS. WESLEY:

Q.   --had a chance to listen to a recording that was produced of the transaction that took place at McDonald's?

A.   Uh-huh (yes).  I saw it--heard it.

Q.   And you recognized your voice?

A.   I did.

Lang - Direct

Q.   Okay.  And you also recognized the voice of the other person that you spoke with?

A.   Yes.

Q.   And that person was Dale Brown?

A.   That I called?

Q.   No.  Actually during the transaction?

A.   Oh, it was Dale.

Q.   Okay.  And of course you've known Dale in the past, correct?

A.   Yes, I knew Dale before I knew Wop.

Q.   Okay.  And--and that--the conversation that took place between you and Dale Brown, as you listened to the recording, is it accurate between what happened between the two of you?

A.   It is.

        MS. WESLEY:  Okay.  Your Honor, I'd move to have Government Exhibit 15A admitted into evidence.

        THE COURT:  Is there any objection?

        MR. CURRY:  No, Your Honor.

        THE COURT:  All right.  The Court admits Government Exhibit 15A into evidence.

        MS. WESLEY:  Thank you.

        (Government Exhibit Number 15A admitted.)

        MS. WESLEY:  Your Honor, may we publish it?

        THE COURT:  All right.  Ladies and Gentlemen, the

Lang - Direct

Government intends to publish this recording and by that it means it intends to play it for you.  Now, there's no transcript, right?  It's just a recording.

   MS. WESLEY:  Right.

   THE COURT:  All right.  Ladies and Gentlemen, they're going to do this digitally so you should be able to hear it without the need for any earphones.  Go ahead.

 (Government Exhibit 15A published)

BY MS. WESLEY:

Q.   Now your husband, was he present with you when you made that transaction with--

A.   Yes, he was in the car.

Q.   Was he often with you when you made your transactions as a confidential informant?

A.   Yes.

Q.   And what was the discussion between you and Dale Brown about--about--was it $10?

A.   That's what--yes, that was about $10.

Q.   Okay.  You testified earlier about being taxed or middlemen?

A.   Uh-huh (yes).

Q.   Is that what was going on there?

A.   Yes.  Dale said he was charging me $210; that's for two bundles, how much.  He added on $10.  He said he was making himself $10 and I said, in that tape, well, whatever, but

Lang - Direct

you know, it's one thing and that you're getting hooked up
for bringing it to me but it doesn't matter.  I said it was
for somebody else.  That's what that said.

Q.   Okay.  And so later that day did you agree to make
another controlled buy for the Mon Valley Drug Task Force at
that same location?

A.   Yes.

Q.   Okay.  And the second transaction, did it involve Dale?
Who did it involve, the second transaction?

A.   Ty came to the second transaction.

Q.   Okay.  And, of course, we discussed Ty previously.
What did Ty look like?

A.   He was a tall, skinnier black boy.

Q.   Okay.  And where--how did it come to be that you were
going to make this second transaction from Ty?

A.   I called Wop and told him what I needed and then Ty--Ty
and--there was a car load--they showed up.

Q.   I'm sorry, what was that?

A.   There was a car full of people but then they showed up
at McDonald's eventually.

Q.   Okay.  Do you know who was in the other car?

A.   I remember Dale was in the car and Ty was in the car
and a boy named Nova was in the car.

Q.   And did you actually have the transaction with--

A.   I had the transaction with Ty.

Lang - Direct

THE COURT:  Just a minute.

(Pause)

THE COURT:  All right.  Ladies and Gentlemen, there was a 5.--earth--5.8 earthquake, point earthquake in Virginia between Richmond and Washington, D.C.  So that's what we know at this point.  I've just inquired of the--of the Court Security Officers to ask the Marshals what they direct us to do because out of an abundance of caution they are moving people out of the hospital at the VA Hospital here in Clarksburg.  All right.   I think we're safe right now or I wouldn't have you still in the courtroom but until we know whether the Marshals think we should adjourn and evacuate the courthouse I think we're safe to continue and the Marshals--the earlier inquiry said that the Marshals felt that we were safe to continue.  So at this point in time, it was between Washington and Richmond, Virginia, which is approximately 275 miles away from here, thereabouts, I think that we're okay to continue.  All right.  But I am inquiring.  I will not keep you in here one minute if I think it's not safe to be here.

BY MS. WESLEY:

Q.   Ms. Lang, I'm sorry.  Just briefly discussing that transaction that took place between you and Dale, do you know Dale's last name?

A.   Brown.

Lang - Direct

Q.   Okay.  And did you actually give Dale Brown the money when he was there for the heroin?

A.   Well, we were just talking about the second buy I did completely--

Q.   Yes.

A.   --but you're going back to the first one right now?

Q.   I am.

A.   Okay.  I was just making sure.  Yes, I gave Dale the money directly.

Q.   Okay.  And did he give you the heroin directly?

A.   He did.

Q.   Okay.  I'm sorry, I just wanted to make sure since your husband was in the car with you.

A.   No, it was me.

Q.   Now going back to--to the second transaction that took place, was your husband, Todd, with you during the second transaction?

A.   No, it was just me.

Q.   Okay.  Now--and how was it--and I may have asked you this but just for clarifying, how was it arranged that you were going to meet Ty on that second transaction?

A.   I met with the detectives first and called Wop, while wearing a wire, and then went to McDonald's and met them--set it up and then I went to meet him.

Q.   Okay.  And you said that Ty was not alone in the

Lang – Direct

vehicle?

A.   No.

Q.   Okay.  And approximately how long did you have to wait before Ty actually showed up?

A.   A long time.  I'd say about an hour.

Q.   Okay.  How did you feel about waiting an hour?

A.   I was angry.

Q.   Okay.  And so what did you do as you were waiting there for Ty to show up?

A.   Continuously called Wop.  I called Wop.

Q.   And what did you say to Wop when you called him?

A.   Where's your dude?  I've been here waiting.  Where is he at?

Q.   Okay.  And you said that you were wearing a wire during this transaction with Ty?

A.   Yes.

Q.   Okay.  And it produced an audio recording?  And it produced an audio recording?

A.   It did.

          MS. WESLEY:  Your Honor, may I approach?

          THE COURT:  Yes.

          MS. WESLEY:  Thank you.

BY MS. WESLEY:

Q.   Have you had a chance to listen to this recording?

A.   I have.

Lang - Direct

Q.    Okay.  And you recognize your voice on the recording?

A.    Uh-huh (yes).

Q.    You recognize the transaction that took place?

A.    I do.

Q.    Do you recognize the other voice on the recording?

A.    Yes.

Q.    And the other voice would have just been Ty?

A.    Yeah, it's just Ty.  Yeah, it's just Ty's.  That's the only voice you can hear.

Q.    Okay.

        MS. WESLEY:  Your Honor, I would move to admit Government Exhibit 16B into evidence.

        THE COURT:  B as in--

        MS. WESLEY:  B as in boy.

        THE COURT:  Okay.  16B.  Just a moment.

    (Pause)

        THE COURT:  As an update, Ladies and Gentlemen of the Jury, and to everyone in the courtroom, the Marshals are monitoring the situation carefully in connection with Washington.  They see no reason to evacuate at this time.

        MS. WESLEY:  Your Honor, I move to admit Government Exhibit 16B.

        THE COURT:  Any objection?

        MR. CURRY:  No, Your Honor.

        THE COURT:  All right.  The Court admits

Lang - Direct

Government Exhibit 16B.

    (Government Exhibit Number 16B admitted.)

        MS. WESLEY:  Your Honor, may we publish that?

        THE COURT:  Yes you may.  Ladies and Gentlemen, you're going to hear an audio recording as you heard after 15A was published.

    (Government Exhibit Number 16B published)

BY MS. WESLEY:

Q.   Now, Ms. Lang, whose vehicle did you get into at the end of that transaction?

A.   Todd Forbes.  And of course that's the--the officer that you were working with?

A.   Uh-huh (yes), correct.

Q.   And--and what did you do with--and going back through that transaction, did you actually give the money for the heroin to Ty?

A.   Yeah, he took it from me, yes.

Q.   And--and what did he give you in exchange?

A.   From that tape he gave me two bundles but I handed one back.

Q.   Okay.  And what was the agreed upon transaction for?  Was it for one bundle or two?

A.   Yeah, it was for one bundle.

Q.   Okay.  Why was he giving you two?

A.   Probably--I don't know.

Lang - Direct

Q.   Okay.  And--and who were you complaining to about the service that you were receiving from Ty?

A.   Wop.

Q.   And what were you hoping Wop would do for you as a result of your complaint?

A.   I don't know.

Q.   Did you just--what, did you just have a need to vent or were you expecting something?

A.   Well, I mean that's his--that's who's handling his business and if I'm not happy I gotta complain to him.

Q.   Now, at some point in time you could hear you say, you know, don't--don't yell at me.  How did things get with--with Ty during that transaction?

A.   Ty was mad at me during that transaction so when he first got there he yelled at me.

Q.   Okay.  And you have dealt with Ty in the past?

A.   I have.

Q.   Had he reacted that way in the past?

A.   No.

Q.   Did you--do you have any information that perhaps Wop had spoken to Ty about his bad service?  Only if you know the answer to them ma'am.

A.   I--Wop had told me on that day he would take care of it and later, probably another day I called Wop personally and talked to Wop and he took Ty out of Morgantown and brought

Lang - Direct

him back to Pittsburgh and was going to replace him with

somebody else.

Q.   Now when you got back in the vehicle with Sergeant

Forbes, did you give him the heroin that you had just

received from Ty?

A.   I did.

Q.   And what about the heroin that you had received earlier

that day from--from Dale Brown?  What did you do with that

heroin?

A.   I gave it to Todd.

Q.   Okay.  And that would be Todd Forbes?

A.   Todd Forbes.

Q.   And when you were making those transactions on that day

in that McDonald's area, do you know where Dale and

Todd--not Todd, or Dale Brown and Ty were, where they were

coming from?

A.   The hotel, Econo Lodge.

Q.   How far is the Econo Lodge from--

A.   Across--across the--across the parking lot.

Q.   And how do you know that they were in that Econo Lodge?

A.   Because I had gone there myself to get stuff earlier.

Q.   Okay.  Earlier that day?

A.   Correct.

Q.   And when you went there earlier that day you weren't

working as a CI?

Lang - Direct

A.   I was not.

Q.   So you admit, of course, you were still using heroin even though you were working as a CI?

A.   I was.

Q.   Okay.  And when you went there earlier that day to that Econo Lodge to get heroin, were you able to observe how much heroin they had there?

A.   No.

Q.   And who was actually in the room when you were there?

A.   Just Jules and Dale.

Q.   Okay.  Jules and Dale?

A.   Correct.

Q.   Ty wasn't in the room?

A.   I'm sorry.  I meant--I'm sorry.  I don't know what--I'm sorry.  I said that wrong.  In that room was Ty and Dale, not Jules.

Q.   And did you see any money or anything while you were in the room?

A.   I have seen money when I was in--when I have met them before, yes.

Q.   When you've met who before?

A.   Ty or Dale.

Q.   And how much money would--would you be able to observe?

A.   I don't know.  It would be wadded, folded in half and there would be a wad.  I don't know how much it was.

Lang - Direct

Q.   Okay.  Now when you went there earlier that day--let me
ask you.  How did you know that they were in town selling
from that Econo Lodge?

A.   Oftentimes when Wop would arrive in Morgantown, he
would call or send a text message to your phone--to my phone
saying he was in town; everything's good; hit him up.

Q.   And--and that translates to I'm in town and I have
heroin to sell?

A.   Yes.

Q.   Okay.  Now on this occasion--this--this day when you're
in that McDonald's area, how much time had elapsed between
you making your first controlled buy with the officers and
when you had gone there to get a piece of heroin for
yourself?

A.   I don't know.

Q.   Okay.  Do you recall how much heroin you bought for
yourself when you were there?

A.   No.

Q.   Okay.  How much were you using about that time?

A.   At least a bundle.

Q.   Now you've mentioned someone named Jules?

A.   I did.

Q.   And--and who is Jules?

A.   Jules is the guy that Wop replaced Ty with?

Q.   And how did you first meet Jules?

Lang - Direct

A.   Jules stayed at my house.

Q.   And how was it arranged that Jules was going to stay at your house?

A.   I offered it to Wop.

Q.   Okay.  And--and why was that?

A.   Because I would get the benefits of it.  I would be able to get high for allowing this guy to stay at my house.

Q.   And so you would get heroin from letting him stay at your house?

A.   Correct.

Q.   Okay.  And what--how did this whole thing transpire? Did you call Wop and offer?  Did he call you?

A.   I called Wop and offered it.

Q.   Okay.  And do you recall when approximately this occurred?

A.   No I don't.  I remember it was some time in the summer. I don't remember when.

Q.   Summer of last year?

A.   Correct.

Q.   Okay.  And what was Jules going to do from--from your residence?

A.   Just sit there and be--he was going to sit at my house and sell drugs but he didn't--he isn't the one that met anybody?

Q.   And where did you live at this time?

Lang - Direct

A.   I lived on--I lived above Lang Monument.  It's on the
main road in--I don't even know what it's called, on the
main road in Morgantown, one of the main roads.

Q.   Did you live there by yourself?

A.   No, I lived with my husband, Todd.

Q.   And this area, was it a popular area?  I mean was it
highly--in other words, was there a lot of activity around
your house where you lived at this time?

A.   What kind of activity?  Just--

Q.   I'm sorry?

A.   What kind of activity?

Q.   Well, I mean is it off a busy street?

A.   It's close to downtown.

Q.   Close to downtown?

A.   Uh-huh (yes).

Q.   And you said Jules was supposed to sell from your
house?

A.   He was supposed to sit there with Wop's product?

Q.   Okay.  And what happened though once Jules arrived?

A.   I met up with Wop and Jules.  Wop introduced the two of
us and Jules followed me down the street to my house.

Q.   Where did you meet up with Wop and Jules at?

A.   At the top of the street I lived off of under the
bridge.  That's all I can tell you.

Q.   And what happened once Jules got at your house?  Well,

Lang - Direct

did he sell heroin from your house?

A.   He--I don't like to say he sold heroin but he had the heroin that was sold from my house.

Q.   Well then who sold the heroin from your house?

A.   Well, he would give it to Dale or--Dale also came and stayed at my house and Dale or I would run and hand it to whoever was buying it because Wop would call--I guess call Jules and say so and so's needing this; so and so's needing that and then they would run and do it.

Q.   Okay.  So Wop would call Jules and Jules would tell you and Dale where to go?

A.   Correct.

Q.   And did you get to see the heroin in your house?

A.   I did.

Q.   You did not?

A.   I did.

Q.   You did.  And how much heroin did they bring to your--to your--

A.   I think, if I remember, it was about five bricks, maybe more.  I don't remember.  I just remember I saw it.  It was in a backpack.  It was quite a bit.

Q.   And approximately how many transactions--well, let me ask.  How did Dale get involved in this, if you know?

A.   I don't really remember.  I just know he showed up at my house and I don't know how that happened.

Lang - Direct

Q.   Okay.  How long did this go on in your house?

A.   Jules got to my house on a Friday evening and I told Wop he had to be gone by Sunday evening.

Q.   Now why did he have to be gone by Sunday evening?

A.   Because we lived above my husband's family's business, Lang Monument, and we didn't want traffic in and out while the store was open.

Q.   Okay.  So it was just supposed to be a weekend situation?

A.   It was.

Q.   Now approximately how many--how many times were you leaving that--your apartment to make drug deals?

A.   I don't remember.  It was often.

Q.   Any idea about how much heroin you may have sold over the course of that weekend?

A.   I don't.

Q.   Now, at some point in time did you contact law enforcement about what was going on in your residence?

A.   I called Todd Forbes to tell him.

Q.   And--and what was your reason for contacting Sergeant Forbes?

A.   Just because I had been working with him on the Wop situation.

Q.   And after you had a conversation with Sergeant Forbes, did you come up with a course of action?

Lang - Direct

A.   Yes we did.

Q.   Okay.  And so what--what were you going to do after speaking to Sergeant Forbes?

A.   I was going to pretend to get pulled over with Dale and--I was going to get pulled over with Dale and Jules in my car.

Q.   And how were you going to get Dale and Jules in your vehicle?

A.   I had been talking to Wop because it was Sunday evening.  It was time for them to leave and Wop was supposed to have come and picked them up but it never happened so I was--Wop and I had already discussed that I was going to take the boys and drop them off with him at the hotel and so I knew that that would be an opportunity.

Q.   Okay.  And so you knew that, of course, they were going to be in the vehicle with you eventually?

A.   Yes.

Q.   Okay.  And before we get to that, did they actually give you anything for the--the weekend for you selling heroin?

A.   They did.

Q.   And what did--what were you given?

A.   I got a bundle a day.  I think my husband got a bundle a day also.

Q.   Okay.  So you both got a bundle each of heroin?

Lang - Direct

A.    Yes.

Q.    Now did Dale and Julian get in your car with you?

A.    Dale and Jules?

Q.    I'm sorry, Dale and Jules.  I'm sorry.

A.    That's okay.  Yeah, they did.

Q.    And where--was anyone else in the vehicle with you?

A.    My husband was in the vehicle.

Q.    And who was driving the vehicle?

A.    Me.

Q.    Okay.  And who was in the front passenger seat?

A.    My husband.

Q.    And who was in--and I guess the other two were in the
back passenger--the back seat?

A.    They were.

Q.    And so what happened when you were driving them to meet
Wop?

A.    I got pulled over.

Q.    Okay.  And what happened--were these officers in
uniform?

A.    They were.

Q.    And of course you knew it was going to happen?

A.    Yes.

Q.    Okay.  So what happened after you were--you were pulled
over?

A.    I pulled into a parking lot and asked why I was being

Lang - Direct

pulled over like I would any other time if I was to get
pulled over and they told me their reasoning and
just--eventually it came upon can we search your car?

Q.   And did you agree?

A.   I believe I did.

Q.   And do you know if the officers found anything in the
vehicle?

A.   I know they found money and they found his backpack.  I
believe there was still some heroin in there.  I don't think
there was much.

Q.   And why--why would there not be much heroin left?

A.   Because they'd been at my house selling it for the
weekend.

Q.   Okay.  Now did Wop or Jules or Dale at this point in
time, did they realize that you were cooperating with law
enforcement?

A.   No.  Wop eventually asked me, questioned me about it,
but I just explained it just happened.  I just got pulled
over.

Q.   Now after that occurred, were you still able to have a
drug relationship with Wop?

A.   I did.  It was--it was difficult at first but
eventually--it didn't take long and, yes, I did again.

Q.   When you say "it was difficult at first",
please--please explain.

Lang - Direct

A.   He was nervous about dealing with me because he suspected that I had set his boys up because me and my husband did not go to jail.

Q.   So the other boys went to jail?

A.   Yes.

Q.   And eventually though you were able to--to deal with him, is that correct?

A.   Yes.

Q.   Do you know what Fall Fest is?

A.   Yes, it's a--it's a concert that they have at the beginning of the school year for the college students.

Q.   Okay.  Is Fall Fest a busy time for young people in Morgantown?

A.   It is.

Q.   And for people who are involved in--in drugs, is it a busy time for them as well?

A.   Everyday's a busy day for drug world.  There's no--there's no special occasions in the drug world.  It's the same every day.

Q.   Now I'm going to direct your attention then to that--that period of Fall Fest of 2010.  Were you able to make any controlled drug purchases from Wop when he's utilizing other people during this time period?

A.   Yeah, through Wop.

Q.   Through Wop?

Lang - Direct

A.    Yes.  I would call Wop, yes.  I was able to, yes.

Q.    Okay.  And was there an occasion when--on one of your
buys where Wop wanted you to pick something else for him in
addition to the money?

A.    On one of my buys the night of Fall Fest, yes.

Q.    Okay.  And what was that?

A.    He wanted me to pick him up some Corona beers.

Q.    Okay.  And do you know if that was done?

A.    It was.  It was almost ten o'clock--it was almost the
time that they can't sell beer after.  I don't know what
time that is but it was almost that time and I called Forbes
and told Forbes, Detective Forbes, that he's saying I need
to get him beer and I didn't have money so--but the
detectives went and bought it for me before so I did end up
having the beer for him.

Q.    Okay.  And how did Wop communicate to you that he
wanted beer?

A.    He said, hey, pick me up some beer.

Q.    Okay.  Now, I guess I should've asked, was it over the
telephone?

A.    Oh, yes.

Q.    Okay.  And did--was he going to reimburse you for the--

A.    I was going to take it out--I believe I was buying a
bundle.  I was going to take it out of the money I had for
the bundle and then I would just give him the receipt and

Lang - Direct

the remaining money.

Q.   Okay.  And that whole initial transaction between yourself and Wop where you were arranging, it was a phone call is where it started, correct?

A.   Yes.

Q.   And that phone call was recorded, was it not?

A.   It was.

Q.   Okay.  And you had an opportunity to listen to the phone--recording, correct?

A.   Yes.

Q.   Did it accurately reflect your conversation with Wop?

A.   It did.

          MS. WESLEY:  Your Honor, may I approach?

          THE COURT:  You may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government Exhibit Number 22 for identification.

A.   Okay.

Q.   Did you have an opportunity--of course you testified you listened to it, did it accurately reflect the conversation you had with Wop?

A.   Yes.

          MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 22 admitted into evidence.

          THE COURT:  Is there any objection?

Lang - Direct

           MR. CURRY:  No, Your Honor.

           THE COURT:  All right.  The Court admits
Government Exhibit 22.

      (Government Exhibit Number 22 admitted.)

           MS. WESLEY:  Your Honor, may we publish it?

           THE COURT:  Yes, certainly.

      (Government Exhibit Number 22 published.)

BY MS. WESLEY:

Q.   And so after that conversation--well, first, I assume
that conversation took place while you were at the Police
Department, is that correct?

A.   It did.

Q.   Okay.  And were you going to travel to the location
alone or was your husband--

A.   My husband drove me.

Q.   Okay.  And so where's this Hot Spot that you discussed
that you were going to go to meet him at?

A.   It's just--it's in between Sabraton and downtown.  It's
just on a main road that connects--it's just in between
them.

Q.   Okay.  And did you--after you met with the officers,
did you take custody of the--the beer?

A.   Yeah.  They gave me the beer and the receipt.

Q.   Okay.  The beer and the receipt.  Okay.  And what
happened after you left the police station, where did you

Lang - Direct

go?

A.   Went to--I bel--I don't know.

Q.   Were you being driven?

A.   I was being driven by my husband.  I just--I remember
the transaction.  He said to go to Hot Spot.  I remember it
was on a side street; it was not the Hot Spot that we met
at.

Q.   And is this still in the downtown Morgantown area?

A.   It's still in the same--in between downtown and
Sabraton.

Q.   Okay.  But you don't know the street?

A.   No.

Q.   Did you know who you were going to meet?

A.   No.

Q.   So how is it that you know that this is the person
you're actually going to do a transaction with when you get
to these locations?

A.   I don't.  I just--when they approach my car, I mean,
that's--that's just who it is.

Q.   So what type of car did you have at that time?

A.   A Jeep Cherokee.

Q.   And so Wop has--is Wop familiar with the vehicle that
you would be driving?

A.   Yes.

Q.   Okay.  And so you would go to a location and someone

Lang - Direct

would just approach your vehicle and then that's the first

that you will know who's actually going to do the

transaction?

A.    Yes.

Q.    Now on this actual transaction, did you know the person

who showed up?

A.    No, I never seen them.

Q.    What did the person look like?

A.    A young boy.

Q.    And when you say "young boy", what--what do you mean?

A.    You could tell he was young, very young.

Q.    And so what happened when he--when you saw him?  What

happened?

A.    He just got--I handed him the beer and receipt and he

handed me what I needed and he took the money and he left.

Q.    And you got the heroin from him?

A.    Yes.

Q.    And you had never seen this person before this night?

A.    No.

Q.    And that--when you met with the officers, they put an

audio recording on you?

A.    They did.

Q.    Okay.  And you have listened to the recording?

A.    I have.

          MS. WESLEY:  May I approach this witness, Your

Lang - Direct

Honor?

THE COURT:  You may.

BY MR. WESLEY:

Q.   And did the recording reflect that transaction that
took place between you and this person?

A.   Yes.

MS. WESLEY:  Your Honor, I would move to have
Government Exhibit 22A admitted into evidence.

THE COURT:  Is there any objection?

MR. CURRY:  No, Your Honor.

THE COURT:  All right.  The Court admits
Government Exhibit 22A.

(Government Exhibit Number 22A admitted.)

MS. WESLEY:  Your Honor, may we publish it?

THE COURT:  Yes.

(Government Exhibit Number 22A published)

BY MS. WESLEY:

Q.   At the end of that--that recording, was someone
counting something?

A.   Yeah, that was me counting the bags.

Q.   Okay.  And the bags of heroin I take it?

A.   Yes.

Q.   Do you recall how many bags of heroin you received?

A.   Ten, a bundle.

Q.   Now the transaction with this person, you said you

Lang - Direct

hadn't--you never met this person before?

A.   No, I had not.

Q.   Okay.  How did you--did he approach your vehicle as you were parked at a particular location?

A.   He did.

Q.   Okay.  And was he alone?

A.   He was.

Q.   And it was just you and your husband, Todd, in the vehicle, correct?

A.   Until he opened the door, yes.

Q.   Did he actually get inside the vehicle with you to do the transaction?

A.   I don't recall but I believe he just opened the door, you know, his body and grabbed the beers and--and left out.

Q.   Did it appear that he knew that he was supposed to get the beer or did you have to tell him to get the beer?

A.   I don't know if he knew.  I just said, here's the beer.

Q.   Okay.  Now what did you do--where did you go after you met with he godly needs of the door-body and that the Bears and left this person and you obtained the heroin?  Where did you go?

A.   I went back to the police station and gave it to Todd Forbes.

Q.   Okay.  And you gave the heroin to Todd Forbes?

A.   Yes.

Lang - Direct

Q.   And at that time do you actually sit down with the officers and tell them what happened in those transactions?

A.   I mean they hear my recordings.  I don't--there's times when we've gone over what's happened but I don't remember on that specific one or not.

Q.   Okay.  Now did you make another phone call to Wop to arrange another drug transaction on that day?

A.   No.

Q.   Later that day?

A.   That was at night.

Q.   Okay.  The morning?

A.   Yes.

Q.   Okay.  It's night-time.  Okay.  Do you recall how much time had elapsed from that first buy and the next?

A.   The first buy was at night time.  The next buy was in the morning after I had slept so, no, I don't know.

Q.   Okay.  And was the buy set up through a phone call?

A.   Yes.

Q.   Okay.  And did you have an opportunity to listen to the phone call?

A.   Yes.

          MS. WESLEY:  Your Honor, may I approach this witness?

          THE COURT:  Yes.

BY MS. WESLEY:

Lang - Direct

Q.    I'm handing you what's been marked as Government
Exhibit Number 26.  Did you have an opportunity to listen to
this phone recording?

A.    I did.

Q.    And did you recognize your voice on it?

A.    My voice only?

Q.    Well, whose voices did you recognize?

A.    Mine and the little boy's.

Q.    On the phone call?

A.    Oh, the phone call.  Mine and Wop's.

Q.    And did it accurately reflect the conversation you had
with him that day?

A.    Yes.

        MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 26 admitted into evidence.

        THE COURT:  Is there any objection?

        MR. CURRY:  No, Your Honor.

        THE COURT:  All right.  The Court admits
Government Exhibit 26.

    (Government Exhibit Number 26 admitted.)

    (Government Exhibit Number 26 published)

BY MS. WESLEY:

Q.    Now would that normally rise any type of suspicion, the
fact that you're calling again trying to get more heroin?

A.    No.

Lang - Direct

Q.   Okay.  And--and why--why not?

A.   Because I went through him multiple times a day.

Q.   Okay.  Now that recording we just heard, once again, did that take place at the police department?

A.   The phone call did, yes.

Q.   The phone call did.  Okay.  And when you were going to go to--to make the transaction, were you going to be alone?

A.   Yes.

Q.   Todd wasn't with you this time, your husband?

A.   No he was not with me.

Q.   Okay.  And what happened after you left the police department?

A.   I went down to the same spot I went to the night before.

Q.   And is daylight at this time?

A.   It is daylight.

Q.   Okay.  And--and what did you see after you got there?

A.   I don't know what I saw.

Q.   I'm sorry, what?

A.   You said what did I see?

Q.   Did you see anyone when you got there?

A.   No, not when I first got there.

Q.   Okay.  How long did you have to wait before you saw anyone?

A.   I don't remember.

Lang - Direct

Q.   Okay.  Did anyone eventually come?

A.   Yes, there was some little boy.

Q.   The same one from the previous transaction?

A.   Correct.

Q.   Okay.  And was he wearing the same clothes, if you recall?

A.   I don't recall, but I recall just in general they always had the same clothes on, but I don't--specifically I don't remember, no.

Q.   Okay.  And what happened when you met with him?

A.   He gave me the drugs.

Q.   Okay.  And it's heroin again?

A.   It is.

Q.   And you gave him the money?

A.   I did.

Q.   Okay.  And you were wearing a recording device which took a recording of--of that transaction you had with that person?

A.   Yes.

Q.   And you still do not know this person's name, is that correct?

A.   I still do not.

        MS. WESLEY:  Your Honor, may I approach her with 26A?

        THE COURT:  Yes.  It's approaching three o'clock,

Lang - Direct

Ms. Wesley, and I'm just wondering after this exhibit, would that be a good time to take a recess or--

MS. WESLEY:  If you'd like to stop now, there's going to be another exhibit after this one.

THE COURT:  All right, why don't we go ahead and do that.  Ladies and Gentlemen, before we listen to--or before we go through the process of admitting Government Exhibit 26A, let's take a recess and we'll be back in here at three o'clock.

I also wanted to read to you what I've learned about the earthquake.  Two things.  The Marshal's Office has checked this building for structural damage and there does not appear to be any and that includes water lines and gas lines.  All right.  So we're safe in here.  It appears we were on the fringe of the earthquake so it's not necessary to evacuate the building.  The Wall Street Journal alerted with the following:  "A 5.9 magnitude earthquake centered northwest of Richmond, Virginia shook much of Washington, D.C. and was felt as far north as New York City and Rhode Island.  The quake sent hundreds of people spilling into the street a block from the White House, with other buildings evacuated in North Carolina.  It is believed to be the most powerful earthquake to ever hit the D.C. area."  Okay.  So that's what we know at this point in time but we're safe and the building is good and I will confirm that again when--

Lang - Direct

before I return to the Bench and advise you accordingly.
All right.

Now, Ms. Lang, you're going to be subject to continuing
examination during this recess so just sit there until the
jury leaves the room.

Ladies and Gentlemen, please don't discuss the case
among yourselves during the recess.  Leave your notebooks
facedown on your chairs and we'll see you at, well five
after three.  That will give me time to check on everything
myself.

(Jury Out at 2:52 p.m.)

THE COURT:  All right, Ms. Lang, you may step
down.  Would you please be prepared to resume the stand at
five after three?

THE WITNESS:  Okay.

THE COURT:  All right.  Thank you.

(Witness excused from stand)

THE COURT:  I understand that your office felt it,
Ms. Wesley, and who else?  Bankruptcy--bankruptcy felt it.
So--I thought maybe a truck hit the building or something
like that because we're right here at the back of the
building but it was hard to determine.  I've never been in
an earthquake before so that was interesting, but--

MR. CURRY:  Is there anything coming out of
Richmond?  Any news coming out of Richmond?  That's a little

Lang - Direct

ominous.

THE COURT:  Well, it--it was apparently northwest
of Richmond, somewhere on the I-95 corridor I assume, but I
don't know.  I'll try to find out more information.  Oh, the
center was close to Louisa, Virginia, which would be west,
northwest, yeah you would know in particular.  So we're
getting to western Virginia, probably on the line of the
Allegheny Front.  Okay.  All right.  Thank you.

The Court stands in recess until five after three.

(Recess from 2:55 p.m., until 3:10 p.m., 08-23-2011)

THE COURT:  Okay.  With the approval of counsel,
I've got an AP update on what actually happened that
mentions aspects of what happened here in West Virginia, so
I thought I might read it to the jury.  Is that okay?  All
right.  You know, if they have friends elsewhere in the
state or in D.C. that they're concerned about and it also
mentions in Ohio.

(Jury in 3:11 p.m.)

THE COURT:  All right.  Ladies and Gentlemen, I'm
your intrepid FOX Reporter I think.  I thought you might
want an update on what actually happened since we have you
here captive as a jury and you can't look at the paper.

(The Court gave the Jury an AP update.)

THE COURT:  Okay.  So now you have all the
information and as the hardy souls we all are, we will

Lang - Direct

continue with our trial.  You may continue with your direct

examination of the witness.  Thank you.

RESUME DIRECT EXAMINATION

MS. WESLEY:  Your Honor, may I approach the

witness with Exhibit 26A?

THE COURT:  You may.

BY MS. WESLEY:

Q.   Have you had an opportunity to listen to 26A?

THE COURT:  Now could you please speak up so the

jury can hear you?

MS. WESLEY:  I'm sorry.

BY MS. WESLEY:

Q.   Have you had an opportunity to listen to that?

A.   I have.

Q.   And did it accurately--did you recognize your voice on

it?

A.   I did.

Q.   And the voice of the person that you were doing the

transaction with?

A.   I did.

Q.   Okay.  And is it an accurate reproduction of what

occurred during that transaction?

A.   Yes.

MS. WESLEY:  Your Honor, I'd move to have

Government Exhibit 26A admitted into evidence.

Lang - Direct

THE COURT:  26A.  All right.  Is there an objection to the admission of 26A?

MR. CURRY:  No, Your Honor.

THE COURT:  All right.  Then the Court admits U.S. Exhibit 26A.

(Government Exhibit Number 26A admitted.)

MS. WESLEY:  Your Honor, may we publish it?

THE COURT:  Yes, you may.

(Government Exhibit Number 26A published.)

BY MS. WESLEY:

Q.   Ms. Lang, was that the same person you had dealt with on the previous transaction?

A.   Yes, this was that young, little boy.

Q.   I'm sorry?

A.   Yes, this was that young--younger boy.

Q.   Okay.  Now what did you do after that drug transaction? Where did you go?

A.   Back to the police station.

Q.   And who did you meet with once you arrived there?

A.   Todd Forbes.

Q.   And what did you do with the drugs that you purchased?

A.   Handed it to him.

Q.   Now was there another phone call later that day to arrange another drug transaction?

A.   It was almost immediately.

Lang - Direct

Q.   Okay.  And who was that phone call to?

A.   Wop.

Q.   Now since it was almost immediately, would that be a strange occurrence for you to call him back almost immediately?

A.   No.

Q.   And why not?

A.   Because often times I would go buy a bun, sell it, make my profit off of it and then go buy my own.

Q.   Okay.  And so I want to hand you what's been marked as Government Exhibit Number 28.

        MS. WESLEY:  May I approach this witness, Your Honor?

        THE COURT:  Yes.

BY MS. WESLEY:

Q.   Did you listen--have an opportunity to listen to the phone call between yourself and Wop?

A.   Yes.

Q.   Okay.  And you recognize your voice?

A.   I do.

Q.   Did you recognize his voice?

A.   I do.

Q.   Did it accurately depict the conversation that took place between the two of you?

A.   Yes.

63

Lang - Direct

      MS. WESLEY:  Your Honor, I'd like to move to have Government Exhibit Number 28 admitted into evidence.

      THE COURT:  Is there any objection?

      MR. CURRY:  No, Your Honor.

      THE COURT:  All right.  Government Exhibit 28 is admitted.

    (Government Exhibit Number 28 admitted.)

      MS. WESLEY:  May we publish it?

      THE COURT:  Yes.

    (Government Exhibit Number 28 published.)

BY MS. WESLEY:

Q.   Now, Ms. Lang, were you going to be alone during this transaction?

A.   Yes.

Q.   So you're going to be on foot and not driven by your husband?

A.   Correct.

Q.   And this phone call that we just listened to, did it take place again or in other words were you at the police department when the recording was produced?

A.   Yes.

Q.   Okay.  And did they give you money?

A.   Yes.

Q.   And did they equip you with a device to make a recording of the transaction?

64

Lang - Direct

A.   Yes.

Q.   And do you recall where you traveled to after you left the police department?

A.   It was just directly across the street from where I had been meeting him.

Q.   All right.  And who did you see after you arrived at that location?

A.   The young boy.

Q.   Was it the same young boy that you had met with on the two previous transactions?

A.   Yes.

Q.   Okay.  And what happened after he arrived?  Did you actually go through with the transaction?

A.   Yes we did.

Q.   You gave him the money?

A.   Yes.

Q.   And he gave you the drugs?

A.   Yes.

Q.   And your interaction with him was recorded from the audio recording device that you were wearing?

A.   Yes.

        MS. WESLEY:  Your Honor, may I approach?

        THE COURT:  Yes.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as 28A and

Lang - Direct

previously you listened to that recording?

A.    Yes.

Q.    And you recognize your voice on it?

A.    I do.

Q.    And the young person that you met with?

A.    Yes.

Q.    And it accurately reflected what took place between the
two of you?

A.    Yes.

        MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 20A admitted into evidence.

        THE COURT:  Is it 20A or 28A?

        MS. WESLEY:  28A, I'm sorry.

        THE COURT:  28A.  All right.  Government Exhibit
28A is admitted if there's no objection.

        MR. CURRY:  No objection, Your Honor.

        THE COURT:  All right.  It may be published.

    (Government Exhibit Number 28A admitted.)

    (Government Exhibit Number 28A published.)

BY MS. WESLEY:

Q.   Now where did you go after that meeting with that
individual?

A.   I went back to the police station.

Q.   Okay.  And who did you meet with after you got back at
the police station?

Lang - Direct

A.   A different detective.

Q.   Do you recall that detective's name?

A.   No.

Q.   And what did you do with the drugs that you received?

A.   I gave it to him.

Q.   Okay.  Now in your testimony you referred to bags.
When you refer to bags do you mean stamps?

A.   Yes.

Q.   Okay.  So to you a bag is a stamp?

A.   Uh-huh (yes).

Q.   These transactions that took place in that
series--those series of a day, they all were within the Fall
Fest of last year, were they not?

A.   Yes.

Q.   Ms. Lang, are you still using heroin?

A.   No.

Q.   When did you last use heroin?

A.   Sept--well, the last day of August last year.

Q.   2010?

A.   Yes.

Q.   And how did you begin the process of weaning yourself
from heroin?

A.   I just moved to Kentucky, in with my family and just
went through the sickness.

Q.   Did you go through--did you get any type of assistance

Lang - Cross

from Suboxone or some other drug to help beat your--

A.   A day or two before I moved I had taken a Suboxone but once I left West Virginia I--I had nothing.

Q.   So you've been clean since October 2010?

A.   I've been clean since September 1st, 2010.

        MS. WESLEY:  Okay.  I have nothing further of this witness, Your Honor.

        THE COURT:  All right.  Cross-examination and Ladies and Gentlemen, Mr. Curry's hip is bothering him and he has requested, and I have given him permission, to cross-examine from a seated position at counsel's table.  He means no disrespect to either you or to me; it's just a necessity.  Thank you.  Mr. Curry.

        MR. CURRY:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CURRY:

Q.   Ms. Lang, when did--when were you--did you get clean?

A.   Yes.  Yes.

Q.   When was that?

A.   I got clean at the end of August of last year.

Q.   Do you remember coming in and testifying before the Grand Jury on September 8th?

A.   Not on that date, but I remember.  I remember coming in, yes.

Q.   Were you clean then?

Lang - Cross

A.   No, I wasn't clean whenever I went to Court.

Q.   So if I represent to you that that was on September 8th, you've just got your dates wrong?

A.   Yeah, I guess so.

Q.   And you're saying you got clean without having any medical assistance, is that correct?

A.   Correct.

Q.   Have you been represented by a lawyer in any of this process?

A.   No.

Q.   Have you been arrested?

A.   Since I've been?

Q.   Since you've been cooperating with Government.

A.   I've been arrested one time but not for this, nothing related to this.

Q.   Have you been prosecuted for anything related to drugs?

A.   No.

Q.   Do you expect to be prosecuted for anything related to drugs?

A.   No.

Q.   Do you expect to be arrested for anything related to drugs?

A.   No.

Q.   Do you believe that you have an arrangement with the Government that you're not going to be arrested or

Lang - Cross

prosecuted?

A.   I've just never been in trouble with drugs.

Q.   I beg your pardon?

A.   I have never been in trouble with drugs.

Q.   And you don't believe you're going to get in trouble with drugs?

A.   No, I don't use them.  They're not in my life any more.

Q.   Okay.  Now you distributed heroin, correct?

A.   Yes.

Q.   And your husband distributed heroin?

A.   Yes.

Q.   How much?

A.   Depend--it just--if we bought a brick, then that's how much we distributed.

Q.   Okay.  Who did you distribute it to?

A.   Different people throughout the community that were also drug addicts.

Q.   Over what period of time did you distribute heroin?

A.   I distributed it for a long time.

Q.   Well, does that mean more than a year?

A.   Yes.

Q.   More than two years?

A.   Ah, I'd say around two years probably.

Q.   Was your husband also distributing it?

A.   Not for the same time period.

Lang - Cross

Q.   For some time period he was?

A.   Yes.

Q.   Does he likewise believe that he's not going to get in trouble over this?

       MS. WESLEY:  Objection, Your Honor.

       THE COURT:  Sustained.

BY MR. CURRY:

Q.   You became a CI for what reason?

A.   To help my husband.

Q.   Was the real estate where you were selling out of owned by you?

A.   No.

Q.   Was the automobile you were selling out of owned by you?

A.   My husband, no.

Q.   Now you say you met the individual that you identified as Wop through a guy named Right, is that correct?

A.   That's correct.

Q.   Do you have any other information about the guy named Right?

A.   What other information do you mean?

Q.   Well, any other names?

A.   No, that's his birth name, Right.

Q.   Do you have a last name?

A.   I don't know it.  We don't give last names in the drug

Lang - Cross

world.

Q.   Have you ever run into him again?

A.   Since when?

Q.   Since you met Wop through him?

A.   Yes, he's a drug addict also.

Q.   When did you last see him?

A.   Sometime before I moved to Kentucky.

Q.   Now you're indicating that the individual you've identified as Wop was not your Number one person?

A.   No.

Q.   Who was your number one person?

A.   It doesn't--he's not here.  He's not in this courtroom.

Q.   Okay.  Did he have a name.

A.   Yeah, he had a name.

Q.   Okay.  What was the name?

A.   I mean, does it matter?  His name--I mean there was a bunch of people I went through honestly.

Q.   Well, who did you consider--

A.   I went through a guy named Arrack.  I went through a guy named Jewell--what was it.  A guy named Marcus and his brother.  I don't--I mean I don't remember everybody's names, but those were my main people around that time.

Q.   Now you say that the most you ever purchased from Wop was six bundles.  Is that correct?

A.   That's what I said.

Lang - Cross

Q.   And do you recall when that was?

A.   No, I don't.

Q.   Do you recall even what year that was?

A.   It was towards the summer of the year that all this went down, last year.

Q.   Do you recall where that was?

A.   It was in Morgantown.  It was one of the instances in Morgantown.  Location, no.

Q.   Time of day, do you recall that?

A.   No.

Q.   So you know you bought six bundles but you don't know time of day, where, other than it was in Morgantown?

A.   No.

Q.   Now when you started working as a CI obviously the police officers knew that you were a drug addict, correct?

A.   Yes.

Q.   Did you also inform them that you were selling drugs?

A.   No.

Q.   Okay.  Did they ask?

A.   No.

Q.   How long did you work as a CI?

A.   Not long.

Q.   Maybe a month?

A.   Maybe from the time I started till--a month, yes.

Q.   Did you inform the police that you continued to use

73

Lang - Cross

drugs during that time?

A.   No I did not inform them.

Q.   Did you inform the police that you continued to sell drugs during that time?

A.   No.

Q.   I take it since you got clean some time, let's say right after the end of August, 2010 that the last time you purchased heroin was after these controlled buys that we've heard, is that correct?

A.   Would you say that again?

Q.   Okay.  We have heard some controlled buys you made up through the 24th of August, correct?

A.   Correct.

Q.   And if you got clean some time right after the end of August I assume you kept purchasing heroin after that?

A.   I purchased heroin until-- yes.  The answer is yes.

Q.   Okay.  Did you also continue to sell heroin up until then?

A.   Yes.

Q.   Now you didn't go to the police out of a spirit of community mindedness, did you?

A.   No.

Q.   You went because you wanted to help your husband who was in trouble, correct?

A.   Correct.

Lang - Redirect

Q.   And to the best of your knowledge you're not going to have any negative consequence with the law as a result of your activities, is that correct?

A.   What do you mean negative consequences?

Q.   You're not going to be fined; you're not going to go to jail; you're not going to lose anything?

A.   No, I'm not going to because I didn't get in trouble.

        MR. CURRY:  Okay.  I have no other questions of this lady, Your Honor.

        THE COURT:  All right.  Thank you.  Is there any cross--redirect, excuse me?

        MS. WESLEY:  Just briefly.

                    REDIRECT EXAMINATION

BY MS. WESLEY:

Q.   When you say you didn't get in trouble, explain what you mean by that?

A.   When I just said I didn't get in trouble to him?

Q.   Yes.

A.   I'm not--I didn't get caught selling anything.  I haven't been in trouble.  I haven't--as far as I know there's no evidence against me, even though I'm openly admitting, yeah, I did stuff wrong but I have never been caught doing it and so there's no evidence to prosecute me for anything I've done.

Q.   So basically, to your knowledge, the law enforcement

Lang - Redirect

doesn't have anything that they can charge you with other
than your own admissions about what you've done?

A.    Correct.

Q.    Okay.  Now, additionally ma'am, you certainly don't
suggest that it's okay to sell drugs, right?

A.    No.

Q.    Just that you were never caught?

A.    I was never caught.

          MS. WESLEY:  I have nothing further, Your Honor.

          THE COURT:  Any further cross-examination?

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right.  Thank you.  Is this
witness subject to recall?

          MR. CURRY:  No ma'am.

          THE COURT:  Thank you.  You may step down, Ms.
Lang.  You're excused as a witness and free to go.

     (Witness excused)

          THE COURT:  The Government may call its next
witness.

          MS. WESLEY:  Your Honor, the Government calls
Staci Taylor.

          THE COURT:  Staci Taylor.

          MS. WESLEY:  Your Honor, she's one of the
chemists.

          THE COURT:  All right.  Ladies and Gentlemen,

Taylor - Direct

she's S-t-a-c-i, T-a-y-l-o-r.  She's a Forensic Chemist with the West Virginia State Police, I believe.

    (Pause)

        THE COURT:  All right, Ms. Taylor, good afternoon. Would you approach the Clerk in the red jacket at the front of the courtroom and she will administer the oath to you before you take the witness stand.

        STACI TAYLOR, GOVERNMENT'S WITNESS, SWORN

        THE CLERK:  Thank you.  You may take the witness stand.  The witness is Staci Taylor, T-a-y-l-o-r.

        THE COURT:  All right.  You may proceed.

        DIRECT EXAMINATION

BY MS. WESLEY:

Q.  What is your occupation?

A.  I'm a Forensic Chemist for the West Virginia State Police in the Drug Identification Section of the Forensic Laboratory.

Q.  And how long have you been employed in that capacity?

A.  Since January of 2004.

Q.  And what is your educational background for you to hold that position?

A.  I have a Bachelor of Science degree in Chemistry that I received from West Virginia State College May of 2002.

Q.  And what type of training do you possess for your position with the West Virginia State Police Forensic

Taylor - Direct

Laboratory?

A.   The West Virginia State Police puts on an extensive training program in the areas of vegetation, pills, powders and liquids.  Upon the completion of that training I do a written proficiency examination and an unknown practical examination.  Upon the completion of those I am approved to begin working case work.

Q.   And have you had an occasion to chemically analyze a substance to determine if the substance contains a narcotic type drug?

A.   Yes ma'am, I have.

Q.   Okay.  And have you also had an occasion to analyze a substance to see if it contains a non-narcotic type drug?

A.   Yes ma'am.

Q.   Approximately how many times have you analyzed substance for the presence of a narcotic type drug?

A.   I have worked thousands of cases that include narcotic and non-narcotic.  Approximately ninety percent of those contain narcotic substances.

Q.   And when you say thousands of cases, you mean thousands of cases in your career?

A.   Yes ma'am, thousands of cases at the West Virginia State Police since I began processing case work in the end of 2004.

Q.   Have you had an occasion to chemically analyze a

Taylor - Direct

substance to determine whether or not it contains a
detectable amount of heroin?

A.    Yes ma'am, I have.

Q.    Approximately how many times have you analyzed a
substance to determine if it has a detectable amount of
heroin in it?

A.    Hundreds of cases for the presence of heroin.

Q.    Have you had an occasion to chemically analyze a
substance to determine whether or not it contains cocaine
base?

A.    Yes ma'am, I have.

Q.    Approximately how many times have you analyzed a
substance for that?

A.    Several hundred.  Approximately forty percent of the
cases that I've analyzed have been for the presence of
cocaine or cocaine base.

Q.    And based upon, of course, your testimony it's a part
of your regular duties to analyze substances for either the
presence of a narcotic or a non-narcotic type drug, is that
correct?

A.    Yes ma'am it is.

Q.    Have you had an occasion to qualify as an expert
witness to testify in court?

A.    Yes I have.

Q.    Approximately how many times have you been qualified as

Taylor - Direct

an expert witness?

A.   Approximately 50 times in Magistrate, Circuit and Federal Court.

        MS. WESLEY:  Your Honor, I'd like to move to have Ms. Taylor declared as an expert in the field of chemistry and the analysis of narcotic and non-narcotic drugs.

        MR. CURRY:  I have no objection to her qualifications, Your Honor.

        THE COURT:  All right.  In light of the fact that there's no objection and no request to voir dire the witness by defense counsel, the Court admits Ms. Taylor as an expert qualified to offer testimony in the area of forensic chemistry, particularly the analysis of drug substances.

        MS. WESLEY:  Thank you.  Your Honor, may I approach this witness?

        THE COURT:  You may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government Exhibit Number 1, which also contains Government Exhibit Number 2 for identification.  What is Government Exhibit Number 1?

A.   Government Exhibit Number 1 is a manila envelope.  It appears to be the envelope that was sent from our Central Evidence Receiving Section.  It has the initials across the seal of one of our Central Evidence Receiving Technicians.

Taylor - Direct

Q.    And who sent it to you?

A.    I would see my case number before I can answer that.
Government's Exhibit 2 has my case number on it, which is
D10-2376.

Q.    Okay.

A.    That was submitted to the Laboratory by First Sergeant
Todd Forbes.

Q.    And do you recall when you received it?

A.    It was received October 6, 2010.

Q.    And did you--what did you do with Government Exhibit
Number 1 when you received it?

A.    When the evidence is received at the Laboratory it's
received in the Central Evidence Receiving Section.  It's
given a unique identifying number that's specific only to
that piece of evidence.  In this case it's the D10-2376.
It's logged into our computer system and is then stored into
a vault which it remains until I notify Central Evidence
Receiving Technicians I need that particular piece of
evidence for testing.  I will notify them of that.  They
will remove it from the vault.  It will be transferred into
my custody.  The transaction is recorded electronically by
scanning a bar code.  That's recorded into the computer
system.  The evidence will go into my custody.  I will store
it in my personal locker until which time I begin processing
and doing the analysis.

Taylor - Direct

Q.    Okay.  And did you actually make any analysis on Government Exhibit Number 1?

A.    Yes ma'am I did.

Q.    What type of analysis did you perform on it?

A.    I received several packages of a tan powder.  The analysis on that is to weigh the powder.  I will then do preliminary testing, which gives me an indication of what type of drug may or may not be present.  I will then use instrumentation to confirm what the preliminary test indicated.

Q.    And from the test that you actually performed on Government Exhibit Number 1, did you form an opinion as to what is contained in that exhibit?

A.    Yes ma'am I did.

Q.    And what is your opinion based upon the analysis that you performed?

A.    All the items contained in Government's Exhibit Number 1 contain heroin, a Schedule I Controlled Narcotic substance.

Q.    And Government Exhibit Number 1, has it been continuously under your care and control other than when it was out for your--when you performed analysis on it?

A.    When I perform the analysis it remains in my control. When I'm complete with analysis, generate my report.  My report is reviewed by another analyst.  I then will return

Taylor - Direct

the evidence back to Central Evidence Receiving and it will remain there until they resubmit it back to the officer.

Q.    Okay.  And do you recall when Government Exhibit Number 1 was resubmitted back to the officer?

A.    It was returned via certified mail March 9th, 2011.

Q.    Okay.  Now did you actually create a laboratory report documenting your findings and your conclusions based upon your analysis of Government Exhibit Number 1?

A.    Yes ma'am I did.

Q.    Okay.  And is that--your conclusions anywhere up there? Government Exhibit Number 2?

A.    Yes ma'am.  Government's Exhibit Number 2 is an original copy of my Laboratory Report for my case number D10-2376.

Q.    Okay.  And it basically details your findings based upon your analysis?

A.    Yes ma'am.  It has the evidence that I received, the results of my analysis and my signature at the bottom.

Q.    And is it in the same condition as when you prepared it?

A.    Yes ma'am it is.

        MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 2 admitted into evidence.

        THE COURT:  Is there any objection to the admission of Government Exhibit Number 2?

Taylor - Direct

          MR. CURRY:  No, Your Honor.

          THE COURT:  Then Government Exhibit Number 2 is

admitted.

     (Government Exhibit Number 2 admitted.)

BY MS. WESLEY:

Q.   Now, Ms. Taylor, based upon your analysis, did you

determine any actual drug weight for the heroin that you

analyzed in Government Exhibit Number 1?

A.   Yes ma'am I did.

Q.   And what drug weights did you determine based upon your

analysis?

A.   I have--my item number 1.1 was one wax paper bag

containing tan powder weighing approximately 0.028 gram.

Item 1.2 was another wax paper bag containing tan powder

weighing approximately 0.013 gram.  Item 1.3 was another wax

paper bag containing tan powder weighing approximately 0.031

gram.  Item 1.4, another wax paper bag containing tan powder

weighing approximately 0.033 gram.  Item 1.5, another wax

paper bag containing tan powder weighing approximately 0.023

gram.  Item 1.6 was another wax paper bag containing tan

powder weighing approximately 0.024 gram.  Item 1.7, another

wax paper bag containing powder weighing approximately 0.024

gram.  Item 1.8 was a wax paper bag containing tan powder

weighing approximately 0.023 gram and my item 1.9 was a

total of 42 wax paper bags, each containing tan powder.  The

Taylor - Direct

weight of the tan powder alone was approximately 1.33 gram.

Q.   Now, ma'am, I want to bring to your attention
Government Exhibit Number 14 and contained in Government
Exhibit Number 14 is also Government Exhibit Number 15.

         MS. WESLEY:  May I approach this witness, Your
Honor?

         THE COURT:  Yes you may.

BY MS. WESLEY:

Q.   In reference to Government Exhibit 14, who sent it to
you?

A.   This evidence was also submitted by First Sergeant Todd
Forbes.

Q.   And when did you receive it?

A.   This was also received October 6, 2010.

Q.   Okay.  And did you follow the same procedure as you
followed with Government Exhibit Number 1 and how you
handled that exhibit?

A.   Yes ma'am I did.

Q.   And did you perform any analysis on that exhibit?

A.   Yes ma'am.

Q.   Okay.  And what type of analysis did you perform on
Government Exhibit Number 14?

A.   I performed the same analysis.  I weighed the samples
that I received.  I performed the preliminary testing and
the confirmatory testing on the instrumentation.

Taylor - Direct

Q.   And based upon the analysis that you performed were you able to form an opinion as to what is contained in Government Exhibit Number 14?

A.   Yes ma'am I was.

Q.   Okay.  And what is your opinion?

A.   All the items in Government's Exhibit 14 contain heroin, a Scheduled I Controlled Narcotic substance.

Q.   And Government Exhibit Number 14, when it was in your care, it was continuously under your care, custody and control, is that correct ma'am?

A.   Yes ma'am it is.

Q.   And did you prepare a report documenting your findings for Government Exhibit Number 14?

A.   I did.

Q.   And Government Exhibit Number 15 is up there with you. Is that your report detailing your findings for that exhibit?

A.   Yes it is.  Government's Exhibit 15 is my original Laboratory Report for my case number D10-2359.

Q.   And is it in the same condition now as when you prepared it?

A.   Yes ma'am it is.

     MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 15 admitted into evidence.

     THE COURT:  Any objection?

                          Taylor - Direct

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right.  Government Exhibit 15 is
admitted.

     (Government Exhibit Number 15 admitted.)
BY MS. WESLEY:
Q.   Ms. Taylor, Government Exhibit 15, does it detail your
weights based upon your analysis of Government Exhibit
Number 14?
A.   Yes ma'am it does.
Q.   And what drug weights did you conclude based upon your
analysis?
A.   My item 1.01, which is a wax paper bag containing
tan--or off-white powder, excuse me, was weighing
approximately 0.025 gram.  My item 1.02 was a wax paper bag
containing off-white powder, weighing approximately 0.030
gram.  My item 1.03, another wax paper bag containing
off-white powder weighing approximately 0.040 gram.  My item
1.04 was a wax paper bag containing off-white powder
weighing approximately 0.027 gram.  My item 1.05 was a wax
paper bag containing off-white powder weighing approximately
0.032 gram.  Item 1.06, a wax paper bag containing off-white
powder weighing approximately 0.020 gram.  Item 1.07 was a
wax paper bag containing off-white powder weighing
approximately 0.011 gram.  Item 1.08 was a wax paper bag
containing off-white powder weighing approximately 0.028

Taylor - Direct

gram.  My item 1.09 is a wax paper bag containing off-white powder weighing approximately 0.020 gram.  Item 1.10 was 11 wax paper bags each containing off-white powder with a total weight of 0.24 gram for the powder alone.

Q.   Now, ma'am, I want to bring your attention to Government Exhibit Number 16 and contained within it is Government Exhibit Number 17.

            THE COURT:  Your Honor, may I approach?

            THE COURT:  Yes.

BY MS. WESLEY:

Q.   Ma'am, who sent you Government Exhibit Number 16?

A.   It was also submitted by First Sergeant Todd Forbes.

Q.   And when did you receive it?

A.   October 6, 2010.

Q.   And what did you do with it when you received it?

A.   I performed the same procedure I described earlier.  I received it from Central Evidence Receiving.  I then began doing my case work on it, which includes weighing the sample and performing the preliminary and confirmatory testing to identify the substance.

Q.   And were you able to form an opinion based upon the analysis that was performed on it?

A.   Yes ma'am.

Q.   Okay.  And what is your opinion as to the nature of the substance contained in Government Exhibit Number 16?

Taylor - Direct

A.   The items contain heroin, a Schedule I Controlled
Narcotic substance.

Q.   And was Government Exhibit number 16 in your continuous
care and control while it was at the State Police
Laboratory?

A.   From the time I picked it up.  It was originally in the
Central Evidence Receiving vault.  Then it was in my
custody.  Then it returned back to the Central Evidence
Receiving vault and then it was returned to the submitting
officer.

Q.   Do--did you prepare a report detailing your
conclusions?

A.   Yes ma'am I did.

Q.   Please look at Government Exhibit Number 17.  Does
Government Exhibit 17 document your conclusions based upon
your analysis of Government Exhibit Number 16?

A.   Yes ma'am it does.

Q.   Is it in the same condition as when you prepared it?

A.   Yes it is.

        MS. WESLEY:  Your Honor, I would move to have
Government Exhibit 17 admitted into evidence.

        THE COURT:  Any objection?

        MR. CURRY:  No objection, Your Honor.

        THE COURT:  All right.  Government Exhibit 17 is
admitted.

Taylor - Direct

(Government Exhibit Number 17 admitted.)

BY MS. WESLEY:

Q.   And, Ms. Taylor, you've also of course in your findings in Exhibit 17 you list the weights of the heroin that you analyzed?

A.   Yes ma'am I did.

Q.   And so it's detailed there on the report where anyone can look at it and determine what those weights are?

A.   That's correct.

Q.   I want to direct your attention then to Government Exhibit 18 and contained within it is Government Exhibit 19.

          MS. WESLEY:  May I approach, Your Honor.

          THE COURT:  Yes you may.

BY MS. WESLEY:

Q.   What is Government's Exhibit 18?

A.   Government Exhibit 18 is evidence I received from First Sergeant Todd Forbes on October 6, 2010.  It has--it is my case number D10-2373.

Q.   And did you perform the same analysis on Government Exhibit 18 that you detailed that you had performed on the previous exhibits?

A.   Yes ma'am I did.

Q.   And based upon your analysis did you reach any conclusions as to any type of substance that may be contained in Government Exhibit Number 18?

Taylor - Direct

A.   Yes I did.

Q.   And what conclusions did you reach?

A.   I again received several wax paper bags in this case. My item 1.01 was a wax paper bag containing off-white powder residue.  I did not analyze that.  My items 1.02 through 1.09, 1.11 through 1.37 contained heroin, a Schedule I Controlled Narcotic substance.  Item 1.10 contains no identifiable controlled substances.

Q.   And directing your attention to item number 1.37 what was contained in that exhibit?

A.   Item 1.37 was 85 wax paper bags, each containing off-white powder and that contained heroin, a Schedule I Controlled Narcotic substance.

Q.   And how much heroin, in terms of weight, was involved in item 1.37?

A.   The weight of the powder alone was 2.24 grams.

Q.   Now did you prepare a report detailing your findings for Government Exhibit Number 18?

A.   Yes ma'am I did.

Q.   And are your conclusions found in Government Exhibit Number 19?

A.   Yes ma'am they are.

Q.   And Government Exhibit 19, is it in the same condition as when you Prepared it?

A.   Yes it is.

Taylor - Direct

MS. WESLEY:  Your Honor, I'd move to have Government Exhibit Number 19 admitted into evidence.

THE COURT:  Is there any objection?

MR. CURRY:  No objection, Your Honor.

THE COURT:  Government Exhibit 19 is admitted.

(Government Exhibit Number 19 admitted.)

MS. WESLEY:  Your Honor, may I approach this witness with Government Exhibit Number 23 and 23A?

THE COURT:  Yes you may.

BY MS. WESLEY:

Q.   When did you first receive Government Exhibit Number 23?

A.   Government's Exhibit 23 is my case number D10-2371.  It was received on October 6, 2010 by First Sergeant Todd Forbes.

Q.   And did you follow the same procedure with Government Exhibit 23 that you did with the other drug evidence that was submitted to the laboratory?

A.   Yes ma'am I did.

Q.   Did you perform the same analysis and testing that you performed on the other drug substances that were submitted?

A.   Yes I did.

Q.   And were you able to reach a conclusion based on the analysis that you performed?

A.   I was.

Taylor - Direct

Q.    Okay.  And what is your opinion as to Government
Exhibit Number 23?

A.    The items in Government's Exhibit 23 contain heroin, a
Schedule I Controlled Narcotic substance.

Q.    And did you prepare a report as reflected in Government
Exhibit 23A?

A.    Yes I did.

Q.    And does it detail your findings as a result of your
testing of Government Exhibit Number 23?

A.    Yes it does.

Q.    And is your report in the same condition as when you
first prepared it?

A.    Yes ma'am.

        MS. WESLEY:  Your Honor, I would move to have
Government Exhibit 23A admitted into evidence.

        THE COURT:  Is there any objection?

        MR. CURRY:  No, Your Honor.

        THE COURT:  Government Exhibit 23A is admitted.

    (Government Exhibit Number 23A admitted.)

        MS. WESLEY:  Your Honor, I'd like to approach this
witness with Government Exhibit 25 and 25A.

        THE COURT:  You may.

BY MS. WESLEY:

Q.    When did you first receive Government Exhibit 25?

A.    Government's Exhibit 25 is my case number D10-2372.  It

Taylor - Direct

was also received October 6, 2010 and it was submitted by First Sergeant Todd Forbes.

Q.   And did you perform the same analysis that you performed on the previous drug exhibits?

A.   Yes ma'am I did.

Q.   And did you maintain and secure it in the same fashion that you had done with the previous exhibits as well?

A.   Yes I did.

Q.   Based upon your analysis were you able to make any type of determinations as to what is contained in Government Exhibit 25?

A.   Yes ma'am.

Q.   And what conclusions did you reach upon completing your examination?

A.   My item 1.1 contains heroin, a Schedule I Controlled Narcotic substance and my item 1.2 contains cocaine base, a Schedule II Controlled Narcotic substance.

Q.   Okay.  And cocaine base is the same as crack cocaine?

A.   Yes ma'am it is.

Q.   Okay.  And would you have to perform a different type of test to determine that it was cocaine base?

A.   I still would perform preliminary and confirmatory testing just as I do for the heroin.

Q.   And of course you're confirmatory testing to firmly establish that it is cocaine base?

Taylor - Direct

A.   Yes ma'am.

Q.   Now did you prepare a report in Exhibit 25A documenting your conclusions?

A.   Yes ma'am.

Q.   And is it in the same condition as when you prepared Exhibit 25A?

A.   Yes it is.

     MS. WESLEY:  Your Honor, I would move to have Government Exhibit 25A admitted into evidence.

     THE COURT:  Is there any objection?

     MR. CURRY:  No objection, Your Honor.

     THE COURT:  All right.  Government Exhibit 25A is admitted.

    (Government Exhibit Number 25A admitted.)

BY MS. WESLEY:

Q.   I want to hand you what's been marked as Government Exhibit 27 and 27A for identification.

     MS. WESLEY:  May I approach, Your Honor?

     THE COURT:  You may.

BY MS. WESLEY:

Q.   When did you receive Government Exhibit 27?

A.   Government Exhibit 27 is my case number D10-2377.  I received that also on October 6, 2010 from First Sergeant Todd Forbes.

Q.   And did you perform the same type of analysis as on the

Taylor - Direct

previous exhibits?

A.   Yes ma'am I did.

Q.   And you maintained it and stored it in the same fashion

A.   Yes ma'am.

Q.   Did you reach a conclusion based upon your analysis of Government Exhibit 27?

A.   Yes ma'am.

Q.   And what conclusions did you reach upon your--upon completion of your examination?

A.   The items in Government's Exhibit 27 contain heroin, a Schedule I Controlled Narcotic substance.

Q.   And Exhibit--is Exhibit 27A a report detailing your findings regarding your analysis of Exhibit 27?

A.   Yes ma'am it is.

Q.   And is it in the same condition as when you prepared it?

A.   Yes it is.

          MS. WESLEY:  Your Honor, I would move to have Government Exhibit 27A admitted into evidence.

          MR. CURRY:  No objection, Your Honor.

          THE COURT:  All right.  The Court admits Government Exhibit 27A.

     (Government Exhibit Number 27A admitted.)

          MS. WESLEY:  Your Honor, may I approach this witness with Government Exhibits 29 and 29A?

Taylor - Direct

THE COURT:  Yes.

BY MS. WESLEY:

Q.   When did you first receive Exhibit 29?

A.   Government's Exhibit 29 is my case number D10-2358.  It was received on October the 6th, 2010 from First Sergeant Todd Forbes.

Q.   And did you maintain Exhibit 29 in the same fashion that you did with the other exhibits?

A.   Yes ma'am I did.

Q.   And did you perform the same type of analysis as you did on the previous exhibits?

A.   Yes I did.

Q.   Did  you reach a conclusion based upon you analysis?

A.   Yes ma'am.

Q.   And what conclusions did you reach?

A.   The items in Government's Exhibit 29 contain heroin, a Schedule I Controlled Narcotic substance.

Q.   And is Exhibit 29A a report detailing your findings regarding Government Exhibit 29?

A.   Yes ma'am it is.

Q.   And is it in the same condition as when you prepared it?

A.   Yes ma'am.

MS. WESLEY:  Your Honor, I would move to have Government Exhibit 29A admitted into evidence.

Taylor - Cross

                MR. CURRY:  No objection.

                THE COURT:  The Court admits Government Exhibit
29A.

        (Government Exhibit Number 29A admitted.)

BY MS. WESLEY:

Q.   Now, Ms. Taylor, Government Exhibits 1, 14, 16, 18, 23,
25 and 29, after you concluded your analysis what did you do
with each and every one of those exhibits?

A.   Once I concluded my analysis I generated a report.  My
entire case, including my analysis results and report was
reviewed by another analyst to insure I followed the proper
procedures and protocols.  After that is done, the evidence
is--I reseal the evidence and then return it to Central
Evidence Receiving where it is stored until which time it's
returned to the submitting officer, along with a copy of the
report.

                MS. WESLEY:  I have nothing further of this
witness, Your Honor.

                THE COURT:  All right.  Thank you.
Cross-examination, Mr. Curry.

                MR. CURRY:  Thank you, Your Honor.

                        CROSS EXAMINATION

BY MR. CURRY:

Q.   Ms. Taylor, your role here is that you receive what
turns out to be drugs, analyze them and send them back,

Taylor - Cross

correct?

A.    Yes sir.

Q.    You have no part in the investigation, correct?

A.    No sir, I simply identify the substances submitted.

Q.    Now we're talking about very minute quantities.  Can you give us an idea, maybe some common object, what are we talking about in grams?

A.    A packet of sugar is generally one gram.  These are--most ot the samples that I received are less than half a gram, so approximately less than half a packet of sugar.

Q.    In many instances you found--well for example, here's one, 0.030 grams.  How much is that--how much sugar would that be?

A.    That's just slightly less than half a packet.  A half of a gram is point--I'm sorry.  A half of a packet of sugar is .5 grams so it is way less than that.  It's approximately an eighth or so.

Q.    That's--that's three one-hundredths of a gram?

A.    Yes sir.

Q.    I take it you're using a very accurate scale?

A.    Yes sir.

Q.    Electronic or balance beam?

A.    It's electronic balance.

Q.    At times you have weighed the packaging material, is that correct?

Taylor - Cross

A.    Yes sir it is.

Q.    What was the packaging material with these varying

drugs?

A.    It was a wax paper bag.

Q.    And was this material that was in any way permeable?

A.    No sir.

Q.    So the drugs would not leach into this packaging in any

way, would it?

A.    No sir, the packaging was folded and taped closed,

containing the powder within.

Q.    Have you previously analyzed heroin?

A.    Yes sir I have.

Q.    Are you familiar with, and I hate to call it an

industry.  Are you familiar with any standard way that

heroin is packaged for sale?

A.    Only from what I see as evidence.

Q.    Okay.  From what you see as evidence, was the evidence

you reviewed in this case consistent with other cases you

have seen?

A.    Yes sir it is.

Q.    Have you heard of the individual dosage units referred

to as stamps?

A.    Yes sir.

Q.    Based upon your review of--of many cases, what is the

average weight of drugs in a stamp?

Taylor - Cross

A.    Approximately what I've reported as my weights.  In my

case number D10-2358, that was Government's Exhibit 29, the

packages had an average weight of .09--009 gram.  I have--

Q.    So approximately a hundredth of a gram?

A.    A hundredth to three hundredth of a gram is commonly

seen in the wax paper bags.

        MR. CURRY:  Thank you very much.  I have no other

questions of this witness, Your Honor.

        THE COURT:  All right.  Ms. Wesley, any redirect?

        MS. WESLEY:  No, Your Honor.

        THE COURT:  Then the witness may step down.  Thank

you, Ms. Taylor.  You're free to go.

    (Witness excused)

        THE COURT:  Does the Government have witness

please?

        MS. WESLEY:  Yes, Your Honor, a witness who's in

custody, David DeBerry.

        THE COURT:  All right.  Ladies and Gentlemen,

while we're waiting for that witness, here's an update.

    (The Court gave an update on the earthquake)

        THE COURT:  Please bring the witness forward.

Please raise your right hand.  The Clerk will administer the

oath to you.

        DAVID DEBERRY, GOVERNMENT'S WITNESS, SWORN

        THE CLERK:  Thank you.  You may take the witness

DeBerry - Direct

stand.  The witness is David Daniel DeBerry, last name

D-e-B-e-r-r-y.

            THE COURT:  All right.  Mr. DeBerry, if you will

speak in a loud, clear voice into the microphone so that the

jurors can hear you clearly.  Thank you.

    You may begin.

                    DIRECT EXAMINATION

BY MS. WESLEY:

Q.    How old are you sir?

A.    Twenty-six (26).

Q.    And you're apparently in--in custody.  Are you in

custody on a state matter?

A.    Yes.

Q.    And what is the--the basis of your--your incarceration?

A.    Probation violation.

Q.    And have you used heroin in the past?

A.    Yes.

Q.    And would you consider yourself to be someone who was

addicted to heroin?

A.    Yes ma'am.

Q.    And when did you first start using heroin?

A.    About 2--7--2007, 2008.

Q.    And how did you begin using heroin?

A.    I snorted it.  Like how I used it or what led me to

using heroin?

DeBerry - Direct

Q.    What led you to using heroin?

A.    My father committed suicide in 2007, led me into a depression.  I went through some counseling and just kept getting depressed over and I just turned to drugs.

Q.    And how did you support your--your heroin addiction?

A.    I bought heroin at a cheap price and resold it so I could support my addiction.

Q.    And do you know someone known to you as Wop?

A.    Yes.

Q.    And when did you first meet him?

A.    About the end of 2009, beginning of 2010.

Q.    And who--who introduced you to him?

A.    Amanda Borror.

Q.    And what was the circumstances of Amanda Borror introducing you to Wop?

A.    I don't know what you mean.

Q.    Why was she introducing you to Wop?

A.    So I could buy heroin.

Q.    And where did this introduction take place?

A.    Bluegrass Village in Morgantown.

Q.    Do you know who resided there?

A.    I believe somebody by the name of Justin.

Q.    And how much money did you have to purchase heroin?

A.    Right around a thousand dollars.

Q.    And what--what happened during this--this meeting that

DeBerry - Direct

you had with Wop?

A.   I went into the house.  I met him.  I went in; pulled my shirt up for him; turned around and showed him I wasn't wearing a wire or nothing because I had never met him before that.  We had a brief conversation about the business and I purchased the dope and left.

Q.   And you said that you pulled up your shirt and showed him that you weren't wearing a wire.  Is that common in situations where you're just meeting someone?

A.   I mean he never asked me to but I just, you know, I took it upon myself more or less to go in good faith I guess just to show him.

Q.   Okay.  And at this time when you were buying this--this heroin from--from Wop, were you already selling heroin to support your addiction?

A.   No.

Q.   So at this point in time you're just using?

A.   Yes.

Q.   And how much heroin were you buying for a thousand dollars?

A.   I believe it was roughly around three bricks.

Q.   Three bricks?

A.   Yes.

Q.   And so you were going to use three bricks all by yourself?

DeBerry - Direct

A.    No.

Q.    Okay.  What were you going to--were you going--what were you going to do with the--

A.    I probably did two of the bricks and sold one so I can have money to continue to support my habit.

Q.    Okay.  Now have you ever been sick from not using heroin?

A.    Yes.

Q.    And were you sick at that time from heroin when you first met Wop?  What was your condition?

A.    I was starting to go through withdrawal slightly.

Q.    And so how long does it take before one starts to go through withdrawal?

A.    I had--I had to have it every day.

Q.    If you didn't have it daily, you would start to get sick?

A.    If I didn't get high at least two to three times a day, I'd feel--I wouldn't get out of bed.  I would have cold sweats.  I'd ache.  I'd lay there and cry.  It's pretty--

Q.    After that--that first meeting with--with Wop, did you make any additional purchases from Wop?

A.    Yes.

Q.    When you first met him was there an exchange of phone numbers or any information so that you could contact each other in the future?

DeBerry - Direct

A.   Yeah, I believe I asked for his phone number and received it.

Q.   Okay.  The Wop that you're referring to, do you see that person in the courtroom today?

A.   Yeah, he's sitting right over there.

Q.   Would you please describe what he's wearing?

A.   A white shirt with black stripes.

        MS. WESLEY:  Your Honor, may the record reflect he's identified Mr. DeVaughn?

        THE COURT:  The record may so reflect.

        MS. WESLEY:  Thank you.

BY MS. WESLEY:

Q.   And so after you exchanged phone numbers, how often would you approach Wop to--to get heroin?

A.   Probably once a week, once very other week.

Q.   And what quantities were you buying?

A.   One to two bricks every time I met him.

Q.   And how much were you paying for this?

A.   Between two seventy-five, three fifty.

Q.   Per brick?

A.   Yes.

Q.   And how long did this last, you making these purchases of brick quantities from Wop?

A.   Roughly five to six months.

Q.   How was his--the heroin that you were purchasing from

DeBerry - Direct

him, was it packaged in any particular way?

A.   It was packaged in bundles, individual stamps were packaged.

Q.   How were you paying for--I mean I understand that you were selling heroin to support your addiction.  Did you have any type of employment that you would--that assisted you as well in making your heroin purchases?

A.   When I first started, yes, I worked, kind of odd jobs around, doing this and that, like work for construction companies here and there.

Q.   The time period that you--you discussed that you were making these purchases from--from--from Wop, during that time period approximately how many bricks do you estimate that you purchased from him?

A.   I don't know.  I probably met him between 20 to 30 times on the two bricks at a time.

Q.   So between 20 and 30 purchases with one to two bricks at a time?

A.   Yes.

Q.   What's the--the most amount of heroin that you ever purchased from Wop?

A.   I believe it was five bricks at once.

Q.   Do you recall when that occurred?

A.   It was towards the end of when I was--towards the end of our--it was towards the end of my knowing him as a drug

DeBerry - Direct

dealer I guess.

Q.   Now where were some of the places that you would go to meet Wop to--to obtain the heroin?

A.   I'd meet him at the Mall, like fast food restaurants, motels.  I met him at this place on Point Marion Road in a driveway.

Q.   Do you know who resided at this place on Point Marion Road that you met him at?

A.   I just knowed it as Debbie and Wendell's.

Q.   And you said you met him in a driveway?

A.   Yes.

Q.   Would--would he be in a vehicle or how would this happen?

A.   Yeah, he would be in a car.

Q.   What type of car?

A.   A gold four-door.

Q.   And would he be alone?

A.   No.

Q.   Who would be with him?

A.   His girlfriend.

Q.   Do you know the girlfriend's name?

A.   I believe it was Grace.

Q.   And who would have the drugs on them when you met them?

A.   She would.

Q.   And where would she keep the drugs?

DeBerry - Direct

A.    I witnessed her pulling it out of her crotch area; in her underwear I guess, somewhere around there.

Q.    Would that be the norm from how those transactions would occur?

A.    Yes.

Q.    Did you ever get heroin from Wop from anyone other than him or Grace?

A.    I believe once.

Q.    And who was that?

A.    Somebody by the name of Bulldog.

Q.    And where did you meet Bulldog at?

A.    Just Debbie and Wendell's.

Q.    Is that the same place on Point Marion Road we just discussed?

A.    Yes.

Q.    And how was it arranged that you were going to meet Bulldog?

A.    Through a phone.  I called.

Q.    I'm sorry.  I didn't hear that sir.

A.    I called him through a phone.

Q.    You called who?

A.    Wop.

Q.    And what happened after you called him?

A.    He sent me there to meet his cousin.

Q.    So you called Wop and he sent you to meet the cousin?

DeBerry - Direct

A.    Yes.

Q.    Do you recall how much you purchased on that occasion?

A.    Ah, probably a brick maybe.

Q.    The gold car that you mentioned that you saw Wop parked in, do you know where the vehicle was registered?

A.    I believe it was Pennsylvania.

Q.    Did you ever see anyone other than Grace or Bulldog with Wop in that gold vehicle?

A.    Occasionally there'd be somebody else in the car but I don't know who they were.

Q.    What did they look like?

A.    Black, young male.

Q.    When you say "young male", how young?

A.    Between my age and probably 17, 18.

Q.    When--when did you last use heroin?

A.    About September of last year.

Q.    And--and what was the basis for you--was it by design that you haven't used since that time?

A.    What do you mean, by my choice?

Q.    Yes.  I mean you haven't been in custody since September--

A.    No.

Q.    --2010, right?

A.    Yeah, I--it was the second time I've overdosed from heroin and I decided that it was--my life wasn't worth

DeBerry - Cross

getting high so I quit.

Q.   You haven't used it since?

A.   No.

Q.   Does Mr. DeVaughn know that you--I'm sorry.  Does Wop

know that you OD'd on heroin?

A.   Ah, I believe one time I think I told him about it.

Q.   What did he do after he learned that you OD'd on

heroin?

A.   What--what do you mean?

Q.   Did you purchase heroin from him after you OD'd?

A.   I believe I purchased like 10 to 15 stamps afterwards.

Q.   Right after you OD'd?

A.   Within a couple hours, yeah.

          MS. WESLEY:  I have nothing further of this

witness, Your Honor.

          THE COURT:  All right.  Cross-examination?

          MR. CURRY:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. CURRY:

Q.   Mr. DeBerry--

A.   Yes.

Q.   Did you go to the police to tell them about your

involvement or did they come to you?

A.   When?

Q.   When you first encountered the police about drugs, was

DeBerry - Cross

it you going to them or them coming to you?

A.   I believe they called and asked me to come down and talk to them.

Q.   Who was it that called you?

A.   I believe it was Detective Forbes.

Q.   Well tell us about that conversation.

A.   He called my girlfriend's phone and talked to her; asked her to come down to the police station in Morgantown. I road down with her and when they seen that I was with her he said he needed to talk to me as well and went to a room and he asked me some questions.

Q.   Okay.  Did he tell you that you were in trouble?

A.   He told me that he was doing investigation and that--like he described it like everybody was in a triangle and that if I didn't want to be in triangle that--just to tell him what I knew.

Q.   So did you understand that you could get yourself out of trouble by talking to him?

A.   I believe so but he made it--he didn't really say that I was in trouble like.

Q.   Well did you feel like you were in trouble at that point?

A.   No.  He told me I wasn't being placed under arrest or nothing; I could leave at any time.

Q.   Was he aware that you were using heroin?

DeBerry - Cross

A.   I believe so.

Q.   Was he aware that you were selling heroin?

A.   I believe so.

Q.   Were you pretty cool about the situation or were you scared?

A.   I was nervous.

Q.   You went through rehab, is that correct?

A.   Yes.

Q.   And that was successful?

A.   Yes.

Q.   Okay.  Congratulations for that.  You have not been charged with drug offenses in either the state or federal systems, is that correct, sir?

A.   Yes sir.

Q.   And the reason you're in jail now has nothing to do with drugs, correct?

A.   Yes, you're correct.

Q.   You and I have talked, correct?

A.   Yes.

Q.   And you have some kind of a hearing this week and you hope to get out of jail?

A.   Yeah, they're going to put me back on probation.

Q.   And then you hope to go to work in the coal mines?

A.   Yes.

          MR. CURRY:  Well good luck to you, sir.  I have no

Bolden - Direct

other questions.

          THE COURT:  Anything on redirect?

          MS. WESLEY:  No, Your Honor.

          THE COURT:  All right.  The witness may step down.

     (Witness excused)

          THE COURT:  The Government may call its next

witness.

          MS. WESLEY:  Your Honor, the Government calls

another witness in custody.  That would be Debbie Bolden.

          THE COURT:  Debbie?

          MS. WESLEY:  Bolden.

          THE COURT:  Bolden.  All right.

     (Pause)

          THE COURT:  Ms. Bolden, would you please approach

the Clerk in the red jacket standing here in the front of

the courtroom.  She'll administer the oath to you before you

take the witness stand.

          DEBRA LYNN BOLDEN, GOVERNMENT'S WITNESS, SWORN

          THE CLERK:  Thank you.  You may take the witness

stand.  The witness is Debra Lynn Bolden, first name

D-e-b-r-a; last name Bolden, B-o-l-d-e-n.

          THE COURT:  All right, you may proceed.

                    DIRECT EXAMINATION

BY MS. WESLEY:

Q.  How old are you ma'am?

Bolden - Direct

A.    Forty-one (41).

Q.    And you're presently incarcerated?

A.    Yes.

Q.    What are you incarcerated for?

A.    For selling drugs.

Q.    Okay.  And they're federal charges?

A.    Yes.

Q.    And what type of drugs did you sell?

A.    Heroin.

Q.    And have you ever used heroin?

A.    Yes.

Q.    What started you using heroin?

A.    I was in a car wreck and broke my back and started on
pain pills and then the doctor cut me off pain pills and I
started doing heroin because it was cheaper than buying pain
pills.

Q.    And when did you begin using heroin then?

A.    About two years ago.

Q.    Okay.  And you said, of course, that you've got--there
are federal charges that put you in custody.  Did you
actually sign a plea agreement?

A.    Yes.

Q.    And the plea agreement that you--you've signed with the
Government for selling heroin, whose heroin were you
selling?

Bolden - Direct

A.   I got it from Grace, Wop's girlfriend.

Q.   Do you know where Grace got the heroin from?

A.   Wop, I guess.  Wop.

      MR. CURRY:  Move to strike the I guess.

      THE COURT:  Sustained.

BY MS. WESLEY:

Q.   Do you know where Grace would have got the heroin from?

A.   Yeah, from Wop.

Q.   And you pointed your finger at the direction of when you said Wop, would you please identify Wop?

A.   Sitting right there.

Q.   What is he wearing?

A.   Gray shirt.

      MS. WESLEY:  Your Honor, may the record reflect that she's pointing at and referencing the defendant as Wop?

      THE COURT:  Yes, it may so reflect.

BY MS. WESLEY:

Q.   When did you--you first meet Wop?

A.   About two years ago.

Q.   And where did you meet him at?

A.   Um, at Justin's house in Country Squire Mobile Home Park.

Q.   And is that in Morgantown?

A.   Yes.

Q.   And--and what was going on when you--you first met Wop?

Bolden - Direct

A.   I went over there to get heroin off of Justin and
that's how I met him.

Q.   Did you actually get some heroin when you were over
there?

A.   Uh-huh (yes).

Q.   And who did you get the heroin from?

A.   From Justin.

Q.   And when Wop was introduced to you how--how was he
introduced?

A.   We just started talking.

Q.   And what--how much heroin did you buy from Justin that
day?

A.   Probably a couple bags.

Q.   Do you know whose heroin Justin was selling that day?

A.   Yeah, Wop's I guess.

Q.   How do you know it was Wop's heroin?

A.   Because he was there.

Q.   How--how does that typically work?  Please explain to
the jurors.  When you go to a place and you're trying to buy
heroin, please explain to them who the people are that are
typically involved.

A.   Usually drug dealers and users.

Q.   And when you first start buying heroin from someone
new, are you able to buy directly from the source usually?

A.   No.

Bolden - Direct

Q.    What happens?

A.    You usually go through a middle-man, somebody that introduces you to them.

Q.    At some point in time were you able to develop a relationship with Wop so that you could buy from him directly?

A.    Yes.

Q.    And do you recall approximately when that occurred?

A.    Um--

Q.    Let me rephrase that.  How long after you first met him were you able to buy from him directly?

A.    Probably a couple months.

Q.    And when you were able to buy from him directly, how often were you--were you getting it from him?

A.    Um--sometimes--sometimes twice a week; sometimes more.

Q.    And what type of quantities were you--were you buying from him?

A.    Just a couple bags.

Q.    When you say--

A.    Yeah, no more than--I never bought more than a bun from him.

Q.    And a bun is--

A.    Ten (10).

Q.    --ten (10) bags or 10 stamps?

A.    Yeah.

Bolden - Direct

Q.   And where were some of the places that you would meet
him at?

A.   At stores, in his car--

Q.   What type of--

A.   --and in Grace's car.

Q.   I'm sorry.

A.   In Grace's car.  I would meet Grace in her car at the
stores, like over at Westover at the BP or at the Exxon.

Q.   what type of car did Wop have to your knowledge?

A.   It was Grace's car.  It was a Ford, a gold Ford, I
think.

Q.   And you think it was Grace's car?

A.   Yeah.

Q.   Would you ever meet him at any hotels or anything like
that?

A.   No, he--I think he was staying at the motel, but no.

Q.   You said that you would meet Grace to get it as well?

A.   Yeah.

Q.   How would--how would that happen that you would meet
Grace to--

A.   I would just call the phone and she would answer.

          THE COURT:  All right, Ms. Bolden, you're going to
have to speak in a louder voice into the microphone.  I want
to make sure that the jurors hear your testimony, please.
Thank you.

Bolden - Direct

BY MS. WESLEY:

A.   I would just call the phone and Grace would answer and she would say meet me here.

Q.   I'm sorry, she would what?

A.   She would say meet me here and tell me where to meet her.

Q.   And--and whose phone number were you dialing?

A.   They both had phones.

Q.   Okay.

A.   So they each had a separate phone?

A.   Yes.

Q.   Okay.  And you could call either/or?

A.   Uh-huh (yes).

Q.   Okay.  And how was it that you got in contact with Grace so that you could buy heroin?

A.   I called the cell phone.

Q.   Okay.  But who told you that you could go to Grace to get heroin?

A.   Oh, I met her through him--through Wop.

Q.   Now what would be the most that you would get from either Grace or Wop in terms of heroin?

A.   I never got more then 10 bags.

Q.   Did you basically operate as a middle person to support your addiction?

A.   Yes.

Bolden - Direct

Q.   And would you sometimes get it--when you're getting these buns from Wop, is it all for you or are you going to resell to support your addiction?

A.   It was usually for me but like I would--if like one of my friends, they needed it, I would sale it to them and go back and just get more for myself.

Q.   And where did you life at during this time?

A.   Point Marion Road in Morgantown.

Q.   At some point in time did you enter into an arrangement with Wop so that he can sell from your driveway?

A.   No, not--I mean he just--he came over and he said do you care if I sit in your driveway for a while and I just said yeah, he could set there and he'd give me a couple bags for just setting there.

Q.   Okay.  So when you say "yeah", you were giving him permission to do so?

A.   Yeah.

Q.   Okay.  And he would sit in your driveway?

A.   Yeah.

Q.   Would he be in the vehicle?

A.   Yes.

Q.   And he would be--what would he be doing from his vehicle in your driveway?

A.   He never had people come there when I was home.  I never seen nobody come there when I was home.

Bolden - Direct

Q.   You said he would give you a couple of--

A.   Bags.

Q.   Bags?  That's heroin?

A.   Uh-huh (yes).

Q.   So he's giving you heroin to stay in his vehicle in your driveway?

A.   Yes.

Q.   Okay.

Q.   Now what was--what was he doing in your--in the vehicle in your driveway?

A.   Setting out there.  He had a TV in there, watching TV.

Q.   Would he be alone?

A.   No, Grace would be with him.

Q.   Were they conducting drug transactions?

A.   Yes.

Q.   Now when did he start selling from your driveway?

A.   Um, I don't know.  He only did it for like probably a couple months.

Q.   A couple months?

A.   A couple months, yeah.

Q.   And please describe to the--to the jurors where your house is situated.

A.   It's out by itself, up on a big driveway--up on a hill by itself.

Q.   So it's not a location that's easily visible or

Bolden - Direct

accessible?

A.    No.

Q.    And how much heroin would he give you for you

permitting him to sell from the driveway?

A.    A couple bags.

Q.    A couple of bags how often?

A.    Like every time he came to sell.

Q.    When he was parked in your driveway, did you have to

buy or pay for heroin from him?

A.    No.

Q.    It was given to you as long as he was in the driveway

selling?

A.    Yeah.

Q.    Now we--we talked briefly about your--your plea

agreement with the Government and of course you've already

said that you pled for selling heroin.

A.    Uh-huh (yes).

Q.    Who was--who was the person who was--who was the person

who basically wore a wire on  you?

A.    Debbie Long.

Q.    And do you recall where you were--where that

transaction took place between you and Debbie Long?

A.    Yeah, at the bottom Woodlawn Terrace Trailer Court.

Q.    I'm sorry?

A.    At the bottom of Woodlawn Terrace Trailer Court.

Bolden - Direct

Q.   And who resided there, if you know?

A.   Debbie Long.

Q.   And that heroin that you sold to--to Debbie Long, do you recall how much you--you sold to her?

A.   Yeah, seven bags.

Q.   Which is equivalent to seven stamps, correct?

A.   Yeah.

Q.   Okay.  Now we talked a little bit about--about--about Grace and the fact that she was introduced to you from Wop. Have you met any other individuals through Wop that would sell from your--your driveway?

A.   No.

Q.   It was just Wop or Grace?

A.   Wop and Grace, yeah.

Q.   Now in terms of the times that you actually purchased heroin from Wop, approximately how many times did you purchase heroin from him?

A.   Probably 20 or 30 times.

Q.   And does that--in terms of the times when he was in your driveway selling heroin, approximately how many times did he give you heroin?

A.   Probably about 20 times, 30 times.

Q.   Have you ever seen Wop in possession of--of large quantities of heroin?

A.   Usually when I would go he would have it already out

Bolden - Direct

and ready to give to me, but one time I did see a bag that
had some heroin in it but usually he already had them ready
to give to you when you met him at the store.

Q.   Now have you ever seen Grace in possession of any large
quantities of heroin?

A.   No, she usually had it ready to--yeah, I seen her with
some--probably--it was just in a Baggie.

Q.   Okay.  So it was the same with Wop--when it was with
you was what you were getting?

A.   Yeah.

Q.   Now would there ever be an occasion where you would
call Wop and that he would send someone else other than
Grace?

A.   Yeah.  I would meet Justin.

Q.   And do you know Justin's last name?

A.   No.  No ma'am.

Q.   And what type of--did Justin have a vehicle?

A.   Yeah, an orange sports car.

Q.   An orange sports car?

A.   Yes.

          MS. WESLEY:  Your Honor, I don't have anything
else for this witness.

          THE COURT:  All right.  Mr. Curry.

          MR. CURRY:  Thank you, Your Honor.

                    CROSS EXAMINATION

Bolden - Cross

BY MR. CURRY:

Q.   Ms. Bolden, bottom line is you sold heroin but not a whole lot of it?

A.   Yes.

Q.   And you have entered into a plea agreement, correct?

A.   Yes sir.

Q.   You were furnished an attorney, is that correct?

A.   Excuse me?

Q.   You were furnished an attorney to represent you?

A.   Yes.

Q.   And who was that?

A.   James Zimarowski.

Q.   And you're aware he's one of the leading attorneys up here?

A.   Yes sir.

Q.   Okay.  And you became aware of something called the sentencing guidelines, didn't you?

A.   Yes sir.

Q.   And your understanding is that--well, what is your understanding of the role that the amount of drugs you sell has on the length of your sentence?

          MS. WESLEY:  Objection, Your Honor.

          THE COURT:  Sustained.

BY MR. CURRY:

Q.   Did you enter into any kind of agreement with the

Bolden - Cross

Government respecting an agreement as to how much drugs you
sold?

A.    Yes.   They know I sold seven bags.

Q.    Okay.   Do you recall what that amount was that you
entered into an agreement for?

A.    It was under five grams.

Q.    Okay.   And do you have an expectation of what effect
that agreement would have on a recommendation for the
sentence?

A.    I think I'm going to do like six--

        MS. WESLEY:   Objection, Your Honor.

        THE COURT:   Sustained

BY MR. CURRY:

Q.    Well you understand that only the Judge can sentence
you, correct?

A.    Yes.

Q.    Okay.   You knew that individuals were selling drugs out
of your home?

A.    Out of my driveway.

Q.    Or out of your drive--did they ever come inside to sell
drugs?

A.    No.

        MR. CURRY:   I have no other questions of the lady,
Your Honor.

        THE COURT:   All right.   Thank you.   Is there any

Bolden - Cross

redirect?

        MS. WESLEY:  No, Your Honor.

        THE COURT:  All right.  Thank you.  You may step

down, Ms. Bolden.  You're excused as a witness.

   (Witness excused)

        THE COURT:  Do you have a short witness?  No?

   All right.  Well, I think the jury has been here for a

long time today and I think it's appropriate to go ahead and

conclude.  Before I give them their instructions for the

evening, Ms. Wesley, what time are we starting tomorrow

morning?

        MS. WESLEY:  Ten o'clock, Your Honor.

        THE COURT:  Ten o'clock.  All right.  That's all

right with you, Mr. Curry?

        MR. CURRY:  Yes ma'am.

        THE COURT:  All right.  Ladies and Gentlemen of

the Jury, we'll--we'll end now.  You had to be here early

this morning for jury selection and I know it's been a long

day so let me give you your instructions regarding tomorrow

and does the Government plan to finish tomorrow?

        MS. WESLEY:  There's--there's a good chance we may

be able to rest tomorrow, Your Honor.

        THE COURT:  All right.  Or early Wednesday

morning--Thursday morning, I take it.

        MS. WESLEY:  Early Thursday morning or late

tomorrow, Your Honor.

THE COURT:  Ladies and Gentlemen, as you plan and for those of you who need to let family know or employers know, I definitely believe this case will be to you on Thursday and tomorrow we will begin at 10:00 a.m.  We'll go to five and if we need to finish a witness beyond five, we'll do that; we'll stay but not past 5:30, but since the late start I would extend it a half an hour at the other end of the day to finish a witness.  Now the reason we're concluding before five tonight is because the Government doesn't have a witness that we can finish before five o'clock and there's no point in starting someone and then you have to remember what they said tomorrow morning when you come in.

Tonight, while you're going to be looking for all the information on the earthquake, please do not look for any information on this case on the TV or on the radio or in the newspaper tomorrow morning and avoid any research about any of the issues raised in this case, whether on line or in any books.  As I've told you before, the evidence in this case and my instructions are your universe of information with regard to the decisions you have to make in this case.

Now you're able to tell your families and your employers you've been selected for jury duty in Clarksburg but until the conclusion of the case you can't say anything

further.  Do you understand?  All right.  And certainly
you're free to tell them about the schedule because I'm sure
that's of primary interest to them.

Do not allow any third person to approach you to
discuss the case.  Should someone attempt to do that, please
walk away from them, instructing them that you've been
ordered by the Court not to discuss the case.  If they
persist in talking to you, report that to me at your
earliest opportunity, either through Carole or Court
Security.

And please leave your notebooks face down on your
chairs.  I believe that's I have for this evening.  We'll
see you at ten o'clock tomorrow morning.  If you arrive
before that, Carole will have coffee and snacks in there
available for you and as I said, you're free to bring any
nutritional elements that you think you need to get through
the day.  All right.

Thank you very much.  Appreciate your patience and your
attention.  We'll see you tomorrow morning.  Safe drive
home.

(Jury Out at 4:45 p.m.)

THE COURT:  Are there any matters that we need to
take up this evening before we adjourn?

MS. WESLEY:  No, Your Honor.  We just have--we
brought everything back and of course these were admitted

into evidence, the forensic lab, so I just wanted to give
those to the Clerk.

          THE COURT:  Yes, before you leave will you check
with Carole to make sure that all the evidence that was
admitted today is in her custody for the overnight.

     Mr. Curry, is there anything from you on behalf of your
client?

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right.  Thank you very much.  This
Court stands adjourned and we resume at ten o'clock tomorrow
morning.

          (The trial adjourned at 4:47 p.m., 08-23-2011)

```
 1                          CERTIFICATE

 2

 3       I, Linda L. Bachman, Official Reporter of the United

 4  States District Court for the Northern District of West

 5  Virginia, do hereby certify that the foregoing is a true and

 6  correct transcript of the proceedings had in the

 7  above-styled action on August 23, 2011, as reported by me by

 8  stenomask.

 9       I certify that the transcript fees and format comply

10  with those prescribed by the Court and the Judicial

11  Conference of the United States.

12       Given under my hand this 7th day of February, 2012.

13

14                       ___/s/ Linda L. Bachman_____

15                       Linda L. Bachman, CCR, CVR
                         Official Reporter, United States
16                       District Court for the Northern
                         District of West Virginia
17

18

19

20

21

22

23

24

25
```