IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.             CRIMINAL ACTION NO:  1:10CR78-1

HERBERT DEVAUGHN,
also known as Wop,

        Defendant.

               - - -

    <u>Testimony</u> on <u>August 24, 2011</u> and <u>Defendant Closing Argument</u> on <u>August 25, 2011</u> in the <u>Trial</u> of the above styled action before Honorable Irene M. Keeley, Judge, at Clarksburg, West Virginia.

APPEARANCES:

FOR THE GOVERNMENT:    ZELDA E. WESLEY, ESQUIRE
                        Assistant United States Attorney
                        320 West Pike Street - Suite 300
                        Clarksburg, West Virginia   26302
                        304-623-7030

FOR THE DEFENDANT:     ROGER D. CURRY, ESQUIRE
                        Curry Amos & Associates
                        1414 Country Club Road
                        P.O. Box 3040
                        Fairmont, West Virginia   26554
                        304-368-1000

The defendant was present in person.

Proceedings recorded by stenomask, transcript produced by official court reporter.

LINDA L. BACHMAN, CCR, CVR, OFFICIAL COURT REPORTER
P.O. BOX 969, CLARKSBURG, WEST VIRGINIA   26302-0969
304-622-0177

**I N D E X**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Grace McLaughlin | 134 | 156 | 156 | |
| Amanda Borror | 157 | 187 | | |
| Farrah Machado | 189 | | | |
| Dale Brown | 200 | 220 | 225 | 225 |
| Marcus Gamble | 226 | 236 | 238 | |
| Sara Triplett | 240 | 245 | 247 | |
| Jason Ammons | 248 | | | |
| Mike Bloniarz | 258 | | | |
| Shawn Williams | 263 | | | |
| Jeff Beatty | 267 | 272 | | |
| Rob Miranov | 274 | 283 | | |
| Todd Forbes | 288 | 354 | 365 | 367 |

**AUGUST 25, 2011**

Defendant Closing Argument - Page 370

**I N D E X**

| EXHIBITS | ADMITTED |
|---|---|
| Government Exhibit Number 24 | 184 |
| Government Exhibit Number 5 | 193 |
| Government Exhibit Number 8 | 195 |
| Government Exhibit Number 10 | 197 |
| Government Exhibit Number 12 | 199 |
| Government Exhibit Number 11 | 270 |
| Government Exhibit Number 29 | 272 |
| Government Exhibit Number 31 | 276 |
| Government Exhibit Number 31A | 276 |
| Government Exhibit Number 1 | 303 |
| Government Exhibit Number 4 | 308 |
| Government Exhibit Number 7 | 311 |
| Government Exhibit Number 9 | 314 |
| Government Exhibit Number 13 | 321 |
| Government Exhibit Number 13A | 322 |
| Government Exhibit Number 14 | 325 |
| Government Exhibit Number 16 | 329 |
| Government Exhibit Number 18 | 333 |
| Government Exhibit Number 20 | 334 |
| Government Exhibit Number 21 | 334 |
| Government Exhibit Number 23 | 339 |
| Government Exhibit Number 25 | 341 |
| Government Exhibit Number 27 | 344 |
| Government Exhibit Number 30 | 354 |
| Government Exhibit Number 33 | 347 |
| Government Exhibit Number 34 | 348 |

134

McLaughlin - Direct

P R O C E E D I N G S

1

2        (08-24-2011, 10:08 o'clock a.m., defendant present)

3        (Jury in at 10:08 a.m.)

4        THE COURT:  All right.  The Government may call

5   its next witness, Ms. Wesley.

6        MS. WESLEY:  Your Honor, the Government calls

7   Grace McLaughlin.

8        THE COURT:  Grace McLaughlin.

9        (Pause)

10        THE COURT:  All right.  Ms. McLaughlin, will you

11   please approach the Clerk.  She's standing here in a pink

12   jacket in the front of the courtroom and she will administer

13   the oath to you before you take the witness stand.

14        GRACE MCLAUGHLIN, GOVERNMENT'S WITNESS, SWORN

15        THE CLERK:  Thank you.  You may take the witness

16   stand.  The witness is Grace McLaughlin, last name,

17   M-c-L-a-u-g-h-l-i-n.

18        THE COURT:  All right.  Now, Ms. McLaughlin, if

19   you'll just speak in a loud, clear voice into the microphone

20   in response to Ms. Wesley's questions so that the jury can

21   hear you.  All right.  Thank you.  You may proceed.

22                    DIRECT EXAMINATION

23   BY MS. WESLEY:

24   Q.   How old are you?

25   A.   Twenty-one (21)

135

McLaughlin - Direct

1   Q.   And where do you presently live?

2   A.   Pittsburgh.

3   Q.   And how far did you go in school?

4   A.   Twelfth grade and college.

5   Q.   Excuse me?

6   A.   Twelfth Grade and college.

7   Q.   And where did you attend college?

8   A.   Everest and Sanford Brown.

9          THE COURT:  I'm sorry.  I didn't understand your

10  answer.

11  BY MS. WESLEY:

12  A.   Everest and Sanford Brown.

13  Q.   And what were you studying there?

14  A.   Medical.

15  Q.   And are you presently in school, ma'am?

16  A.   No.

17  Q.   Do you know someone known to you as Wop?

18  A.   I know him as Herbert DeVaughn but I also know other

19  people is calling him Wop.

20  Q.   So you--you know Herbert DeVaughn?

21  A.   Yes.

22  Q.   Do you see Herbert DeVaughn seated in this courtroom

23  today?

24      (Witness pointed to defendant)

25          THE COURT:  All right.  You have to answer out

McLaughlin - Direct

1    loud please.

2    BY MS. WESLEY:

3    A.   Yes.

4            THE COURT:   Thank you.

5    BY MS. WESLEY:

6    Q.   And you pointed at which individual, ma'am?

7    A.   In the white shirt.

8    Q.   Is it just a white shirt?

9    A.   Stripes.

10   Q.   Stripes.

11           MS. WESLEY:   Your Honor, may the record reflect

12   that the individual in the striped shirt is Mr. DeVaughn?

13           THE COURT:   Yes, the record may reflect that she

14   has identified the defendant as Mr. DeVaughn, known as Wop.

15   Thank you.

16   BY MS. WESLEY:

17   Q.   How long have you known Mr. DeVaughn?

18   A.   For maybe about two years.

19   Q.   Excuse me?

20   A.   For maybe about two years, if that.

21   Q.   And did you have a romantic relationship with

22   Mr. DeVaughn?

23   A.   Yes.

24   Q.   Were you his girlfriend?

25   A.   Yes.

137

McLaughlin - Direct

1    Q.   And when did you start dating him?

2    A.   Um, I'd say like 2000--the end of like 2008 maybe.

3    Q.   Ms. McLaughlin, have you ever used heroin?

4    A.   No.

5    Q.   At some point in time did you get involved in the

6    selling of heroin?

7    A.   Yes.

8    Q.   How did you get introduced to heroin?

9    A.   Ah--(witness crying).

10   Q.   Would you answer the question please?  Or let me ask

11   you, do you understand the question?

12   A.   I don't know how you want me to answer it.

13   Q.   What was the circumstance that you first saw heroin?

14   A.   Down in West Virginia.

15   Q.   And whose--who had the heroin in their possession?

16   A.   Well, the--I--Darrell Upshur.

17   Q.   At some point in time, ma'am, when you were dating Mr.

18   DeVaughn did he have any type of employment?

19   A.   Yes.

20   Q.   Where was he working when you first met him?

21   A.   Heinz Field.

22   Q.   Were you--

23            THE COURT:  I'm sorry, I didn't hear the answer.

24   BY MS. WESLEY:

25   A.   Heinz Field.

McLaughlin - Direct

1    THE COURT:  Hyattsville?

2    MS. WESLEY:  Heinz Field.

3    THE COURT:  Heinz Field.  Okay.  Excuse me.

4  BY MS. WESLEY:

5  Q.  And were you working there as well?

6  A.  Yes.

7  Q.  At some point in time did his employment at Heinz Field

8  end?

9  A.  I had stopped working there.  I don't know if he

10  stopped or what happened.

11  Q.  When you were dating Mr. DeVaughn did he appear to have

12  money?

13  A.  A little.

14  Q.  Did you know what the source of that money was?

15  A.  No.

16  Q.  And at some point in time did you become aware that Mr.

17  DeVaughn was involved with heroin?

18  A.  Yes.

19  Q.  How did you first become aware that he was involved

20  with heroin?

21  A.  I saw it.

22  Q.  Where were you when you saw it?

23  A.  Down in West Virginia.

24  Q.  And what was going on?

25  A.  I just saw it.

McLaughlin - Direct

1    Q.   Who--who had the heroin?

2    A.   Mr. DeVaughn.

3    Q.   And what was he doing with it?

4    A.   I guess selling it.

5    Q.   And the first time that you saw him with heroin where

6    was he selling it?

7    A.   I don't know.

8    Q.   Was it--give us some ideas about what type of location

9    it was.  Was it a resident?  Was it a hotel?  What was the

10   circumstances the first time that you saw it?

11   A.   Hotel.

12   Q.   Do you recall the name of the hotel?

13   A.   Um--Econo.

14   Q.   Now when you were--after the first time that you saw

15   it, did--did a situation develop  that you saw him in

16   possession of heroin on a regular basis?

17   A.   Not on a regular basis but--

18   Q.   Okay.  Explain to us what happened then.

19   A.   It would be like every other--like day maybe.

20   Q.   Every other day?

21   A.   Yes.

22   Q.   Okay.  And when you saw him with heroin, what would he

23   be doing with it?

24   A.   He was selling it.

25   Q.   Did he--would the heroin already be packaged in stamps

McLaughlin - Direct

1   when you saw him selling it?

2   A.   Yes.

3   Q.   How much would you see him sell on these given days?

4   A.   Maybe like a couple of little bags here and there and

5   like a brick like every other day maybe.

6   Q.   I'm sorry, what?

7   A.   I said maybe like a bag or--a couple bags here and

8   there throughout the day and then a couple--like one brick

9   like every two days, one or two days.

10  Q.   And what is your understanding of a brick quantity of

11  heroin?

12  A.   What do you mean?

13  Q.   How many stamps are in a brick?  Do you know the answer

14  to that?

15  A.   Fifty (50), I guess.

16  Q.   When did you first become aware that Mr. DeVaughn was

17  selling heroin?

18  A.   Ah, like in the middle of our relationship.

19  Q.   And when was that in terms of time period?

20  A.   I don't remember; it was so long ago.

21  Q.   Okay.  Do you recall when you were arrested in this

22  case?

23  A.   July 27th.

24  Q.   Of 2010, correct?

25  A.   Yes.

McLaughlin - Direct

1    Q.   Let's use that as a benchmark.  Going forward in time

2    from July the 27th of 2010 when did you first become aware,

3    approximately, of when Mr. DeVaughn was selling heroin?

4    A.   I don't remember.  I honestly don't.

5    Q.   Do you know where Mr. DeVaughn was getting his heroin

6    from?

7    A.   No.  I have no idea.

8    Q.   How would--how would Mr. DeVaughn get to West Virginia

9    to sell heroin?

10   A.   A ride.

11   Q.   Excuse me?

12   A.   A ride.

13   Q.   And who would--who would drive?

14   A.   J. and Chelsea.

15   Q.   I'm sorry, I didn't hear you.

16   A.   J. and Chelsea.

17   Q.   Could you say the names again?

18   A.   Justin and Chelsea.

19   Q.   And who--who are Justin and Chelsea?

20   A.   I guess friends or I guess they was users.

21   Q.   Do you know where J. and Chelsea lived?

22   A.   I don't remember the location.  I know it was on top of

23   a hill.  I think Preston County.

24   Q.   So it was in West Virginia?

25   A.   Yes.

142

McLaughlin - Direct

1    Q.   Do you--other than this J. and Chelsea, where--and you

2    mentioned the Econo Lodge, where were some of the other

3    locations that Mr. DeVaughn would sell heroin?

4    A.   Um--I don't remember.

5    Q.   Do you know a Debbie?

6    A.   Yes.

7    Q.   Do you know Debbie's last name?

8    A.   Bolden I think.  Bolden.

9    Q.   Do you know if Mr. DeVaughn sold heroin with Debbie?

10   A.   Yes.

11   Q.   What do you know about that?

12   A.   That he would be there and sell heroin.

13   Q.   Where would he sell the heroin from when he was there?

14   A.   On the porch.

15   Q.   Would you be with him sometimes when he was selling

16   heroin from that area?

17   A.   Yes.

18   Q.   And do you recall where Debbie lived?

19   A.   On top of a hill too.

20   Q.   Excuse me?

21   A.   On top of a hill also.

22   Q.   And what type of vehicle did Mr. DeVaughn have at this

23   time or did he drive at this time?

24   A.   Ah, a gold car.

25   Q.   Do you know the make and model?

McLaughlin - Direct

1    A.    A Taurus.

2    Q.    Now do you know where Mr. DeVaughn would--would keep

3    his heroin before he sold it?

4    A.    No.

5    Q.    Would you occasionally keep the heroin on you for Mr.

6    DeVaughn?

7    A.    Yes I would.

8    Q.    How did that--how did that begin?

9    A.    Ah, I don't know how it begun.  I just said I would

10   hold it.

11   Q.    Excuse me?

12   A.    I just said I would hold it.

13   Q.    You volunteered to hold it for him?

14   A.    Pretty much.

15   Q.    And where would you--where would you keep the heroin?

16   A.    In the front of my pants.

17   Q.    Excuse me?

18   A.    In the front of my pants.

19   Q.    And what's the reason for you hiding the heroin in--in

20   that location?

21   A.    I don't know.

22   Q.    No idea why?  I mean, did you have a purse?

23   A.    Yeah.

24   Q.    Why would you keep it there instead of in your purse?

25   A.    I guess knowing that no one could search me I guess.

McLaughlin - Direct

1    Q.    I'm sorry?

2    A.    I guess knowing that no one could search me.

3    Q.    And who would you be worried about searching?

4    A.    I don't know.  I guess a cop.

5    Q.    Would you ever travel from Pennsylvania to West

6    Virginia with heroin hidden on your--on your person?

7    A.    Just inside my pants.

8    Q.    Okay.  So you've done that before?

9    A.    Yes.

10   Q.    Approximately how many times have you done that?

11   A.    A couple.  A couple times.

12   Q.    Excuse me?

13   A.    A couple times.

14   Q.    And where did you get the heroin from that you hid in

15   your pants to bring back to West Virginia?

16   A.    Mr. DeVaughn.

17   Q.    About how much heroin was he giving you that you were

18   transporting back to West Virginia?

19   A.    It was like a brick at first and then two bricks and

20   then it went to five.

21   Q.    So the first time it was one brick, then it was two

22   bricks and the last time it was five bricks?

23   A.    Pretty much.

24   Q.    Do you know any of the individuals who would receive

25   heroin from Mr. DeVaughn?

McLaughlin - Direct

1    A.    The lady Debbie.

2    Q.    Excuse me?

3    A.    Are you talking about as users?

4    A.    Users and--let's talk about users first.  Some of the

5    users who got heroin from either Mr. DeVaughn or you.

6    A.    Okay.  Let's see.  Ah, Debbie, ah, Katy and Justin.

7    That's all I can remember.  Ah--that's all I can remember.

8    Q.    Now, Ms. McLaughlin, how did you end up selling heroin

9    for Mr. DeVaughn?  When I say that, I mean not talking about

10   you actually transporting it but actually selling and making

11   deals.  How did that--how did that happen?

12   A.    I started going down there with him and I got myself

13   involved.

14   Q.    How did you actually get involved?  Who--

15   A.    By carrying it.

16   Q.    Okay.  Well after you carried it, how did you next get

17   involved to actually selling it and making deals?

18   A.    Um, I don't know how you want me to answer that.

19   Q.    Well, did you volunteer?  Did Mr. DeVaughn ask you?

20   How did it come to be?

21   A.    I pretty much volunteered myself at it.

22   Q.    And what was the reason that you volunteered to assist

23   in this?

24   A.    Stress at home, wanting--

25   Q.    Excuse me?

McLaughlin - Direct

1    A.    Stress at home, wanted to get away, wanted to just get

2    out, tired of the house situation that I was going through.

3    Q.    What would you receive for selling heroin?

4    A.    Nothing.

5    Q.    You didn't use heroin?

6    A.    No.

7    Q.    Did you get paid any money?

8    A.    No.

9    Q.    You received absolutely nothing for--for selling the

10   heroin?

11   A.    No.  I mean he did stuff for me but I never wanted

12   anything, you know what I mean?

13   Q.    And of course at this time you're still

14   boyfriend/girlfriend?

15   A.    I guess, I don't know how--what terms we're on.

16   Q.    I'm sorry?

17   A.    I don't know what terms we're on currently.

18   Q.    No, no, no.  I'm sorry.  I didn't mean now.  I meant at

19   the time when you were selling heroin for him?

20   A.    Oh, yes.

21   Q.    You were boyfriend/girlfriend at that time?

22   A.    Yeah.

23   Q.    Do you still have a relationship with Mr. DeVaughn

24   presently?

25   A.    I don't know about currently.  I don't know.

McLaughlin - Direct

1    Q.   I'm sorry?

2    A.   I don't know how we are right now.  I don't--

3    Q.   How many heroin distributions were you making in a

4    given day?

5    A.   It would depend.

6    Q.   What would it depend on?

7    A.   Who called.

8    Q.   What does that mean?

9    A.   Whoever called.  It would depend.  I couldn't give you

10   a--

11   Q.   I'm sorry?

12   A.   I couldn't exactly give you a number of people that got

13   served that day.

14   Q.   On some days--give me a high and low.  What's the least

15   amount of transactions you would make in a day?

16   A.   Maybe like ten.

17   Q.   And what would be the most amount of heroin

18   transactions you would make in a day?

19   A.   Like 15.

20   Q.   I'm sorry?

21   A.   Like 15 maybe.

22   Q.   Ten to 15 a day.

23   A.   Yes.

24   Q.   Were there other people that you could give the heroin

25   to who would make a transaction for you?

148

McLaughlin - Direct

1    A.    What do you mean?

2    Q.    Well did you--if someone called, did you always make

3    the transaction or could you send someone else to make a

4    deal?

5    A.    Yeah.

6    Q.    Okay.  Who were some of the people that you could send

7    to make deals?

8    A.    Ah, well if they would call and say someone else needed

9    something, they would come get it and they would just

10   distribute it but it wasn't like I was--you know what I

11   mean, sending them to do it.

12   Q.    Now how often were you and Mr. DeVaughn getting heroin

13   from Pittsburgh for distribution in West Virginia?

14   A.    A couple times a month maybe.

15   Q.    And what type of quantities were you bringing down

16   typically and I don't mean you personally, I mean the two of

17   you together?

18   A.    Less than like--like less than eight or nine bricks.

19   Q.    I'm sorry, one more time.

20   A.    Less than eight or nine bricks.

21   Q.    And how often were you bringing down eight or nine

22   bricks then?

23   A.    Like every maybe I'll say like week.

24   Q.    Eight or nine bricks a week?

25   A.    Like every week, every other week.

McLaughlin - Direct

1  Q.   Okay.  And when did you get to the point that you were

2  bringing down eight or nine bricks every week or every other

3  week?  When did that start?

4  A.   I don't recall.

5  Q.   How long did it last and of course we understand that

6  it would have ended with your arrest, correct?

7  A.   Yes.

8  Q.   How long prior to your arrest were you bringing down

9  eight or nine bricks every week to every other week?

10  A.   Maybe like three months, two months.

11  Q.   Two to three months?

12  A.   Yes.

13  Q.   Okay.  Now do you know someone named Rashie Johnson?

14  A.   Yes.

15  Q.   Did I pronounce her name correctly?

16  A.   Yes.

17  Q.   Okay.  Was Rashie's residence a place where you could

18  sell heroin?

19  A.   The first time I was there I was with Darrell Upshur.

20  Q.   Was that a place where you all--

21  A.   A one time thing.

22  Q.   Okay.  And who is--who is Darrell Upshur?

23  A.   A cousin.

24  Q.   A cousin to whom?

25  A.   Herbert DeVaughn.

McLaughlin - Direct

1    Q.   And how did you meet Darrell Upshur?

2    A.   Came down to West Virginia.

3    Q.   Who introduced you to him?

4    A.   Mr. DeVaughn.

5    Q.   And what was the purpose of Mr. DeVaughn introducing

6    you to Darrell Upshur?

7    A.   Ah, I honestly don't know.  I guess because I was the

8    girlfriend at the time.  He introduced me as his girlfriend.

9    Q.   We've already talked about Debbie and Rashie--Rashie,

10   I'm sorry, I always confuse her name.  Were they given dope

11   on a front?

12   A.   Sometimes.

13   Q.   And please explain to the jurors your understanding of

14   what a front is.

15   A.   Ah, giving the drug; they would sell it and give the

16   money whenever they got it.

17   Q.   And who would front Debbie and Rashie heroin?

18   A.   Me and Herbert DeVaughn.

19   Q.   Approximately how many times did you or Herbert

20   DeVaughn front heroin to--to Debbie?

21   A.   Just a couple times.

22   Q.   And how about Rashie?

23   A.   She would come like twice a week, if that.

24   Q.   Twice a week for how long?

25   A.   I don't know.

McLaughlin - Direct

1    Q.   Let's talk a little bit about Justin and Chelsea again.

2    Were they--did they have a vehicle?

3    A.   Yes.

4    Q.   Did their vehicle assist you and Mr. DeVaughn in any

5    way with your heroin?

6    A.   Back and forth to West Virginia.

7    Q.   I'm sorry?

8    A.   Back and forth to West Virginia.

9    Q.   So would they drive you and Mr. DeVaughn back and forth

10   to West Virginia or would they just transport the heroin for

11   the two of you back and forth to West Virginia?

12   A.   Sometimes a little bit of both.

13   Q.   How often would they make trips with just the heroin

14   without you or Mr. DeVaughn being present?

15   A.   They never did it by theirselves.

16   Q.   Okay.  So always either you or Mr. DeVaughn was

17   present?

18   A.   Yeah.

19   Q.   Would you trust them to do it by themselves?

20   A.   No.  No.

21   Q.   About how many times did they make trips then

22   with--total trips that would have been made by either Justin

23   or Chelsea?

24   A.   There was only three times with us in presence and then

25   the week that I--the week of my arrest it was like every

McLaughlin - Direct

1    three days, every two days.

2    Q.   At some point in time, ma'am--you do know--do you know

3    someone named Marcus?

4    A.   I know of him but I don't know him to know know him.

5    Q.   You know of Marcus?

6    A.   Yes.

7    Q.   Do you know Marcus' last name?

8    A.   No.

9    Q.   How did it start that you would sell--did you ever sell

10   heroin to Marcus?

11   A.   I believe so, yes.

12   Q.   How did that start?  How did you get in touch with

13   Marcus to sell him heroin?

14   A.   Ah, call him up or--I met him through Deb--Debbie.

15   Q.   Debbie initially introduced you to him?

16   A.   Yes.  They would come over to our house.

17   Q.   We've--we've talked about your arrest and what day were

18   you arrested?

19   A.   July 27th, 2010.

20   Q.   And who was with you on the day of your arrest?

21   A.   Darrell Upshur.

22   Q.   And was anyone else in the vehicle?

23   A.   Jay and Chelsea.

24   Q.   And where were you arrested at?

25   A.   I believe it was Burger King.

McLaughlin - Direct

1    Q.   Do you know the area of Morgantown where it occurred?

2    A.   Ah, I don't recall where I was.

3    Q.   Now what were you attempting to do when you were

4    arrested?

5    A.   Sell heroin.

6    Q.   And who were you going to sell it to?

7    A.   I don't know if it was Marcus.  I don't know because

8    Darrell had the phone at the time.

9    Q.   And was--how much heroin were you going to sell on that

10   occasion?

11   A.   Well from my understanding there was only two buns left

12   and I don't know if Darrell had one in his pocket or what

13   but supposedly there was supposed to be more than that, they

14   said on the arrest papers.

15   Q.   Initially when this whole transaction got started,

16   wasn't it--did it not get started with a phone call from

17   you?

18   A.   Yes.

19   Q.   Okay.  And who did you call?

20   A.   I don't remember.

21   Q.   Was it an undercover police officer?

22   A.   From what I'm hearing, yes.

23   Q.   And how did you get that number that you called that

24   undercover police officer?

25   A.   Someone else had said that my friend wanted some.

154

McLaughlin - Direct

1    Q.   And so you called them not realizing it was an

2    undercover officer?

3    A.   Yes, ma'am.

4    Q.   And--and ultimately it led to your arrest, correct?

5    A.   Yes.

6    Q.   Was any money seized from anyone at the time of the

7    arrest?

8    A.   From Darrell Upshur.

9    Q.   Was there any money seized from you?

10    A.   Two hundred dollars.

11    Q.   Okay.  And there was heroin seized from the vehicle as

12    well?

13    A.   Yes.

14    Q.   Okay.  Where was--where was Mr. DeVaughn at this time

15    when you and--and Darrell Upshur got arrested?

16    A.   Pittsburgh.

17    Q.   Okay.  Did he trust you to manage his affairs while he

18    was in Pittsburgh?

19    A.   Yes.

20    Q.   You weren't a heroin user, correct?

21    A.   No.

22    Q.   But he knew you wasn't going to use the product?

23    A.   Correct.

24    Q.   How did the money get back to him when he was in

25    Pittsburgh?

McLaughlin - Direct

1    A.   I guess Darrell give it to him.

2    Q.   So you would give the money to Darrell and Darrell

3    would give it to Mr. DeVaughn?

4    A.   Yes.

5    Q.   You've entered a plea agreement with the Government,

6    correct?

7    A.   Yes ma'am.

8    Q.   It was a written plea agreement, right?

9    A.   Huh?

10   Q.   It's written down on paper?

11   A.   Yes.

12   Q.   And you've already pled guilty before the Court, right?

13   A.   Yes.

14   Q.   And what did you plead guilty to?

15   A.   It was a phone transaction.

16   Q.   Was it distribution maybe?

17   A.   Yes.

18   Q.   And you're just awaiting to be sentenced on that at

19   this time, correct?

20   A.   Yes ma'am.

21            MS. WESLEY:  I have nothing further of this

22   witness, Your Honor.

23            THE COURT:  All right.  Cross-examination, Mr.

24   Curry.

25            MR. CURRY:  Thank you, Your Honor.

McLaughlin - Cross/Redirect

CROSS EXAMINATION

BY MR. CURRY:

Q.   Ms. McLaughlin, has been hanging over you for now 13 months, correct?

A.   Pardon me?

Q.   This--this whole trouble's been hanging over you now for more than a year, correct?

A.   Correct.

Q.   And you have to be very frightened about the whole thing, right?

A.   Yes sir.

Q.   Do you believe that you get any benefit by coming here to Court today and testifying?

A.   No.

Q.   So you don't believe that that will result in any kind of ultimate benefit to you in what sentence you get?

A.   I guess it will.

          MR. CURRY:  Okay.  Nothing further, Your Honor.

          THE COURT:  Anything else?  All right.

                    REDIRECT EXAMINATION

BY MS. WESLEY:

Q.   Are you willing to lie to get a benefit?

A.   No.

          MS. WESLEY:  Okay.  Nothing further, Your Honor.

          THE COURT:  All right.  Is this witness subject to

Borror - Direct

recall?

      MR. CURRY:  No, Your Honor.

      THE COURT:  All right.  Thank you.  Then, Ms.
McLaughlin you may step down and you are excused as a
witness.

    (Witness excused)

      THE COURT:  The Government may call its next
witness.

      MS. WESLEY:  Amanda Borror.

    (Pause)

      THE COURT:  Ms. Borror, good morning.  Would you
approach the Clerk in the front of the courtroom in the pink
jacket and she will administer the oath to you before you
take the witness stand.  Please approach.

      AMANDA BORROR, GOVERNMENT'S WITNESS, SWORN

      THE CLERK:  Thank you.  You may take the witness
stand.  The witness is Amanda Borror.  First name,
A-m-a-n-d-a.  Last name, B-o-r-r-o-r.

      THE COURT:  All right, Ms. Borror, if you'll
please speak in a loud, clear voice into the microphone so
that the jurors may hear you.  Thank you.

      THE WITNESS:  Okay.

          DIRECT EXAMINATION

BY MS. WESLEY:

Q.   How old are you ma'am?

Borror - Direct

A.   Twenty-nine (29).

Q.   And do you have any kids?

A.   Yes I do.

Q.   And what are their ages?

A.   My little boy is 13--well no, he's 14 now, sorry, and my little girl is 11.

Q.   Are you presently employed?

A.   No, not right at this moment.

Q.   Where were you working previously?

A.   At Long John Silver's.

Q.   Now, Ms. Borror, have you entered into a plea agreement with the Government?

A.   Yes I have.

Q.   Okay.  Have you actually been before a Court and have pled guilty to any offense though?

A.   No I haven't.

Q.   What do you anticipate, based upon your plea agreement that you're going to plead guilty to?

A.   Ah, controlled substance.

Q.   Would it be distribution?

A.   Ah, I think so, yeah.

Q.   And what type of controlled substance was involved?

A.   Heroin.

Q.   And were you a user of heroin?

A.   Yes I was.

159

Borror - Direct

Q.    When did you start using heroin?

A.    I started using heroin in the year of 2005, I think, 2004.  Yeah, probably about 2004.

Q.    And how--how did you start using heroin?

A.    It was introduced to me.  I was having a lot of problems and a friend of mine told me that it would more or less take my problems away and make me numb so I started using it.

Q.    And how did you pay for heroin?

A.    I sold it to support my habit.

Q.    Do you know someone known to you as Wop?

A.    Yes I do.

Q.    And how did you first meet him?

A.    The first time I met him was through another dealer. Then he didn't mess with heroin the first time that I met him, when he came around.  He messed with powder and crack and I didn't do it so I really never messed with him until later on.

Q.    And when was this approximately that you first met him?

A.    When I first met him?

Q.    Yeah.

A.    Whew.  It was the summer of about 2005 I would say.

Q.    And--and at that time of course you just exclusively used heroin?

A.    Yes.

Borror - Direct

Q.    And at some point in time did you become, I should say, reacquainted with him in terms of heroin?

A.    Yes.

Q.    And how did that occur?

A.    Ah, let's see.  My other dealer told me he was getting rid of it so I started going through him just buying, you know, a little bit at a time and then it started getting to be bigger because he started coming to my house and staying and giving it to me to get rid of.

Q.    I'm sorry.  And there was--I want to make sure that we understand what you're saying.  You said your other dealer was--was doing what?

A.    He's the one that introduced me to him.  He's the one that told me that he's started getting rid of it so I just started going through him.

Q.    And who was the other dealer?

A.    Stacks.

Q.    Okay.  Do you know where Stacks is from?

A.    Pittsburgh.

Q.    Okay.  Did you know where Wop was from?

A.    Yeah, Pittsburgh.

Q.    Do you know if they traveled down from Pittsburgh together?

A.    Yes they did.

Q.    And so Stacks was selling heroin at that time?

Borror - Direct

A.   Yes.

Q.   And Mr. DeVaughn was selling what?

A.   He--at first?

Q.   Yes ma'am.

A.   He started selling crack and heroin--crack and coke.

Q.   And so it was Stacks who basically referred you to--to Wop?

A.   Yes.

Q.   And what was the reason that Stacks referred you to Wop?

A.   I don't know, probably because he wasn't around that much.  He just didn't want to come around as much because he was in the studio a good bit so it was somebody else to get rid of it.

Q.   And it's Stacks who you're saying who wasn't around that much?

A.   Pretty much, yeah.

Q.   So when did you first start dealing or obtaining heroin from--from Wop?

A.   Probably about three weeks to a month after--yeah, about a month after I met him.

Q.   Okay.  And what time period is that or what year at least?

A.   It was 2005.

Q.   Do you see the person that's known to you as Wop in the

Borror - Direct

courtroom today?

A.    Yes I do.

Q.    Okay.  And what is he wearing?

A.    He's wearing a striped shirt, dress shirt.

          MS. WESLEY:  Your Honor, may the record reflect
that she's identified Mr. DeVaughn as Wop?

          THE COURT:  The record may so reflect.

BY MS. WESLEY:

Q.    And initially when you first started dealing with Wop,
what quantities were you getting from him?

A.    When I first started messing with him?

Q.    Uh-huh (yes).

A.    I would buy about a bundle, two bundles, about 10 to 20
bags at a time.

Q.    And when you say "10 to 20 bags" do you mean 10 to 20
stamps?

A.    Yes.

Q.    And how much were you paying?

A.    A hundred dollars for 10.

Q.    Is that a good price?

A.    Yes it is.

Q.    How often were you doing that?

A.    A good bit; probably about three or four times a day.

Q.    And how were you paying for those amounts that you were
purchasing?

Borror - Direct

A.   I would have other people that would want it so I'd just collect their money to and go and get it.

Q.   How long did that last before the relationship changed between you and--you and Wop?

A.   With buying it like that?

Q.   Yes.

A.   Probably a good two, three months.

Q.   Okay.  And what happened in terms of your relationship with Wop after--after those two or three months?

A.   He started coming over with Stacks and staying at my place and dropping off bricks of dope then to where I would get rid of them and they would come back and get their money and drop off more.

Q.   Now what time period is this, at least what year is this?

A.   It's still 2005.

Q.   Now how was it arranged?  Did they ask you if they can do this or did you offer?  What were the circumstances?

A.   Yeah.  They asked if they could come and I had no problem with it of course.  So they would come over.  They would separate their dope and then give me what they wanted to give me and then go on.

         MR. CURRY:  Your Honor, I'm going to object at this point and request a brief Bench Conference.

         THE COURT:  All right.  Counsel, would you please

Borror - Direct

approach?

(BENCH CONFERENCE)

THE COURT:  I'm assuming this is a 404(b) issue.

MR. CURRY:  Yes, Your Honor.  The Indictment,
Count One charges it was summer of '07; now we're back in
'05.

MS. WESLEY:  This is intrinsic because her
testimony is continuous from now until then heroin.

THE COURT:  Okay.  So you're using this as
intrinsic evidence as the background so the jury will
understand what occurred between her and the defendant
during the course of the conspiracy charged in the
Indictment?

MS. WESLEY:  Yes.

THE COURT:  I'll overrule the objection.

(END OF BENCH CONFERENCE)

THE COURT:  Ladies and Gentlemen of the jury, let
me explain something to you.  You may recall that in Count
One of the Indictment the allegation is that a conspiracy
existed from the summer of 2007.  You're now hearing
testimony that relates to events that according to the
witness occurred in 2005.  I'm allowing this testimony
because the Government's position is that it provides
background information to help you understand the--what it
believes was the relationship between this witness and the

Borror - Direct

defendant that continued on through the time of the
conspiracy so this is what we call intrinsic or background
evidence as a part of the total picture in the case so
that's why it's being allowed.  He's not charged with
anything that occurred in 2005.  Thank you.

BY MS. WESLEY:

Q.    Okay.  So you agreed to let them do this in your
residence?

A.    Yes.

Q.    Now how much heroin were they bringing down at this
time?

A.    They'd bring them in boxes, little boxes about the size
of this speaker here and there was about 10 bricks in each
box and they'd bring two, three, I mean, it divided up
between three people so there was--

Q.    I'm sorry.  Who were the three people that it was
divided up between?

A.    The three people would be Wop, Stacks and Q-Tip.

Q.    Now who is Q-Tip?  I haven't heard that name.

A.    Q-Tip was sometimes a runner.  He would take them up,
get it, bring it back and go in on it with them.

Q.    How often were they bringing down these amount of
quantities?

A.    They'd do this at least every three, four days.

Q.    And how many bricks are they bringing down at a time?

Borror - Direct

A.    In each box that's--about 30.

Q.    So about 30 bricks divided up between three?

A.    Yeah.

Q.    And what would you get for assisting them in this endeavor?

A.    To get rid of?

Q.    Yes.

A.    Like I would get rid of it for them.  I'd get at least a brick from each one, not all three, just the two, just Stacks and Wop.  I'd get a brick from them, get rid of it and like I said, they'd come back and drop off a brick a piece again and get rid of it.

Q.    And so the brick that you would get, you could either use it or sell it?

A.    As long as I had what they wanted for it, yes.

Q.    Did they tell you how much money you had to bring back for getting rid of it?

A.    Yes.

Q.    How much money did you have to earn for the brick?

A.    Three fifty.

Q.    Three fifty per brick?

A.    Yes.

Q.    And how long did this continue?

A.    This went on for a few months, probably about three months, four months.

Borror - Direct

Q.    Okay.  And what happened after that?

A.    They went on and would stay somewhere else and then at
that time I would just go and meet him and buy it again.

Q.    And when you say "him", who are you referring to?

A.    To Wop.

Q.    Okay.  And how much would you buy at that time from
him?

A.    Anywhere from a half a brick to a brick, 25 to 50 bags.

Q.    And how often were--I'm sorry.  I asked you quantities.
How often were you meeting up with Wop to obtain heroin at
this time?

A.    When he was around, if he was here, I would get it from
him every day that he was here.

Q.    And where would you go to meet him?

A.    Oh, just depend where he was at.  I've met him at Point
Marion Road at--at Debbie and Wendell's house.  I've met him
down by where I used to live on Brockway.  I've met him
every where; Granville.

Q.    What happened in early 2008 in terms of your
relationship with--with Wop?

A.    2008.  What do you mean, like could you--

Q.    At some point in time did you--did you stop dealing
with Wop?

A.    No, I've always bought from Wop.

Q.    So it continued up until--

Borror - Direct

A.    It continued all the way up until he went to jail.

Q.    And after--at some point in time was Wop still dealing with Stacks and Q-Tip?

A.    No.

Q.    Okay.

A.    He quit dealing with them.

Q.    Do you recall approximately when that relationship ended?

A.    That relationship ended probably about--almost a year after I met him.

Q.    Okay.  What year do you think that would have been?

A.    It would have been 2006, about the end of it.

Q.    About the end of 2006?

A.    Yeah.

Q.    Okay.  So after that relationship ended at the end of 2006, were you able to still get big quantities of heroin from Mr. DeVaughn?

A.    As long as I bought it, yes.

Q.    What do you mean?

A.    As long as I took cash to him I could get it.

Q.    So at this point in time he's not fronting it to you, you have to buy it?

A.    Yes.

Q.    Okay.  And what type of quantities were you--how much cash could you put together to buy from him?

Borror - Direct

A.   Well it just depends.  I mean sometimes I'd go and buy
a hundred and fifty dollars worth, two hundred and fifty
dollars worth.  Sometimes I'd go and buy three hundred and
fifty dollars worth.  I mean it just depends on how much
money I could get together.

Q.   Did--after the relationship severed with--after Wop's
relationship severed with Stacks and PJ, were you still--did
he still seem to be able to provide brick quantities of
heroin to you?

A.   Yes.

Q.   Now where were some of the other--do you know some of
the other places where Wop's heroin was being distributed?

A.   Where he'd get rid of it?

Q.   Yes.

A.   Yes.

Q.   And where would they be?

A.   It would be in the trailer park over in Granville.

Q.   Do you know who lived there?

A.   Yes.

Q.   Who?

A.   Dale Brown.

Q.   Where else?

A.   Down the Boulevard in Morgantown, ah, Point Marion
Road.

Q.   Do you know who resided at Point Marion Road?

Borror - Direct

A.    Yes.

Q.    Who?

A.    Debbie Bolden and Wendell.   Ah--

Q.    Who is Wendell?

A.    Her old man.

Q.    Okay.

A.    I've got it over in Cheat Lake in Country Squires.   I mean there's--

Q.    Who lived there?

A.    Justin Cole.  I mean I've got it at a bunch of places, just meeting him in spots even so I mean it's hard to remember every spot that I've met him at.

Q.    Did you have--how would you describe your relationship with Mr. DeVaughn which seemed to have spanned for many years?

A.    Very good.  I've--I've have always known him like a brother to me.  I mean we were really close.

Q.    Now do you know someone who--you may have just mentioned Marjorie Gardens?

A.    Yes, I have got it at Marjorie Gardens.  That's where I first met him at.

Q.    And--I'm sorry, whose residence was it at Marjorie Gardens where Mr.--

A.    Marjorie Gardens was Amber and Chelsea.

Q.    And what would the traffic be like at some of these

Borror - Direct

places where--where Wop's heroin was being sold?

A.   It--it'd be like a revolving door.  I mean it's
something like whenever I was getting rid of it.  There was
always somebody coming and going.  There was never really a
time that you actually got to sit for an hour or two hours
and be by yourself.  It always came.

Q.   Now at some time--at this point in time--let me ask you
this.  At this time, and just coming back into 2007 and
2008, what relationship did you have with--with Mr. DeVaughn
in terms of--of heroin?  Would he front it to you or do you
have to purchase it?

A.   I purchased it.

Q.   Okay.  So then on it's always you purchasing it from
him?

A.   Yes.

Q.   Okay.  When you purchased it from him and you were
selling it, what type of quantities were you purchasing?

A.   Bricks.

Q.   How many bricks?

A.   At least one.  I mean sometimes I'd get a half a brick.
It just depends if I was getting it on my own or if I was
getting it with somebody else.  I mean if I was getting it
with somebody else there'd be more.  There'd be at least
three or four of them.

Q.   And how often were you getting bricks from him?

Borror - Direct

A.   From him?

Q.   Yes.

A.   If it was for myself, a brick maybe once a week, if
that.  It just depends.  I mean if you want to count how
many times I've been there a day, then I would end up
equaling up to a brick a day.

Q.   And that's just for you?

A.   Yeah.

Q.   Would you be able to actually use a brick of heroin in
a day?

A.   Yeah.

Q.   So for yourself you would get a brick a day or, I'm
sorry, a brick a week?  I don't want to confuse your
testimony.

A.   It--I mean, it just depends.  Like if you want to count
how much that I bought in one day, it would equal up to a
brick, I mean, because I keep going back.

Q.   Now if you are getting the heroin to sell, not for you,
how much are you buying?

A.   I'd buy that, maybe a little bit more.

Q.   So you'd buy a brick, a little bit more if you're
selling?

A.   Yes.

Q.   So how much are you actually buying a day, including
what you're going to use and what you're going to sell?

Borror - Direct

A.    A day.

Q.    A day.

A.    I'd go anywhere from at least two to four a day.

Q.    You would buy two to four bricks a day?

A.    That's with what I would use and everybody else that I was getting it for, yes.

Q.    How much would you pay for that?

A.    Well, it just depends how I bought it.  If I'd come and buy it by the bundles it would be a hundred dollars a bundle, so five hundred a brick more or less because that's how I would do it sometimes, would just go and buy 10 bags at a time, so yeah.

Q.    Would you get any discounts from buying bigger quantities?

A.    If you buy a bigger quantity, yeah. If you buy a brick, like I said, you'd get it sometimes for three fifty, sometimes for four.

Q.    How long did that cont--and you say a day.  How many days a week are you buying two to four bricks of heroin?

A.    For as long as he's here.  He could be here for a week. If he's here for a week, I'm buying every day like that.  I mean I just keep coming back and buying as much as I need. I could see him 10 times a day and buy a bundle each time.

Q.    And what's the time period that you're doing this with him where you're no longer fronting and you're buying?  When

Borror - Direct

did it start and when did it end?

A.   From buying to--I'm not understanding.

Q.   I'm sorry.  This--this--what you've just discussed,
this two to four bricks a day when he's around, when did it
begin?

A.   Like what year did it begin?

Q.   Yes.

A.   I don't even know; probably about 2006, 2000--yeah
about 2006, 2007's when I started having to bring him cash
to buy my stuff.

Q.   And when did it end?

A.   When he went to jail, which was last year, 2010.

Q.   Now was your situation such that you could get his
heroin from other individuals or did you always deal
directly with Wop?

A.   No, it got to the point that he would have other people
getting rid of it for him.  He'd send other people out.

Q.   And--and who were some of the people that you know of
that he--he would send out to get rid of his heroin?

A.   I've bought it from Dale.  I've bought it from two
younger kids.  I don't even know; the one kid, called him
Pea.  The other kid I don't even know.  His cousin, Jules,
I've got from him.  I've bought from his girlfriend.  I
don't know, probably about, yeah, about five, six different
people.  If I knew all their names, I'd tell you but I

Borror - Direct

don't.

Q.   Do you know where Wop was getting his heroin from?

A.   Sometimes I'd take him up to get it.  I don't know
exactly who he got it from but the areas, yeah.

Q.   And--and what area was it, what city?

A.   We've got it from Pittsburgh but we'd get it in
like--if I can remember the name.  I want to say Monroeville
but it's not Monroeville, it's before there.  It's close to
Oakland in Pittsburgh.

Q.   And who would drive?

A.   Who would drive up?

Q.   Yes.

A.   My sister has drove.  I've never got to drove because I
didn't have a license so it would my sister or somebody else
that used that would be able to make it, make dope to take
him up.

Q.   Now how much heroin would--would be purchased on one of
these trips up there?

A.   For--let's see.  Then it would be separate.  It would
be just taking one or the other up so--

Q.   Who's one or the other?  Who are the people?

A.   It would be him or Stacks that we'd take up, Wop or
Stacks that we'd take up.  I've only taken Wop up probably
three times so him--

Q.   Let me just be clear.  Did you have a relationship with

Borror - Direct

Wop and Stacks?

A.   Yes, I did.

Q.   Even after they quit having their relationship?

A.   Yes.

Q.   You still had a relationship with both of them?

A.   Yes.

Q.   Okay.  So I just want to talk about Wop, okay?

A.   Right.

Q.   So--

A.   Just him alone going up there, he'd bring back anywhere from five to ten bricks by himself.

Q.   And how many trips were you on that he brought back that amount?

A.   I've only made three trips with him total, just him.

Q.   And it would be--would the amount be the same on each one of those trips or would it differ?

A.   Yes.

Q.   And--and what--where would the heroin be--be stashed when you're bringing it back to West Virginia?

A.   When we bring it back?

Q.   Yes.

A.   Where--I don't know.  It would be either in the trunk or on them.  If somebody else is with us that he's buy--that's buying it from him, they would have it on them and you hide it on your body mostly is what we did.

Borror - Direct

Q.    Now you were present on three of these trips?

A.    Yes.

Q.    Was Wop actually present on those trips as well when you were there?

A.    Yes.

Q.    Who else would be present?

A.    Sometimes it would be another person--it would be like another person he would sell to or my sister.  That was about it.  Those are the only two people I've only went with is my sister and another female.

Q.    Were there any trips to get heroin from Pittsburgh for Wop when he wasn't present?

A.    When he wasn't present?

Q.    Yes.

A.    Yeah.  I think I've done--yeah, I've done it probably twice without him being present.

Q.    And how would--how would that occur?

A.    We would go up and meet him is what we would do and bring it back.  Now whatever we would buy he would front us at least one or two bricks on top of whatever we bought.

Q.    And who would be the individuals leaving from West Virginia going to Pittsburgh?  Who would be present in that car?

A.    It would be me, my sister and her boyfriend at the time.

Borror - Direct

Q.   And where would you meet Wop?

A.   We would meet him--it's right by Oakland.  If I could just think of the name it would be different.  It's--right when you come out of the tunnels you make a right and it's like the third, fourth exit up.  I just forget what it's called.  I'm wanting to say it's Monroeville but I know it's not.

Q.   Let me ask you this.  So you all didn't actually have to like transport the money; he already had the heroin and you just got the heroin from him?

A.   We would give him--yes.  We would give him our money for ours and then like I said, he would at least front one to two bricks on top of whatever was paid for and bring it back and then bring back the money, usually the next day.

Q.   How much would you typically pay for?

A.   For--how much altogether for all of them?

Q.   Yes.

A.   We'd usually go up and get about five bricks so about fifteen hundred dollars, eighteen hundred dollars worth of dope.

Q.   How often would you travel to Pittsburgh to get heroin from Wop, not transporting it back but for you to purchase from him for distribution in West Virginia?

A.   From Wop?

Q.   Yes.

Borror - Direct

A.    I've made a good bit of trips.  Ah, I'd say anywhere
from 10, 20 trips I've made up there just to deal with him.

Q.    Just to go with him?

A.    Just to deal with him.

Q.    Deal with him.  Okay.  And when did you first start
making trips to deal with him in Pittsburgh?

A.    Oh my.  I'd say 2006, 2007.

Q.    And when did the trips stop?  When did you stop going
to Pittsburgh to get from him?

A.    Probably about 2000 and--let's see, '09.  I wouldn't go
all the time.  It's not something that I did all the time.
I just would go every now and then, like I said.

Q.    Now you were talking about this--a time period where
you were getting from him two to four bricks a day when he
was around.

A.    Right.

Q.    I want you to--to focus on the summer of 2007.

A.    Okay.

Q.    And I understand you've had a long relationship but
focus just on the summer of 2007 up until the arrest.

A.    Okay.

Q.    How often did you deal with Wop in terms of buying
brick quantities?

A.    At one buy?

Q.    Excuse me?

Borror - Direct

A.   At one buy, is that what you're saying?  You want me to
tell you--

Q.   Total.

A.   --if I bought a brick each time I went to see him.  Is
that what you're saying?

Q.   I want you to focus on the number of times that you
actually dealt with him because clearly he's not in town
every day.

A.   Sometimes I've dealt with him five, six times a day, I
mean.  The year of 2007, I mean--I don't know probably a
good 50, 60 times a month.

Q.   You dealt with him 50 or 60 times a month?

A.   Yeah.

Q.   How were you getting rid of--of all the heroin that you
were selling?

A.   I had clientele, just people that, you know, that does
it.

Q.   Did you have a lot of people that you dealt with?

A.   Yes.

Q.   Now you said 50 to 60 times a month?

A.   Yeah.

Q.   Was--is that every month?

A.   Yeah.  As long as he was here, yeah.

Q.   Are you--what about if he wasn't here?

A.   If he wasn't here and I didn't want to go down and see

Borror - Direct

him then, no, I'd see whoever was around.  If he sent
somebody else up here with his stuff then that's who I would
see.

Q.   Now when you say that 50 to 60 times, does that include
when you're getting his dope from the others who--

A.   Yeah.

Q.   Okay.  And how often would you have to go to someone
who worked for him at the end of your relationship with him?

A.   Every time.  Like it just to the point that you never
seen him.  You would see somebody else.  You would never see
Wop.

Q.   Then how did you know it was Wop's dope that you were
getting?

A.   I would talk to him.  He would be the one that I would
talk to.

Q.   Would you know who he would send to give you the dope?

A.   No.  You never knew if it would be Dale or if it would
be his cousin or the two boys.  You never knew.

Q.   You just knew that you made the arrangement with him?

A.   Right.

Q.   At some time, Ms.--Ms. Borror, did you agree to work as
a confidential informant with the Government?

A.   Yes.

Q.   And--and what was the reason that you agreed to--

A.   The reason that I agreed is because they've got a good

Borror - Direct

bit of stuff on me too.

Q.   And so you--you have a plea agreement and--and
you--okay.

A.   Yes I do.

Q.   Now I want to direct your attention then to August the
24th of 2010.

A.   Okay.

Q.   Were you working with the Government on that day as a
confidential informant?

A.   Yes I did.

Q.   And did you meet with any law enforcement officers
prior to going out to work as a--as a confidential
informant?

A.   Yes I did.

Q.   Okay.  And on that day did you make a phone call to
someone to arrange a drug purchase?

A.   Yes.

Q.   And--and who did you call?

A.   I talked to Wop.

Q.   Do you know where Wop was when you spoke to him on the
phone that day?

A.   No I did not.

Q.   Let me ask you this.  When--what was the heroin--what
was the heroin ability like in Morgantown during this time
period of the--the summer of 2010?

Borror - Direct

A.   It was good.  You could more or less get it any time you wanted it.

Q.   And who were the--were there other big dealers of heroin other than Mr.--Mr. DeVaughn at this point?

A.   Yeah.

Q.   And so was it difficult to get your hands on heroin at this time?

A.   That--those few days--yeah, the few days that he got taken down, the 24th and before then, yeah, it was kind of hard to get it then.

Q.   Why--do you know why?

A.   No, I have no idea, just nobody was around.

Q.   So did any--do you know if anyone--or did you communicate that to Mr. DeVaughn that it was hard to get heroin at that time?

A.   Yes I did.  I called him and I told him that there was nobody around, you know, now would be the time to come down and get rid of some and he did.

Q.   Okay.  And so the--you placed a phone call to Mr.--Mr. DeVaughn while you were actually with the police officers, correct?

A.   Yes.

Q.   And--and you had an opportunity to listen to the recording?

A.   Yes I have.

Borror - Direct

MS. WESLEY:  Your Honor, may I approach this witness?

THE COURT:  Yes you may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government Exhibit Number 24 for identification.  Is that a copy of the recording--the phone recording that you listened to?

A.   Yes it is.

Q.   Okay.  And did you recognize the voices you heard on that recording?

A.   Yes I did.

Q.   And whose voices did you hear?

A.   It would be mine and Wop's.

MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 24 admitted into evidence.

THE COURT:  Is there any objection?

MR. CURRY:  No, Your Honor.

THE COURT:  Government Exhibit 24 is admitted and may be published to the jury.

(Government Exhibit Number 24 admitted.)

(Government Exhibit Number 24 published.)

BY MS. WESLEY:

Q.   Ms. Borror, did you know where Mr. DeVaughn was when you spoke to him on the phone?

A.   No.

Borror - Direct

Q.   Of course there's noise that we heard on the
background.  Did you know who was making that noise?

A.   No.

Q.   That was on his end of the line and not yours?

A.   Yes.

Q.   Now in the phone call you discuss rock.  What--what is
rock?

A.   Raw?

Q.   Rock.

A.   Rock.  Rock is crack.

Q.   And of course you used crack in the past?

A.   Yeah, a long, long time ago.

Q.   Would it be--let me ask you this.  How did you--how did
the discussion about crack come into your heroin
transaction?

A.   I was asked--I told him that--he told me that he had
some down here so they asked--

Q.   Who's he?

A.   That Wop told me he had crack down here with him this
time so I let Todd Forbes know and he wanted to buy some of
that too so.

Q.   So you bought the heroin and the crack?

A.   Yes.

Q.   Okay.  now what did you do after you placed the--the
recorded phone call to--to Wop?

Borror - Direct

A.   I went to meet him but I didn't meet him; I met one of the kids that he had, one of the boys that he had with him over on Overdale.

Q.   Where's Overdale?

A.   Overdale street is right above my house.  It's right by the police station pretty much.

Q.   How long did it take you to travel to that location?

A.   Not even five minutes.

Q.   And--and you said one of the kids showed up.  Had you seen this kid before?

A.   Yes I have.

Q.   What were the circumstances of you seeing him in the past?

A.   I've seen him--I've bought from him before.  I've bought bricks off of him before at the Mall and stuff.

Q.   Who arranged the transactions that you dealt with this kid in the past?

A.   Wop did.

Q.   And--so what happened when--when you met the kid?

A.   I'd give him the money and he'd give me the stuff and then we'd go our separate ways.

Q.   Okay.  What did you do after that transaction with--with that kid?

A.   After that transaction I went straight back to Todd Forbes and gave him all of the--the heroin and the crack and

Borror - Cross

I went home.

Q.   Okay.

      MS. WESLEY:  May I have a moment, Your Honor?

      THE COURT:  Yes.

   (Pause)

      MS. WESLEY:  I have nothing further of this witness, Your Honor.

      THE COURT:  All right.  Mr. Curry.

      MR. CURRY:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CURRY:

Q.   Ms. Borror, basically you entered into the plea to help yourself, right?

A.   Yes I did.

Q.   Okay.  You have entered into--or did you enter into a stipulation with the Government about how much heroin you sold?

A.   I'm not understanding.

Q.   Did you make any agreement with the Government about how much heroin you sold?

A.   Just with my plea.

Q.   Okay.  Do you recall what you agreed that you sold, how much?

A.   Up to 400 grams.

Q.   Okay.  When did you first associate the name Herbert

Borror - Cross

DeVaughn with the name Wop?

A.   I've always known him as Wop.

Q.   Well, is this prosecution the first time you ever heard the name Herbert DeVaughn?

A.   No.  I mean I've heard his name.  I've--I've known him for a long time so, yeah, I've known his name; it's just that's not what I call him by.  I call him by Wop.

Q.   Now how much heroin were you using in those days?

A.   In them days I was using up to a brick a day--per day.

Q.   Well, would it be fair to say you were always high?

A.   Pretty much so.

Q.   Okay.  Thank you very much for your candor.

A.   You're welcome.

          MR. CURRY:  Nothing further.

          THE COURT:  Any redirect?

          MS. WESLEY:  No, Your Honor.

          THE COURT:  All right.  Then, Ms. Borror--is she subject to recall by either side?

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right.  Then, Ms. Borror, you may step down and you are excused as a witness.

     (Witness excused)

          THE COURT:  The Government may call its next witness.

          MS. WESLEY:  Your Honor, we call Farrah Machado.

Machado - Direct

THE COURT:  All right.  Farrah Machado.  Ladies and Gentlemen, I believe this is another forensic chemist.

(Pause)

THE COURT:  All right.  Ms. Machado, good after--good morning.  Would you please approach the Clerk who will administer the oath before you take the witness stand.

FARRAH MACHADO, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness stand.  The witness is Farrah Machado.  First name, F-a-r-r-a-h.  Last name, M-a-c-h-a-d-o.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.    Where do you work?

A.    I'm employed with the West Virginia State Police Drug Identification Section.

Q.    And how long have you been employed there?

A.    I've been employed with the State Police for approximately nine years.

Q.    And in what capacity are you employed there?

A.    I work as a Forensic Drug Chemist.

MS. WESLEY:  Your Honor, I agreed--I believe that the parties can stipulate to Ms. Machado's qualifications as a Forensic Chemist.

THE COURT:  Is that correct, Mr. Curry?

Machado - Direct

MR. CURRY:  That is correct, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen, Ms. Machado's qualifications have been agreed to by the parties and I admit her to the status of an expert witness.  Is this in the same capacity as before?

MS. WESLEY:  Yes, Your Honor.

THE COURT:  As an expert chemist qualified to render opinions with regard to certain chemical substances. All right.

MS. WESLEY:  Your Honor, I want to approach this witness with Government Exhibit Number 4 and Number 5.

THE COURT:  All right.  United States' Exhibits 4 and 5.

BY MS. WESLEY:

Q.   What is Government Exhibit Number 4?

A.   This is the outer packaging of a case that was submitted to the State Police Laboratory.

Q.   Okay.  And when--who submitted it?

A.   This was submitted by First Sergeant Todd Forbes.

Q.   And when was it received?

A.   It was received--let me check my notes here.  I'm sorry.  It was received at the laboratory on October 6, 2010.

Q.   Okay.  And what did you do with upon receipt?

A.   Once receiving the evidence, I reviewed the evidence to

Machado - Direct

make sure that the seal was intact.  I then took it back to my laboratory because I picked it up at Central Evidence Receiving.  I opened the evidence and inventoried the case just making sure that everything that the officer says he submitted matched to what actual evidence was in the manila envelope.

Q.   Did you make any type of analysis on Government Exhibit Number 4?

A.   Yes ma'am.  I analyzed items number 1 through number 1.8.

Q.   And what type of tests did you perform on it?

A.   I performed a series of preliminary testing and confirmatory testing.

Q.   And what are they basically designed to do, the confirmatory and the preliminary testing?

A.   To identify any controlled substances present.

Q.   Okay.  And based upon the analysis that you performed on that exhibit, were you able to form an opinion as to if there are any controlled substances contained in Government Exhibit Number 4?

A.   Yes ma'am.

Q.   And what were your conclusions?

A.   In item number 1.1 through number 1.8 I found these items submitted contain heroin, a Schedule I Controlled Narcotic substance.

Machado - Direct

Q.   And basically were those exhibits--were they basically
in the same condition--I'm sorry.  Were they continuously
kept in your possession when they were not in a secured
locker facility?

A.   Yes ma'am.  I have a personal evidence locker that no
one else has access to except myself and when I was not
working on the evidence I put it up in my personal evidence
locker.

Q.   And after you performed your analysis and you're
finished conducting your analysis of those substances, what
did you do with Government Exhibit Number 4?

A.   Once the case was completed by myself, a fellow analyst
will review my case file to insure there's no typographical
errors.  I then seal the evidence back up and return it to
Central Evidence Receiving.  At that point it is returned to
the submitting officer and in this case it was returned by
certified mail.

Q.   And did you prepare a report detailing your findings as
a result of your analysis of Government Exhibit Number 4?

A.   Yes ma'am.

Q.   And I want to direct your attention to Government
Exhibit Number 5.

A.   Yes ma'am.

Q.   Is that your report detailing your findings?

A.   Yes ma'am it is.

193

Machado - Direct

Q.   And is it in the same condition as when you prepared
it?

A.   Yes, ma'am.

        MS. WESLEY:  Your Honor, I would move to admit
Government Exhibit Number 5.

            THE COURT:  Is there any objection?

            MR. CURRY:  No objection, Your Honor.

            THE COURT:  All right.  Government Exhibit Number
5 is admitted.

     (Government Exhibit Number 5 admitted.)

BY MS. WESLEY:

Q.   Did you also basically determine the actual weight of
the substances that you analyzed?

A.   Yes ma'am.

Q.   I want to direct your attention specifically to Item
Number 1.8 of Government Exhibit Number 4.  What is the
weight for that particular item?

A.   Item Number 1.8 weighs a total of approximately 13.8
grams, including packaging.  I also calculated it out
without packaging and it contains approximately 1.24 grams
of heroin.

Q.   And the rest of your conclusions are basically detailed
on Government Exhibit Number 5:

A.   Yes ma'am.

Q.   Now I want to direct your attention then to Government

Machado - Direct

Exhibit Number 7.

       MS. WESLEY:  May I approach, Your Honor.

       THE COURT:  You may.

BY MS. WESLEY:

Q.   And Government Exhibit Number 8 is contained within it.

A.   Thank you.

Q.   When did you first receive Government Exhibit Number 7?

A.   Government's Exhibit Number 7 was received at the laboratory on October 7th, 2010.

Q.   And who submitted it?

A.   It was submitted by First Sergent Todd Forbes.

Q.   Did you maintain that exhibit the same that you did Government Exhibit Number 4 once it came into your possession and custody?

A.   Yes ma'am I did.

Q.   And did you perform the same type of analysis on it?

A.   Yes ma'am I did.

Q.   And based upon your--your analysis, did you form a conclusion as to what's contained in Government Exhibit Number 7?

A.   Yes ma'am.

Q.   And--and what results did you find?

A.   My Items Number 1.1 through Items 1.5 contain heroin, a Schedule I Controlled Narcotic substance.

Q.   Okay.  And did you put your findings in a forensic lab

Machado - Direct

report?

A.   Yes ma'am I did.

Q.   And I'm going to direct your attention to Exhibit Number 8.  Does that represent your findings based upon your analysis of Government Exhibit Number 7?

A.   Yes ma'am.

Q.   And is it in the same condition as when you prepared it?

A.   Yes ma'am it is.

        MS. WESLEY:  Your Honor, I would move to admit Government Exhibit Number 8.

        THE COURT:  Is there any objection?

        MR. CURRY:  No, Your Honor.

        THE COURT:  All right.  Government Exhibit 8 is admitted.

     (Government Exhibit Number 8 admitted.)

BY MS. WESLEY:

Q.   Okay.  Directing your attention then to item 1.5, what is the weight of that heroin that you analyzed?

A.   Item Number 1.5 weighed a total of approximately 4.68 grams including packaging and without packaging Item Number 1.5 contained 0.23 gram of heroin.

Q.   Now I want to direct your attention to Government Exhibit Number 9 and Government Exhibit Number 10 is contained with it.

196

Machado - Direct

A.    Thank you.

Q.    When did you first receive Government Exhibit Number 9?

A.    Government's Exhibit Number 9 was received at the
laboratory on October 6th, 2010.

Q.    And who submitted it?

A.    It was submitted by First Sergeant Todd Forbes.

Q.    And did you maintain Government Exhibit Number 10--I'm
sorry, Number 9 in the same fashion that you did the other
previous drug exhibits?

A.    Yes ma'am.

Q.    And did you perform the same type of analysis on them?

A.    Yes ma'am.

Q.    And did you reach any results based upon the testing
performed?

A.    Yes ma'am.

Q.    And what were your conclusions?

A.    The items submitted, Number 1.1 through 1.8 contain
heroin, a Schedule I Controlled Narcotic substance.

Q.    And did you prepare a report detailing your findings?

A.    Yes ma'am.

Q.    Would you please look at Government Exhibit Number 10?

A.    Yes.

Q.    Is that in the same manner and format as when you
prepared it?

A.    Yes ma'am it is.

Machado - Direct

MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 10 admitted into evidence.

THE COURT:  Is there any objection?

MR. CURRY:  No, Your Honor.

THE COURT:  All right.  Government Exhibit 10 is admitted.

(Government Exhibit Number 10 admitted.)

BY MS. WESLEY:

Q.    Ma'am, I'd like to address your attention to Item 1.8 on your analysis.

A.    Yes.

Q.    Could you please advise the weight of that package?

A.    Yes.  My Item Number 1.8 weighed a total of approximately 14.1 grams including packaging and the weight excluding packaging was 0.82 grams of heroin.

Q.    Now I want to direct your attention then to Government Exhibit Number 11.

MS. WESLEY:  May I approach, Your Honor?

THE COURT:  Yes.

BY MS. WESLEY:

Q.    And it contains Exhibit Number 12.  When did you first receive Government Exhibit Number 11?

A.    Government's Exhibit Number 11 was received at the laboratory on October 6, 2010.

Q.    And who submitted it?

Machado - Direct

A.   It was submitted by First Sergeant Todd Forbes.

Q.   And did you maintain that exhibit in the same capacity
that you did the other drug exhibits?

A.   Yes ma'am.

Q.   And did you perform the same type of drug testing and
analysis on it?

A.   Yes ma'am.

Q.   And were you able to reach a conclusion?

A.   Yes ma'am.

Q.   And what were your conclusions?

A.   My Items Number 1.1, Number 1.2, Number 1.3.8, Number
1.4, Number 1.5.1 through 1.5.5, Number 1.5.7 and Number
1.5.8 contain heroin, a Schedule I Controlled Narcotic
substance and my Items Number 1.3.1 through Number 1.3.7 and
Number 1.5.6 contain heroin, a Schedule I Controlled
Narcotic substance and a trace amount of Oxycodone, a
Schedule II Controlled Narcotic substance.

Q.   Now did you prepare your conclusions in a report?

A.   Yes ma'am I did.

Q.   I want to direct your attention then to Government
Exhibit Number 12.

A.   Yes ma'am.

Q.   Is that the report prepared by you detailing your
findings?

A.   Yes ma'am it is.

199

Machado - Direct

Q.   And is it in the same condition as when you prepared it?

A.   Yes ma'am.

     MS. WESLEY:  Your Honor, I would move to admit Government Exhibit Number 12.

          THE COURT:  Is there any objection?

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right.  The Court admits Government Exhibit 12.

     (Government Exhibit Number 12  admitted.)

          MS. WESLEY:  May I have a moment, Your Honor?

          THE COURT:  Certainly.

     (Pause)

          MS. WESLEY:  I have nothing further of this witness, Your Honor.

          THE COURT:  Cross-examination?

          MR. CURRY:  I have no questions of this witness, Your Honor.

          THE COURT:  All right.  In that case, Ms. Machado, you may step down and you are excused as a witness.

          THE WITNESS:  Thank you, Your Honor.

     (Witness excused)

          THE COURT:  All right.  Your next witness.

          MS. WESLEY:  Your Honor, we call Dale Brown.

          THE COURT:  Dale Brown.

200

Brown - Direct

MS. WESLEY:  Your Honor, may I retrieve--

THE COURT:  Yes please.  Please help.  Mr. Brown,
do you want to take a seat in that first seat until we get
the exhibits straightened out and then we'll bring you up to
the witness stand.  Thank you.

(Pause)

THE COURT:  All right, Mr. Brown, you may
approach.  The Clerk in the pink jacket will administer the
oath to you before you take the witness stand.  Please raise
your right hand.

DALE BROWN, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness
stand.  The witness is Dale Brown.  First name, D-a-l-e;
last name, Brown, B-r-o-w-n.

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.   How old are you?

A.   Twenty-six (26) years old.

Q.   And you presently have a plea agreement with the
Government, do you not?

A.   Yes ma'am.

Q.   And do you recall what you pled guilty to?

A.   Yes ma'am.

Q.   And what did you plead guilty to?

Brown - Direct

A.   Aiding and abetting with intent to distribute.

Q.   Okay.  And what drug were you attempting to distribute?

A.   Heroin.

Q.   And have you already been before the Court to--to plead guilty?

A.   Yes ma'am.

Q.   And you're just awaiting sentencing at this time?

A.   Yes ma'am.

Q.   Okay.  Where are you from originally?

A.   Originally I'm from Morgantown, West Virginia.

Q.   Okay.  Where did you go to high school?

A.   I went to University High School.

Q.   And how did--were you--did you ever use heroin?

A.   Yes ma'am.

Q.   And how did you end up using heroin?

A.   I injected it.

Q.   What was the basis--why did you start using heroin?

A.   I was hanging out with the wrong group of people.  The reason I started using heroin was because I--first I got addicted to pain pills.

Q.   Now you've already acknowledged of course that you pled to aiding and abetting and the possession with intent to distribute heroin.  Whose heroin were you holding that you were going to sell that led to you pleading guilty?

A.   I was holding Herbert's.

Brown - Direct

Q.   I'm sorry, what?

A.   I was holding Wop's.

Q.   And how did you first meet Wop?

A.   I met him through a friend of mine, Brian, probably I'd say two--within two months within being arrested.

Q.   Okay.  So sometime in the summer of 2010?

A.   Yes.

Q.   And what was--what was going on when you first met Wop?

A.   How I met him was a friend of mine had a DVD player for a car that he was wanting to sell to Wop.

Q.   And at some point in time did you realize or become aware--did you think at some point in time that you could get heroin from Wop?

A.   Yes.

Q.   And--and how--how did you become aware that you could do this?

A.   Through my friend that I met him through.

Q.   And the first time you met Wop did he have any type of vehicle?

A.   Yes.

Q.   What type of vehicle?

A.   If I'm not mistaken i think it was a Ford Taurus.

Q.   Do you recall the color?

A.   Gold.

Q.   Now have you ever--have you ever received heroin from

Brown - Direct

Wop for yourself?

A.    Yes.

Q.    When did you first receive heroin from him?

A.    I'd say probably in the middle of June.

Q.    And where were you?

A.    I can't recall exactly where I was at at the time.

Q.    Who were you with?

A.    Probably some friends at the time.

Q.    What--let me ask you this.  How did it happen the first time that you bought heroin from him?

A.    That's when I met him through a friend of mine whenever he was selling him the DVD player for his car.

Q.    So that was the first time?

A.    Yeah.

Q.    Okay.  I'm sorry, I was confused.  Now after that first time then, how many times have you met with Wop to obtain heroin?

A.    Within the first time I met him multiple times after that.  I'd say I'd probably meet him at least two to three times a day for a month a half, two months.

Q.    And what type of quantities were you buying?

A.    I would buy anywhere from--anywhere from like one bun, maybe four buns, five buns at the most.

Q.    Is that a day or is that a transaction?

A.    That's daily.

Brown - Direct

Q.   Okay.  So, I'm sorry.  Three to four buns daily?

A.   No, anywhere from one bun to three to four buns daily.

Q.   Okay.  Got it.  And that amount that you're buying, is that just for you for personal use?

A.   Yes.

Q.   Do you see Wop seated in the courtroom today?

A.   Yes ma'am.

Q.   Would you please identify him for the record by indicating what he's wearing?

A.   He's wearing a button-up polo shirt, white with blue stripes.

     MS. WESLEY:  Your Honor, may the record reflect that he's identified Mr. DeVaughn?

     THE COURT:  The record may so reflect.

BY MS. WESLEY:

Q.   Where would you meet Wop to--to purchase heroin?

A.   I met him on Point Marion Road.

Q.   Do you recall who lived at that residence?

A.   No I don't.

Q.   And where would you meet him at on Point Marion Road?

A.   Usually in his vehicle.

Q.   Okay.  Who would be in the vehicle?

A.   Usually just him and his girlfriend at the time.

Q.   Do you recall or do you know the girlfriend's name?

A.   Yeah.

Brown - Direct

Q.   What was her name?

A.   Grace.

Q.   And where would the heroin be kept at in the vehicle?

A.   I'm not exactly sure where he kept it.

Q.   When you would go there to Point Marion Road, what was the traffic like--the traffic like in terms of the drug traffic?

A.   I remember before I went there and I actually had to get dropped off down the street because there were so many vehicles in the driveway.

Q.   And these are other people purchasing heroin?

A.   Yeah, I think.

Q.   How far down the street did you have to get dropped off to meet with him?

A.   Probably about 50, 100 yards down the street.

Q.   How much would you pay for a bun of heroin?

A.   Just like a hundred dollars.

Q.   Did you ever purchase quantities bigger than a bun?

A.   Yeah.

Q.   And what type of quantities would you purchase bigger than a bun?

A.   At the most I might have purchased a brick at the most, which would be five buns.

Q.   How much would you pay for a brick?

A.   Anywhere between four and five hundred dollars.

Brown - Direct

Q.   And how many times would you purchase a brick of heroin?

A.   Hardly--it'd be very often that I would purchase that.

Q.   Would you ever--on any of the occasions when you were purchasing heroin, were you ever in the position where you could see additional quantities of heroin?

A.   Maybe once or twice but not like a large quantity amount.

Q.   What did you see?

A.   The most I've probably ever seen was maybe just a brick or two at the most.

Q.   And what--where would it be kept that you were able to see it?

A.   I've always just seen it--it was just in a Baggie.

Q.   Would it be in the vehicle?  Would it be--

A.   Yeah, in the vehicle.

Q.   Now could you ever get Wop's heroin from individuals other than Wop?

A.   No.

Q.   You dealt with him directly?

A.   Yeah.

Q.   Was there any--let me ask you this.  What did you do to support your heroin addiction?

A.   Ah, well I was working under the table at the time and then also I had friends that were doing it as well as me.

Brown - Direct

Q.    When you say "doing it as well", what do you mean?

A.    Well my friends that wanted it, if I got them some then they would give me some for getting it for them.

Q.    So you basically brokered or acted as a middle person?

A.    Yeah.

Q.    At some point in time did you end up having a relationship with Wop where you were selling heroin for him?

A.    Yes.

Q.    And how did that begin?

A.    It began when I met him, probably in the middle of June, through a friend of mine whenever he was selling him a DVD player for his car.

Q.    And who approached whom about this arrangement?

A.    He actually approached me about the arrangement.

Q.    And what was he offering you?

A.    He was offering me to make money.

Q.    Did you want the money or did you want the heroin?

A.    I just wanted the heroin.

Q.    And how much heroin would you be paid?

A.    I don't know; it varies anywhere between probably just a couple bags every time that I met somebody.

Q.    And who would you obtain the heroin from that you were going to sell for him?

A.    What's that again?

Q.    Who would you get the heroin from that you were going

Brown - Direct

to sell?

A.    Wop.

Q.    Where would you meet him at?

A.    Various locations, usually on the Point Marion Road.

Q.    How much heroin was he giving you at a time.

A.    Not very much.  Like he--he never really gave me a lot,
like first time that I met him I would only get just a
couple bundles at a time, that's it.

Q.    And when you got the heroin from him did you--did he
tell you where you needed to go to sell the heroin or were
you on your own trying to figure out where to sell it and
how?

A.    No, he actually helped out with selling it.

Q.    I'm sorry, what was that?

A.    He actually helped me out with telling me the people to
meet to sell it.

Q.    Okay.  So he gave you the heroin and told you where to
go?

A.    yeah.

Q.    And how many times would you do that a day?

A.    I'd say maybe three to--no more than four times a day.

Q.    And how would you get to these locations to deliver the
heroin?

A.    Friends of mine.

Q.    And what would you do with the money that you got

Brown - Direct

from--after delivering the heroin?

A.    I would save it and then give it back to him.

Q.    Back to who?

A.    Wop.

Q.    What's the most amount of money you gave him at one time?

A.    I'd say maybe four, no more than five hundred dollars.

Q.    At some point in time--let me ask you this.  When you were working for Wop did you sell any heroin to Jolie Lang?

A.    Yes ma'am.

Q.    Was that the basis of your guilty plea when you pled guilty?

A.    Ah, no.

Q.    At some point in time--and so you--you do know who Jolie Lang is?

A.    Yes ma'am.

Q.    At some point in time did you end up selling heroin from her residence?

A.    Yes I was--well I didn't sell it out of her home but I was at her home with it.

Q.    So her home was basically the point of operation to get the heroin, then to deliver to others?

A.    For one day it was.

Q.    And do you recall approximately when that occurred?

A.    Yes, ma'am.

Brown - Direct

Q.   When was it?

A.   It occurred around August 4th to August 8th of 2010.

Q.   Okay.  And how was that arranged?  In other words, how did you get involved in that?

A.   Ah, I received a phone call from Wop that told me to get dropped off over at her apartment.

Q.   And did you get dropped off at Jolie's house?

A.   Yes ma'am.

Q.   And what were you supposed to do after you arrived at Jolie Lang's house?

A.   I was supposed to meet people for Wop.

Q.   Okay.  And who else was at Jolie Lang's house when you got there?

A.   There was me and another kid named Julian.

Q.   Okay.  Do you know Julian's last name?

A.   I only know it from my paperwork.  It's--

Q.   Okay.  Then never mind.  Had you met Julian prior to this event at Jolie's house?

A.   That was my first time meeting him.

Q.   Now what were you going to receive as a result of selling the heroin from--from Jolie's?

A.   I was going to receive money.

Q.   Do you know how much money you were supposed to get?

A.   No.

Q.   So did you see how much heroin was actually at Jolie's

Brown - Direct

house?

A.   No.

Q.   Okay.  So how did you know where to go to get rid of the heroin when you were at Jolie's?

A.   Ah, Julian would tell me where they would be waiting for me.

Q.   And about how--and I'm sorry, I may have asked you this.  About how many trips did you make while you were there to--to get rid of heroin?

A.   I'm not exactly sure.  I'm not exactly sure how many trips that I made that day honestly.

Q.   Were you using?

A.   Yes ma'am.

Q.   Let me ask you this, and I'm sorry, we'll come back to this in a minute.  Were there other occasions where you would sell Wop's dope from either residences or hotels?

A.   Yes ma'am.

Q.   Where were some of the hotels that you would sell heroin from?

A.   Ah, I sold it from the Econo Lodge in Westover.

Q.   And how did that occur that you ended up selling his heroin from that location?

A.   How did that occur?

Q.   Who asked you to do that?

A.   He did.

Brown - Direct

Q.    Okay.  And would you actually do the transactions from the room in the Econo Lodge?

A.    No ma'am.

Q.    Now do you know someone referred to as Ty?

A.    Yes, ma'am.

Q.    And how do you know Ty?

A.    One morning Wop called me up and said that he needed somewhere to hang out for a couple hours so I said that was fine and he showed up at my residence about a half an hour later and that's when he had that--that guy with him named Ty and he just dropped him off and left him there.

Q.    And when was this approximately?

A.    I'd say this was around the first week of August.

Q.    And so Wop dropped Ty off at your residence?

A.    Yes, ma'am.

Q.    Okay.  And what was the purpose of dropping him off at your residence?

A.    I guess because he wanted me to run the drugs for him.

Q.    Did Ty have drugs on him after Wop dropped him off?

A.    Yes ma'am.

Q.    Do you know how much drugs he had?

A.    No ma'am, I don't.

Q.    So what happened after--after Ty was dropped off?

A.    After Ty was dropped off my father seen him--that he had drugs and he made him leave our residence.

Brown - Direct

Q.    So where did you go after that?

A.    After we left our residence we didn't have anywhere to go and that's when we went to the Econo Lodge in Westover.

Q.    And who rented the room there?

A.    I did.

Q.    And did you have the money to rent the money or did someone give you the money?

A.    Someone gave me the money.

Q.    And did you have to show an ID to rent the room?

A.    Yes ma'am.

Q.    Who stayed in the room?

A.    Just me and Ty.

Q.    How long did you stay in the room?

A.    I'd say maybe four or five days.

Q.    And what did the two of you do throughout these four to five days?

A.    Just basically hung out, smoked weed and ate food and that's about it.

Q.    Did you sell any heroin?

A.    Yes ma'am.

Q.    Do you know how much heroin that--that the two of you had to sell?

A.    No ma'am, I'm not exactly sure how much.

Q.    And who was actually manning--let me ask you this.  Who was actually going out and--and selling--getting rid of the

Brown - Direct

heroin if someone wanted it when you and Ty were staying at
the Econo Lodge?

A.    That was me.

Q.    Okay.  Was it just you?

A.    Yeah.

Q.    And often did you have to leave to go do a heroin deal?

A.    I'm not exactly sure.  I left the room multiple times
though, I know that.

Q.    What type of quantities were you selling?

A.    I wasn't selling anything large, just maybe like a
bundle or two here and there and that's it.

Q.    How did you know where you needed to go to--to--to get
rid of the heroin?

A.    Ty would tell me where to meet the people at.

Q.    And do you know where Ty is from?

A.    I think he's from Pittsburgh but I really don't know.

Q.    Do you know if Ty has a family relationship with anyone
else that you know?

A.    Not that I know of.

Q.    Now did you and Ty run out of any heroin during those
days that you were staying at the Econo Lodge, if you know?

A.    Not that I can remember.

Q.    During that time period that you and Ty were--were
staying at the Econo Lodge, when you would leave to make a
transaction, where were some of the places that you would

Brown - Direct

go?

A.   I would meet people like McDonald's in Westover, Big
Lots, Taco Bell, BFS, somewhere around that facility.

Q.   Are all those businesses in the same close geographical
region?

A.   Yes ma'am.

Q.   How long would it take to walk from the Econo Lodge to
the McDonald's?

A.   Not even five minutes.

Q.   Okay.  Is that where you met Jolie Lang?

A.   Yes ma'am.

Q.   Now I want to talk about Jolie Lang again, what we were
talking about previously when you guys were in her
residence.  Was there anyone else in the residence other
than you and, of course Julian was there or Jules?

A.   Yes.

Q.   What do you call him, Julian or Jules?

A.   I called him Julian.

Q.   Okay.  Was there anyone else there other than Jolie,
you and Julian?

A.   Yes, there was Jolie's husband, Todd.

Q.   Do you know what Jolie was going to receive from
basically letting her home be used as--as a point of
operation for the heroin?

A.   Yeah, I think she received a bundle for--for us being

Brown - Direct

at her residence at the time.

Q.   At some point in time did you and Jules have to leave Jolie's residence?

A.   Yes ma'am.

Q.   And why?  Do you know why?

A.   Ah, I'm not exactly sure why, no.

Q.   And where were you going to go upon leaving Jolie's residence?

A.   She was supposed to give me and Julian a ride to a hotel room.

Q.   Okay.  Do you know which--which hotel?

A.   I'm not exactly sure.

Q.   And what happened while you were in Jolie's car?

A.   She pulled out in front of a Morgantown police officer and he performed a traffic stop on the vehicle and pulled us over.

Q.   And did you know if there was any heroin or anything on any person in the vehicle?

A.   Yes ma'am.

Q.   And so what happened after you were pulled over?

A.   After we got pulled over the police officer walked up to the vehicle and asked Jolie for her license and registration.  She was really nervous and shaking at the time, I can recall, so that gave probable cause and then another police officer came and he pulled us out of the

Brown - Direct

vehicle and then he frisked us down to make sure we didn't have anything on us and then they went through out vehicle and searched the vehicle also.

Q.   Okay.  Did they find any drugs in the vehicle?

A.   Yes ma'am.

Q.   And what did they find?

A.   They found 155 stamps of heroin.

Q.   And where did they find the heroin stamps?

A.   They found it in a black backpack in the back seat of--in the rear of the vehicle in a pair of khaki shorts.

Q.   Did they find anything else on any of the individuals who were in the vehicle?

A.   Yes they found money on me and Julian.

Q.   Okay.  And where did you get the money from that they found on you?

A.   I--I received my money from Julian.

Q.   Approximately how much money did they take from you?

A.   I'm not exactly sure.  I think it was around fifteen hundred dollars.

Q.   Now the room that you and--that Julian were on your way to, did you have to pay for the room?

A.   Not that I know of, no.

Q.   Do you know if the room was already paid for?

A.   I think it was already paid for, yes.

Q.   Do you think or do you know?

Brown - Direct

A.    I'm not exactly sure.

Q.    Do--were you or Julian in communication with Wop prior
to leaving Jolie's residence?

A.    I didn't talk to him but I think Julian might have been
in communication with him.

Q.    When--was Jolie's husband, Todd Lang, in the vehicle
when it was pulled over as well?

A.    Yes ma'am.

Q.    And after this incident were you and--and Julian
arrested?

A.    Yes ma'am.

          MS. WESLEY:  May I have a moment, Your Honor?

          THE COURT:  Yes.

      (Pause)

          MS. WESLEY:  I have nothing further of this
witness, Your Honor.

          THE COURT:  All right.  Cross-examination.

          MR. CURRY:  Thank you, Your Honor.

          THE COURT:  Oh, you know what.  Perhaps, Ladies
and Gentlemen, we'll save that until we come back from lunch
so that you can get your lunch on time.  I think this could
be a longer cross-examination.  It's ten after twelve,
Ladies and Gentlemen.  Please be prepared to return at--did
you find you had enough time with an hour yesterday?  Was
that plenty of time?  All right.  So we'll be back at 1:15.

Brown - Direct

That you should give you enough time for whatever you need and please do not discuss the case among yourselves during this recess.  Do not read any newspaper coverage of it, watch any TV coverage or listen to any radio coverage of it, should there be any.  In any event, don't allow any third party to discuss the case with you.  Should someone attempt to talk to you during this noon hour recess about the case, you must walk away from them, advise them you've been ordered not to discuss it and please let me know about that contact when you return through Court Security or Carole.  It's not necessary for you to let your fellow jurors know about that.  Thank you for your attention and your patience this morning.  We'll see you at 1:15.

        (Jury Out at 12:09 p.m.)

            THE COURT:  All right, Mr. Brown, you may step down and please be prepared to return to the stand at 1:15 to resume your examination.  You'll be on cross-examination by the defendant's attorney.  All right.

            THE WITNESS:  Uh-huh (yes).

        (Witness excused from stand)

            THE COURT:  Are there matters from the Government or the Defendant in the meantime?

            MR. CURRY:  No ma'am.

            MS. WESLEY:  No, Your Honor.

            THE COURT:  All right.  Thank you.  This Court

Brown - Cross

stands in recess until 1:15.  Oh, and, Mr. Brown, I should have mentioned to you.  Do not discuss your testimony with anyone during this recess.  All right.  Thank you.

(Recess from 12:10 p.m., until 1:17 p.m., 08-24-2011)

THE COURT:  Thank you.  Please be seated.  All right, Mr. Brown, will you return to the stand please.

DALE BROWN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

THE COURT:  Counsel, I hope to provide a first draft of the Charge and proposed verdict forms to you by the recess this afternoon.  All right.  If there are no matters to raise, I'll direct the Court Security Officer to please bring the jury in.  Thank you.

(Jury In at 1:19 p.m.)

THE COURT:  Welcome back, Ladies and Gentlemen. We're prepared to resume with cross-examination of Mr. Brown.  Mr. Curry.

MR. CURRY:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CURRY:

Q.   Mr. Brown, how extensive was your drug use?

A.   I had a pretty big problem using heroin.  I probably used at least a bundle a day.

Q.   Were you one of the people that was always high?

A.   Yeah.

Q.   How did you get clean?

Brown - Cross

A.   The reason how I got clean was when I got incarcerated for two and a half weeks.

Q.   Did you go through the withdrawal at that point?

A.   Yes sir.

Q.   You have entered into a plea agreement, is that correct?

A.   Yes sir.

Q.   And you are not currently incarcerated?

A.   No sir.

Q.   You are under an order or a bond order that you get drug tested now and then?

A.   Yes sir.

Q.   And does that assist you in keeping the addiction at bay?

A.   What's that?

Q.   Does that help you stay off the drugs?

A.   Yes sir.

Q.   Are you seeking any kind of drug treatment.

A.   No sir.

Q.   No you were indicted by a Grand Jury, is that correct, sir?

A.   Yes sir.

Q.   Before you were indicted by a Grand Jury, had you talked to any police officers about this drug dealing situation?

222

Brown - Cross

A.   No sir.

Q.   Did you know you were in trouble before you got indicted?

A.   No sir.

Q.   So that came as a bolt out of the blue for you?

A.   Yes sir.

Q.   Have you talked to police officers since you were indicted?

A.   No sir.

Q.   So you have not yet been debriefed?

A.   I don't think so sir.

Q.   You haven't sat down with a police officer and told them everything you did?

A.   Oh, yes sir.

Q.   Okay.  And was that a long talk?

A.   It was at least a half an hour long.

Q.   Okay.  Were you furnished a lawyer in this process?

A.   I got a court appointed attorney.

Q.   Okay.  And did that attorney assist you in coming up with a plea agreement?

A.   Yes sir.

Q.   Do you believe that plea agreement has helped you?

A.   Yes sir.

Q.   And part of that plea agreement is you come and you give information and you testify, is that correct?

Brown - Cross

A.    Yes sir.

Q.    Do you believe that is of any benefit to you?

A.    No sir.

Q.    Do you believe at the end of the process you'll be better off because you have cooperated?

A.    No sir.

Q.    So you think it will be just as bad as if you hadn't cooperated?

A.    No sir.

Q.    You have appeared before a Court and entered your guilty plea at this point?

A.    Yes sir.

Q.    So you're simply awaiting your sentencing?

A.    Yes sir.

Q.    Do you recall the terms of your plea agreement?

A.    No, not that I can recall.  It was--there was about 13 or 14 different paragraphs that was on the plea agreement that I signed.

Q.    Do you recall how much heroin you agreed that you had distributed?

A.    It was anywhere between 20 and 30 grams.

Q.    When you distributed heroin, I think you said that Jolie's husband, Todd, was around?

A.    Yes sir.

Q.    Did he know what was going on?

224

Brown - Cross

A.    He should have known, yes sir.

Q.    It was obvious that it was going on?

A.    Yes sir.

Q.    Did you assist Jolie in any way?

A.    I'm not sure.

Q.    Was he also a drug user?

A.    Yes sir.

Q.    Now you say you met the person you have identified as Wop through a friend?

A.    Yes sir.

Q.    Who was that friend?

A.    His name was Brian.

Q.    Brian what?

A.    I'm not sure what his last name is.

Q.    Okay.  Where was Brian at?

A.    He was down in Granville at the time.

Q.    Was he a drug friend?

A.    Yes sir.

Q.    And did he introduce you to the person you have identified as Wop--

A.    Yes sir.

Q.    --as being a drug kind of connection?

A.    Yes sir.

        MR. CURRY:  I have no other questions of the gentlemen, Your Honor.

Brown - Redirect/Recross

THE COURT:  All right.  Thank you.
Cross--redirect?

MS. WESLEY:  Just one question, Your Honor.

REDIRECT EXAMINATION

BY MS. WESLEY:

Q.   Sir, the plea agreement that you discussed with--with
Mr. Curry, did it require you to testify truthfully?

A.   Yes ma'am.

MS. WESLEY:  Nothing further, Your Honor.

THE COURT:  Any further cross?

MR. CURRY:  Yes, Your Honor.

RECROSS EXAMINATION

BY MR. CURRY:

Q.   But you really believe by coming and testifying that
won't help you out?

A.   The reason why I accepted the plea agreement was to--to
help me out in the situation that I'm in.

MR. CURRY:  Okay.  Thank you, sir.

THE COURT:  All right.  Is there anything further
for the witness?

MS. WESLEY:  No, Your Honor.

THE COURT:  Is he subject to recall?

MR. CURRY:  No, Your Honor.

THE COURT:  Then you may step down, Mr. Brown.
You're excused as a witness.

Gamble - Direct

(Witness excused)

THE COURT:  The Government may call its next witness.

MS. WESLEY:  Marcus Gamble, Your Honor.  He's in custody.

THE COURT:  All right.  Marcus Gamble.

(Pause)

THE COURT:  Mr. Gamble, please come forward to the front of the courtroom and if the Marshal will escort you to the Clerk, she will administer the oath before you take the witness stand.

MARCUS GAMBLE, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness stand.  The witness is Marcus Gamble.  First name, M-a-r-c-u-s.  Last name, G-a-m-b-l-e.

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.   Mr. Gamble, how old are you?

A.   Twenty (20).

Q.   Twenty (20) years old?

A.   Yes ma'am.

Q.   And you are presently incarcerated.  Are you incarcerated on state charges or federal charges?

A.   State charges.

Gamble - Direct

Q.    And what are you actually incarcerated for?

A.    Conspiracy to commit breaking and entering.

Q.    Sir, at some point in time did you use heroin?

A.    Yes ma'am.

Q.    And when did you start using heroin?

A.    About two and a half years ago.

Q.    And how did you support your heroin drug use?

A.    At first I did it by working, then I went to, you know, stealing for it and just helping out drug dealers to get it.

Q.    I'm sorry, sir, I didn't hear that last part.

A.    Helping out drug dealers to get it.

Q.    When you say "helping out drug dealers to get it", do you mean that you were selling it to get heroin as well?

A.    Selling it and giving them rides and stuff like that.

Q.    Okay.  Do you know someone known to you as Wop?

A.    Yes ma'am.

Q.    And how did you first meet him?

A.    Somehow I acquired his phone number and I gave him a phone call.

Q.    And what was the purpose of--of calling him?

A.    To get drugs, heroin.

Q.    And approximately when did you first call him?

A.    I'd say probably two years ago.

Q.    And what did you first--what time of quantities did you initially start purchasing from--from Wop?

Gamble - Direct

A.   just like one or two bags.

Q.   And did that quantity increase at any time?

A.   Yes ma'am.

Q.   And how much did it increase to?

A.   I started getting, you know, multiple bags or bundles and every once in a while I'd get a brick or something like that.

Q.   And how often would you get a bundle from him?

A.   I'd get a bundle off him a couple times a month, sometimes once a week.

Q.   And how many times did you purchase a brick from him?

A.    Five or six.

Q.   And how much would you pay for a brick?

A.   Anywhere from three hundred to four hundred and fifty dollars.

Q.   Do you see the person that you know as Wop in the courtroom today?

A.   Yes ma'am.

Q.   And what is he--would you please identify him for the record by what he's wearing?

A.   A black and white striped shirt.

        MS. WESLEY:  Your Honor, may the record reflect that the witness has identified Mr. DeVaughn as Wop?

        THE COURT:  The record may so reflect.

BY MS. WESLEY:

Gamble - Direct

Q.    And when you purchased heroin from--from Wop were there occasions where you could get his heroin from--from other individuals?

A.    Yes ma'am.

Q.    And who were some of these other individuals?

A.    Just a few people that was from Pittsburgh.  I don't know them by real names, just like Wacha or T or Q or--just different names.

Q.    Did you get them from--okay.  Eventually did you end up buying from any--any women or a woman that was associated with Wop?

A.    Yes ma'am.  Wop's girlfriend, Grace.

Q.    Now you testified that you would sell for--for drug dealers as well to support your--your addiction?

A.    Yes ma'am.

Q.    You would give rides?

A.    Yes ma'am.

Q.    Did you ever sell for Wop?

A.    Yes ma'am.

Q.    And what was the circumstance of you selling for him?

A.    I would just get the drugs from him and give them to other people.

Q.    When did that begin?

A.    A couple months after meeting him and getting them.

Q.    Okay.  And you said you met him two years ago?

Gamble - Direct

A.   Yes ma'am.

Q.   And what type of quantities would you get from him that you would--that you would sell?

A.   Anywhere from just a couple bags to bricks.

Q.   Where would you meet him at to get the heroin?

A.   Hotels around Morgantown or just--there's a couple different houses and stuff that he would stay at.

Q.   Where were these houses located?

A.   Brookhaven Road, ah--ah, Point Marion Road, just different places like that.

Q.   And when you would get the heroin to--to sell, did you have to give Wop money for it or would he front it to you?

A.   He used to front it to me but then it got where I was kind of bad off so I had to get the money.

Q.   Okay.  Explain.  What do you mean?  What happened?

A.   I was just getting bad on the drugs.

Q.   Your addiction?

A.   Yes ma'am.

Q.   So he quit fronting it to you and you had to purchase it?

A.   Yes ma'am.

Q.   Did you ever make any trips, ah, with Wop or for Wop?

A.   Ah, I'd ride up with some people to take him up to Pittsburgh.

Q.   I'm sorry sir?

Gamble - Direct

A.    I said I'd ride with people to take him to Pittsburgh.

Q.    And what was the point of taking him to Pittsburgh?

A.    To pick up drugs.

Q.    And who were some of the people that you would drive up there with?

A.    Just friends.  I never rode up with anybody I met through him, just my friends.

Q.    And what would you receive for making the trips to Pittsburgh?

A.    Drugs.

Q.    How much would he give you.

A.    Roughly around a bundle.

Q.    And of course this would be heroin?

A.    Yes ma'am.

Q.    About how many trips did you--trips to Pittsburgh did you take him to.

A.    Probably four or five.

Q.    And when did the trips occur?

A.    A little while after meeting him but probably a year-and-a-half ago at most.

Q.    Now do you know where he was going to get his drugs at in Pittsburgh?

A.    No ma'am.

Q.    Could anyone go with him or did you have to stay in the car?

Gamble - Direct

A.    We would stay in the car.

Q.    Now do you know how much he was bringing back?

A.    Multiple bricks.

Q.    Were you able to see them?

A.    Occasionally.

Q.    What's the--what's the most amount you ever observed on one of those return trips from Pittsburgh?

A.    Probably five or six bricks.

Q.    What was the usual amount that he would bring back since that was the most?

A.    Probably three or four.

Q.    So three or four was the norm?

A.    Yeah.

Q.    Now at some point in time, Mr. Gamble, did you agree to work as a confidential informant with the--with the Government?

A.    Yes ma'am.

Q.    And--and why did you agree to work as a confidential informant?

A.    To get rid of a charge.

Q.    What type of charge were you trying to get rid of?

A.    Larceny.

Q.    Is larceny one of the things you did to support your drug addiction?

A.    Yes ma'am.

Gamble - Direct

Q.   I want to direct your attention to July of 2010.  Were you working as a confidential informant at that time?

A.   Yes ma'am.

Q.   I want to direct you to the first time that you were going to work as a confidential informant.  Who was the individual that you contacted to try to obtain heroin?

A.   Wop.

Q.   And how did you contact Wop?

A.   By phone.

Q.   And what happened when you called him on the phone?

A.   I called him and he told me to come and meet him and I'm pretty sure I ended up meeting Grace though.

Q.   Okay.  And so after--and so you actually did a transaction with Grace?

A.   Yes ma'am.

Q.   After that first transaction when you're working as a CI, did you have other transactions as a CI with Grace?

A.   Yes ma'am.

Q.   Approximating how many?

A.   I believe just one.

Q.   Where did the transaction take place ?

A.   The first one?

Q.   The first one.

Q.   Was at the Microtel.

Q.   Okay.  And how many times did--and you wore a body

Gamble - Direct

wire?

A.    Yes ma'am.

Q.    How many times approximately did you--in this investigation did you wear a body wire working with the police officers?

A.    Three or four.

Q.    Now do you recall where the other drug transactions took place when you was working as a confidential informant?

A.    I can recall two other ones.  The Wonder Bread Store and the Wendy's in Glenmark.

Q.    Okay.  And when you were working as an undercover, did anyone accompany or go with you when you went to these transactions?

A.    None, other than Detective Forbes.

Q.    And on--you said the first one was with Grace.  Who were the other two ones--who were the other two buys from?

A.    The three that I remember was, two of them was Grace and the other one was just some other guy.  I never--I never got a name or anything.

Q.    How did you get in contact with that other guy?

A.    I called Wop.

Q.    And--and he sent the other guy?

A.    Yeah.

Q.    What did the other guy--you don't know the other guy's name.  Do you know where the other guy is from?

Gamble - Direct

A.   Not really.  I'm guessing Pittsburgh though.

Q.   Now after--after you completed those drug transactions when you're working as a confidential informant, what did you do with the heroin that you purchased?

A.   Gave it to the Detective.

Q.   And which Detective?

A.   Detective Forbes.

Q.   After everyone of those transactions you gave it to Detective Forbes?

A.   Yes ma'am.

Q.   Were you present on July the 27th working with Detective Forbes in an undercover capacity?

A.   I'm not sure of the dates exactly but--

Q.   Were you present and working with Detective Forbes when they arrested Grace?

A.   Yes ma'am.

Q.   And did you see anyone else they arrested?

A.   A couple people but I don't know them.

Q.   You didn't know anyone else?

A.   Huh-uh (no).

Q.   And where did that arrest take place?

A.   At the Wendy's in Glenmark.

Q.   Okay.  And were you arrested as well?

A.   I was put in handcuffs, yes.

Q.   And what was the reason for putting you in handcuffs?

236

Gamble - Cross

A.    I guess to make it look good.

Q.    Because you were working with the officers at that time?

A.    Yes ma'am.

       MS. WESLEY:  May I have a moment, Your Honor?

       THE COURT:  Yes.

    (Pause)

       MS. WESLEY:  I have nothing further of this witness, Your Honor.

       THE COURT:  All right.  Then cross-examination.

       MR. CURRY:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CURRY:

Q.    Okay.  You became a confidential informant to get rid of a charge, is that correct?

A.    Yes sir.

Q.    Over what period of time did you work as a CI?

A.    Probably less than a month.

Q.    Okay.  During that month did you continue to use drugs?

A.    No.

Q.    When did you get clean.

A.    I was in a rehab from the end of June to the beginning of July last year.

Q.    Did you get in touch with the police or did they get in touch with you?

Gamble - Cross

A.   They came to me about a different charge and I got in touch with them.

Q.   Was that before or after you were rehab?

A.   After.

Q.   So you decided to get clean on your own?

A.   Yes sir.

Q.   Did anything prompt that?

A.   No.  I was on juvenile probation but other than that it was my--myself.

Q.   When you were dealing heroin, what was the extent of your drug use?

A.   I was using every day.

Q.   Well were you one of these people that was high all the time?

A.   Ah, at least I was getting well every day, getting to where I wasn't sick, so.

Q.   And how were you supporting your habit?

A.   At first, like I said, I had a job and then it went to where I was stealing for it and I started giving people like Wop rides and stuff to get it.

Q.   How much heroin were you using when you were at your worst?

A.   Maybe a bundle a day.

Q.   And how much would a bundle cost at that time?

A.   Anywhere from a hundred dollars to a hundred and fifty.

238

Gamble - Cross/Redirect

Q.   Now you are currently in a youthful offender's program?

A.   Yes sir.

Q.   And that's not for anything having to do with drugs, is that correct?

A.   It is but it was prior to all of this.

Q.   It was larceny to get drugs?

A.   To get drugs, yes sir.

Q.   You have not been arrested for drugs, have you?

A.   Never.

Q.   And you have not served any time in any jail for drugs, correct?

A.   No sir.

Q.   And do you have any suspicion that anybody is going to arrest you for drugs after this if you stay clean?

A.   No sir.

        MR. CURRY:  Okay.  I have nothing further, Your Honor.

        THE COURT:  All right.  Is there any redirect?

        MS. WESLEY:  Just one, Your Honor.

                    REDIRECT EXAMINATION

BY MS. WESLEY:

Q.   You just said that you were using drugs to get well every day and not be sick?

A.   Yes ma'am.

Q.   What do you mean?  What was going on?

239

Gamble - Redirect

A.   Ah, I got to where I would be sick if I didn't use drugs so that's when I at least used it enough to where I wasn't sick no more.

Q.   And this was of course before you started rehab to--to deal with your addiction?

A.   Yes ma'am.

          MS. WESLEY:  I have nothing further.

          THE COURT:  Is there any further cross-examination?

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right, then the Court excuses Mr. Gamble.

     (Witness excused)

          THE COURT:  The Government may call its next witness.

          MS. WESLEY:  Sara Triplett.

          THE COURT:  Sara Triplett.

     (Pause)

          THE COURT:  Ms. Triplett, please approach the Clerk who will administer the oath to you before you take the witness stand.  She's standing here in the pink jacket. Thank you.

          SARA TRIPLETT, GOVERNMENT'S WITNESS, SWORN

          THE CLERK:  Thank you.  You may take the witness stand.  The witness is Sara Triplett.  First name,

Triplett - Direct

S-a-r-a-h.

        THE WITNESS:  No h.

        THE CLERK:  Last name, T-r-i-p-l-e-t-t.  There's no name on the first name; it's just S-a-r-a.

        THE COURT:  All right.  You may proceed.

        DIRECT EXAMINATION

BY MS. WESLEY:

Q.   How old are you?

A.   I'm 25.

Q.   And at some point in time, ma'am, did--were you a user of heroin?

A.   Yes ma'am.

Q.   Okay.  And how did you begin using heroin?

A.   I believe I was 22.

Q.   How did you get involved with using heroin?

A.   I was living with a boyfriend who was a user and began to use myself.

Q.   Do you know someone known as Wop?

A.   Yes.

Q.   And how did you meet him?

A.   I met him through a friend of mine named Mark Powell.

Q.   How long ago was that?

A.   That was last spring, spring of 2010.

Q.   And at some point in time, ma'am, did you become aware that Wop was someone that you could obtain heroin from?

Triplett - Direct

A.   Yes.

Q.   And--and how did that come to your attention?

A.   My friend had introduced me to him as someone who I could get my drugs off of.

Q.   So initially when you first met him it was for the purpose of obtaining heroin?

A.   Yes.

Q.   How much did you buy during your first meeting?

A.   Just a few bags, like maybe five--five stamp bags or so.

Q.   Okay.  After the first meeting did you obtain any other quantities of heroin from--from Wop?

A.   Yes, I bought off of him several more times.  I probably bought off of him around five or six times, four or five, six times.

Q.   Do the person that you know as Wop, are they seated anywhere in this courtroom today?

A.   Yes.

Q.   Would you please identify for the record what the person's wearing?

A.   A very nice striped polo shirt, a button down polo shirt.

          MS. WESLEY:  Your Honor, may the record reflect that she has identified Mr. DeVaughn as Wop?

          THE COURT:  The record may so reflect.

Triplett - Direct

BY MS. WESLEY:

Q.   On those occasions that you would obtain heroin from
Wop, where would you meet him at?

A.   I met him, ah, a couple times out on the Point Marion
Road at a house.

Q.   Do you know whose house that was?

A.   A woman named Debbie.

Q.   And where else would you meet him?

A.   I met him at two separate locations of an Econo Lodge,
one in Westover and one in Star City.

Q.   And the quantities that you purchased from him, were
they pretty much the same?

A.   Sometimes, I mean the first couple of times it was
probably around five but then I also purchased other than
that between, you know 10 and 20.

Q.   What's the most amount you ever purchased from him?

A.   I believe maybe like 14 probably. between 10 and 14.

Q.   Do you know someone named Grace?

A.   Yes.

Q.   And how do you know Grace?

A.   She called me from Wop's phone to--to let me know if I
needed any heroin I could buy it from her.

Q.   And when did she call you?

A.   Ah, this was more in the summer when she started to
contact me.

243

Triplett - Direct

Q.   Do you know how Grace obtained your phone number?

A.   She got it out of Wop's phone.

Q.   Do you know what type of vehicle Wop may have drove or operated?

a.   At first they were driving like a gold Taurus or like maybe a Gold sedan but I believe they had an accident and after that they weren't driving.

Q.   And who--who are they?

A.   Grace and Wop.

Q.   Do you know a Jess Toothman?

A.   Yes.

Q.   And how do you know Jess Toothman?

A.   I just met her through using.

Q.   Could you--is that a location--could you meet Wop at that location and--

A.   I--like maybe one of the very first times, like maybe the second time I had met him, I met him at Jess' apartment on Brookhaven Road.

Q.   Could you obtain Wop's dope from anyone other than him and Grace?

A.   Yes.  Ah, I had called his phone and he connected me with two other people.  At first one of them was Dale Brown and then this other guy named Julian.

Q.   And if you were to meet Dale Brown to get heroin, where would you obtain it from?

Triplett - Direct

A.    I called Wop's phone and was connected with Dale that way.

Q.    All right.  Would--how would you know where to meet Dale?

A.    I was--I was told by calling that phone number where to go meet--go meet Dale at this location.

Q.    Okay.  Have you ever seen Grace with a large sum of--of heroin?

A.    Yes.

Q.    And what were the circumstances of you observing that?

A.    I had ridden up to Pittsburgh with Jess to pick Grace and Wop both up and Wop had given Grace the drugs to hide.

Q.    And where did Grace hide the drugs?

A.    Inside of her.

Q.    Approximately how much heroin did you see during that trip?

A.    Probably about nine bricks, which would be 50 in each brick, 50 stamp bags in each brick.

Q.    Have you ever seen either Wop and Grace--let me ask this.  Were there any more trips that you were a part of to Pittsburgh to pick up Grace or Wop?

A.    No, not specifically.

Q.    Are you still using heroin?

A.    No.

Q.    And when did you last use?

Triplett - Direct/Cross

A.   Ah, in July but--

Q.   July of what year?

A.   Of this year, but I--it wasn't frequent.  It was just kind of a thing.

Q.   How did you start the process of--of stop using heroin?

A.   Well, right now I'm going to the Methadone Clinic and I'm receiving counseling there.  There's a physician who supervises and I'm also about to start private drug counseling and I occasionally attend NA meetings.

          MS. WESLEY: I have no further questions of this witness, Your Honor.

          THE COURT:  All right. Cross-examination.

          MR. CURRY:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. CURRY:

Q.   When you were using, however the most you were using, how bad was your addiction?

A.   I'd say it was pretty bad, yeah.  I was a heavy user.

Q.   How much were you using in an average day?

A.   I'd say maybe, usually at that point about 10 bags a day.

Q.   When did you start your Methadone Clinic?

A.   I started in July, maybe like the first week of July.

Q.   At a Methadone Clinic you get a drug which helps keep away some of the cravings, is that correct?

Triplett - Cross

A.    Yes, it's a maintenance program.

Q.    Ah, did you distribute any heroin?

A.    No.

Q.    You did accompany Wop and Grace on a trip to
Pittsburgh, is that correct?

A.    I went with someone to pick them up and bring them back
down to West Virginia.

Q.    Did you know what the trip was for?

A.    Yeah, I did.

Q.    Now, Wop was a black male, is that correct?

A.    Yes sir.

Q.    How many black males are there in this room now?

A.    One.

Q.    Have you ever met Detective Forbes?

A.    Yes sir.

Q.    Have you talked to him?

A.    Ah, yeah.

Q.    Was it pretty obvious to you when you came in that
whoever this guy was he was the defendant?

A.    Actually, I didn't--I didn't look honestly.

Q.    Well good luck to you.

A.    Thank you.

            MR. CURRY:  I have nothing further.

            THE COURT:  Any redirect?

            MS. WESLEY:  Just briefly.

Triplett - Redirect

REDIRECT EXAMINATION

BY MS. WESLEY:

Q.   Ms.--Ms. Triplett, even if you hadn't looked around the--the courtroom to see where the defendant was, would you have recognized him based upon your past dealings with him?

A.   Yes.

Q.   And when you dealt with him in the past, were they face-to-face contacts?

A.   Yes.

Q.   It wasn't just over the phone?

A.   No.

          MS. WESLEY:  I have nothing further, Your Honor.

          THE COURT:  All right.  Then the witness may step down.  Is she subject to recall?

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right.  Thank you.  You may step down.

     (Witness excused)

          THE COURT:  The Government may call its next witness.

          MS. WESLEY:  Detective Jason Ammons.

          THE COURT:  Detective Jason Ammons.

     (Pause)

          THE COURT:  Detective, please approach the Clerk in the pink jacket standing here in the front of the

Ammons - Direct

courtroom and she will administer the oath to you before you
take the witness stand.

JASON AMMONS, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness
stand.  The witness is Jason Ammons.  Last name A-m-m-o-n-s.

MS. WESLEY:  May I proceed, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.   Where do you presently work?

A.   Morgantown Police Department.

Q.   How long have you been employed by the Morgantown
Police Department?

A.   Approximately 10 years, will have in November.

Q.   And what are your present duties there?

A.   Right now I'm assigned to the Street Crimes Unit, which
is a patrol unit basically out looking for street level
narcotics.

Q.   And how long have you been assigned to the Street
Crimes Unit?

A.   Exactly a year.

Q.   Prior to being assigned to the Street Crimes Unit what
was your assignment with the Morgantown Police Department?

A.   In January of 2005 I was assigned to the Mon Valley
Drug Task Force, which is a local task force with DEA

Ammons - Direct

affiliation and in October of 2006 I was sworn in by DEA and
worked as an agent with DEA and with the task force.

Q.   Let me direct your attention to September the 28th of
2009, were you assigned to the Mon Valley Drug Task Force
working drug cases then in the Morgantown area?

A.   Yes ma'am.

Q.   Were you working surveillance during that particular
day of September of 2009?

A.   Yes ma'am.

Q.   And were you in a marked vehicle or an undercover of
vehicle?

A.   Undercover vehicle, ma'am.

Q.   And what was the circumstances of you working
surveillance on that day?

A.   Task Force Agent Forbes had a confidential informant
who had been in contact with him regarding making heroin
purchases.  I was assigned to do surveillance.  Agent Forbes
advised me where I needed to be at for surveillance and I
travelled to that location where I set up surveillance
awaiting the purchase.

Q.   And who was the confidential informant that was going
to make the undercover drug purchase?

A.   I'm not sure who the informant was at that time.  I
didn't actually have any direct relation with that
informant.  I don't even know that I saw her except for

Ammons - Direct

during the purchase.

Q.   And so where were you directed to go to work surveillance?

A.   To begin with we were supposed to go to the Morgantown Mall area which is on the other side of Westover near the interstate.  Agent Forbes contacted us and told us that the buy was going to go near the Dairy Mart so our officers at the Morgantown Police Department left there, went over into Westover, which is on the Holland Avenue.  I turned up on a side street so I'm parked at an apartment complex where I could see a partial part of the Dairy Mart parking lot and the Stars Casino and part of that parking lot where Merrywood Lane is.

Q.   Okay.  And where is--where's the Stars Casino located?

A.   Across the street from the Dairy Mart.  The Dairy Mart and Stars both sit on Holland Avenue but there's a--I think it's--Lane Street I think is the name of it.  I'm not a hundred percent sure but I think that's the middle street that splits the two businesses.

Q.   Okay.  And is that actually still in Morgantown?

A.   No, actually that's in the city limits of Westover.

Q.   Now what did you see--did you notice any--any particular type of vehicles while you were in that location conducting surveillance?

A.   Yeah, there were only two vehicles in the parking lot

251

Ammons - Direct

that evening.  I forget what the vehicle was next to the
door, but between the door and Dairy Mart there was a
gold-colored four door sedan with Pennsylvania registration.

Q.   And any particular reason why you noticed this
gold-colored sedan?

A.   Because Task Force Agent Forbes had advised us that the
target was possibly from Pittsburgh, to be looking for a
vehicle with Pennsylvania license plates.  You know, may not
have been one but to look in that general area for one and I
located that vehicle.  It was pulled in towards the door.

Q.   Did you see anyone either enter or exit that vehicle?

A.   Prior to the deal, no I did not.  Once the transaction
began to take place I observed a black male leave the
establishment, walk towards the Dairy Mart and then down the
street.  He actually goes out of sight, comes back up into
sight and goes back to the--the business.

Q.   Which business?

A.   Back into the Stars Casino.  After a little bit of a
wait there, two black males exited the store and got into
the gold-colored car, turned the dome light on and sat there
maybe two minutes at the most and then backed out and left
the parking lot, leaving Westover, turning left headed back
towards Morgantown and across the Westover Bridge.

Q.   Okay.  And when they turned the dome light on, was
there enough illumination where you can see the occupants in

Ammons - Direct

the vehicle?

A.   No ma'am.  Even with binoculars and doing surveillance
I couldn't--couldn't see exactly who would have been who as
far as for identification purposes.

Q.   So what did you do after the vehicle pulled off?

A.   We followed the vehicle over into the Morgantown area,
attempting to get a patrol officer to see if he could make
contact with the vehicle, maybe get the vehicle stopped so
we could identify the occupants because at that point in
time we only had a street name or a nickname of the target
and we only knew him as Wop.  The vehicle traveled over into
the Sabraton area of Morgantown where it pulled into a side
street.  I circled the block and as I came back around
towards the car I actually observed--one of the males was up
on the porch meeting with a white male.  He actually looked
at the car, may car.  I circled the block again, tried to
wait a little bit and I believe they were standing by the
car at that time and due to them seeing me twice, my car in
that area two times, I--I backed out and got away from them
so they didn't identify what we were doing.

Q.   Okay.  And so--and just to be clear, why did you end
the surveillance at that time?

A.   Well due that we had used an informant and made a
controlled purchase and that I had followed them from
Westover over and had circled by them twice, just me and the

Ammons - Direct

way our training is you just get a little bit nervous.  We
don't want to burn that we had just made a purchase so I
didn't want to be caught up someway and then be why are you
following me, what are you doing, something to that effect.

Q.   Now did you see that gold-colored Ford subsequent to
September the 28th of 2009?

A.   Yes ma'am.

Q.   And when did you next see it?

A.   It was on March the 1st--March the 2nd I believe was
the actual date.  I was with Task Force Agent Miranov and we
were doing some surveillance on another target involved in
heroin known as Justin Price.  We went over to check on his
residence and observed the gold-colored Ford parked in front
of his residence with the lights on, setting in the roadway
and where this was, this is a mobile home park and you can't
really get by the car so we actually had to set up and wait.
Knowing Justin was the target of one of our investigations,
we just previously bought of him, we didn't know if this was
somebody purchasing from Justin or if this was Justin's
source.

        MR. CURRY:  Objection.  May we have a Bench
Conference?

        THE COURT:  All right.

                    (BENCH CONFERENCE)

        MR. CURRY:  This is a 404 problem.  I knew this

Ammons - Direct

was coming and this is to identify a photograph that was
taken by the police on another occasion.  However, that is
not for reasons of a disclosure that's not usable.  The fact
that he was--that Mr. DeVaughn was arrested on that occasion
is not going to be offered by the Government; however, they
are coasting around that it was in the middle of a drug
investigation and is clearly other wrong evidence.

THE COURT:  In other words, the investigation was
not this investigation?

MR. CURRY:  Correct, Your Honor.

THE COURT:  Is that what you're saying?

MS. WESLEY:  Justin Price is the same name we have
heard throughout this trial.  Justin Price is an unindicted
co-conspirator.  It's not the first time we've heard that
name and this officer has been advised there are certain
things he can't say and he won't say it.  What he's going to
say is that they pulled the vehicle over to figure out who
the driver was; got his name and his date of birth.  They
are not going to say that they found anything on him or that
he was even arrested.  It's just to establish his identity.

MR. CURRY:  Well first I would move to exclude it
entirely.  If the Court that motion, I would request a
limiting instruction.

THE COURT:  To what extent?  I don't want to give
more--

Ammons - Direct

MR. CURRY:  To the extent that the only purpose is to establish that this individual was in that automobile.

THE COURT:  The defendant was in the automobile?

MR. CURRY:  Yes, Your Honor.

THE COURT:  Is that satisfactory?

MS. WESLEY:  Yes, that's fine.

THE COURT:  I think that's appropriate.

MR. CURRY:  Thank you, Your Honor.

(END OF BENCH CONFERENCE)

THE COURT:  Ladies and Gentlemen, based on what I expect the Government to elicit from--next from this witness, I want to provide to you and instruction that limits the scope of this information to an expected identification of the defendant, nothing more.  All right.

MS. WESLEY:  May I continue, Your Honor?

THE COURT:  Yes.

MS. WESLEY:  Okay.

BY MS. WESLEY:

Q.   Detective Ammons, at some point in time did you stop the gold-colored Ford as it was driving away from this area?

A.   I did not physically stop the car.  I identified it to other officers.  The other officers made a traffic stop based on their own probable cause.

Q.   Okay.  Now, sir, could you identify who the person was who was driving this gold-colored Ford?

Ammons - Direct

        MR. CURRY:  Objection if this is based on hearsay.

        MS. WESLEY:  Based upon his knowledge as a police officer.

        THE COURT:  Are you asking this officer if he observed the person in the car?

        MS. WESLEY:  I'll rephrase, Your Honor.

        THE COURT:  Okay.

BY MS. WESLEY:

Q.   At some point in time did you become familiar with the person who was in that vehicle?

A.   Yes ma'am.

        MR. CURRY:  Same objection unless he was there and saw him, Your Honor.

        MS. WESLEY:  May we approach?

        THE COURT:  Yes.

                (BENCH CONFERENCE)

        THE COURT:  All right.

        MS. WESLEY:  He was actually arrested and this office met with him at the police department and I'm steering him around that limited information.

        THE COURT:  He met with him at the police department after he was arrested?

        MS. WESLEY:  Yes, Your Honor.

        MR. CURRY:  Withdraw the objection, Your Honor.

        THE COURT:  I thought so.

Ammons - Direct

(END OF BENCH CONFERENCE)

THE COURT:  Objection overruled.

BY MS. WESLEY:

Q.   Detective Ammons, did you at some point in time identify the person who was driving that gold-colored Ford?

A.   Yes.

Q.   And who was the person that was driving it?

A.   The subject's name was Atari Brown.

Q.   And who was the person that was a passenger in that gold-colored Ford?

A.   There were two.  The front passenger was identified as Michael Henry and the rear passenger was identified as the defendant, Herbert DeVaughn.

Q.   Were you able to obtain Mr. DeVaughn's date of birth during this encounter with him?

A.   Yes ma'am.

Q.   And what is his date of birth?

A.   October 19th of 1984.

        MS. WESLEY:  May I have a moment, Your Honor?

        THE COURT:  Yes.

        MS. WESLEY:  Nothing further, Your Honor.

        THE COURT:  Is there anything on cross-examination?

        MR. CURRY:  No questions, Your Honor.

        THE COURT:  All right.  Thank you.  Detective, you

258

Bloniarz - Direct

may step down.

(Witness excused)

THE COURT:  The Government may call its next
witness.

MS. WESLEY:  The Government calls Officer Mike
Bloniarz, spelled B-l-o-n-i-a-r-z.

THE COURT:  Officer Mike Bloniarz.

(Pause)

THE COURT:  All right.  Officer Bloniarz, would
you please approach the Clerk who will administer the oath
to you before you take the witness stand.

MIKE BLONIARZ, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness
stand.

MS. WESLEY:  May I proceed, Your Honor?

THE COURT:  Yes you may.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.    Where do you presently work?

A.    The City of Morgantown Police Department.

Q.    And how long have you been employed as a police
officer?

A.    For 10 years.

Q.    And what are your present duties as a police officer?

A.    I'm a Canine Officer assigned to the Street Crimes

Bloniarz - Direct

Unit.

Q.   And how long have you been a Canine Officer?

A.   Just about seven years.

Q.   And I want to direct your attention to August the 8th
of 2010.  Were you working that evening or that day?

A.   No ma'am I was not.

Q.   Were you called in to work?

A.   Yes ma'am.

Q.   Okay.  And what was the basis of calling you in to
work?

A.   The City of Morgantown has no Canine Officers working
on Sundays and Mondays so the--a traffic stop was conducted
and they called me in to do a canine drug search.

Q.   And where were you directed to go?

A.   To pretty much the parking lot beside the Bartlett
House on University Avenue and Kirk Street.

Q.   And when you had arrived at that location were there
other officers already there?

A.   Yes.

Q.   And what--what were they doing?

        MR. CURRY:  Objection on the same basis I have
previously expressed, Your Honor.

        THE COURT:  Overruled.

BY MS. WESLEY:

Q.   What were the officers doing when you arrived?

Bloniarz - Direct

A.   Officer Williams was inside his patrol car doing the average traffic stop procedures.

Q.   And what did you do when you first arrived?

A.   I got on scene, asked PFC Williams why he stopped the vehicle for a probable cause stop.  He said for a brake light violation.  He explained to me what he had, the nervousness of people in the vehicle and he asked me if I would run my canine partner around the vehicle for an exterior vehicle inspection.

Q.   Okay.  Now what happened when you ran your canine around the vehicle for an--an exterior inspection?

A.   He alerted positive on the driver's side rear door by--the way you describe it is jumping up on his hind legs and actually scratching at the side of the paint.

Q.   Okay.  And what does--what does that mean when he reacts positive and he does those things?

A.   It means three things.  Either there is a controlled substance in that vehicle; there was a controlled substance in that vehicle or someone has smoked a controlled substance in that vehicle.

Q.   And what did you do as a result of the canine alerting?

A.   We advised the driver of the vehicle that my canine alerted positive of the vehicle which gave us probable cause to search the contents of the vehicle.

Q.   And did you obtain consent to search?

Bloniarz - Direct

A.    No I did not.

Q.    What did you do next?

A.    Myself and PFC Williams searched the Jeep Cherokee.

Q.    And did you locate anything when you searched the Jeep
Cherokee--let me ask you this.  At this point in time do you
know the names of the occupants in the vehicle?

A.    No I don't.

Q.    And what did you do when you searched the--the Jeep
Cherokee?

A.    We start at the driver's door and work our way to the
rear of the vehicle.  Each of us had a--each of us had a
side of the vehicle.  Inside the vehicle I located a black
backpack.

Q.    And did you locate anything inside the backpack?

A.    Yes, inside of the backpack was a pair of tan shorts
and in one of those pockets of the tan shorts I located
approximately four bricks of heroin.

Q.    And how was the heroin packaged, if you know?

A.    It was in just the average brick of heroin.  I don't
recall of actually how it was packaged or what was labeled.
I didn't--I didn't inspect it.  I just took it back to PFC
Williams.

Q.    And what did you do with--with the backpack?  I'm
sorry, you--

A.    Yes.  We take the--we suspected heroin and we take it

Bloniarz - Direct

inside of the patrol vehicle.  That way it wouldn't get lost
or somebody doesn't take off running with it.

Q.   And what was the name of the officer you gave it to?

A.   PFC Williams.

Q.   PC Williams?

A.   PFC Williams.  Shawn Williams.

Q.   Shawn Williams.  Thank you.  Did you find anything else
on the occupants during that traffic stop?

A.   Yes, there was some U.S. currency located.  That also
was given to PFC Shawn Williams.

          MS. WESLEY:  I have nothing further of this
witness, Your Honor.

          THE COURT:  All right.  Mr. Curry?

          MR. CURRY:  No questions of the gentleman, Your
Honor.

          THE COURT:  Thank you, Officer.  You may step
down.  You're excused as a witness.

     (Witness excused)

          THE COURT:  The Government may call its next
witness.

          MS. WESLEY:  Officer Shawn Williams.

          THE COURT:  Officer Shawn Williams.

     (Pause)

          THE COURT:  Officer, would you please approach the
Clerk who will administer the oath to you before you take

263

Williams - Direct

the witness stand.

SHAWN WILLIAMS, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness
stand.  The witness is Shawn Williams.  First name,
S-h-a-w-n.  Last name, Williams, W-i-l-l-i-a-m-s.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.   Where do you work sir?

A.   Morgantown City Police in West Virginia.

Q.   And how long have you been employed in law enforcement?

A.   Approximately four and a half years.

Q.   Okay.  And what are your present duties with the
Morgantown Police Department?

A.   Just a Patrol Officer on afternoon shift.

Q.   And were you working in that capacity on the 8th of
August of 2010?

A.   Yes ma'am.

Q.   Were you involved in a traffic stop that took place off
of University Avenue?

A.   Yes.

Q.   And what was your basis for--for stopping that vehicle?

A.   The vehicle had two brake lights out; a center brake
light and one of the other main brake lights was out of the
vehicle.

Q.   Okay.  Now prior to actually stopping this vehicle did

Williams - Direct

you have communication with any officers from the Mon Valley

Drug Task Force?

A.    Yes.

Q.    Okay.  And--and based upon that--that conversation were

you actually looking for a reason to stop that vehicle?

A.    Yes ma'am.  They said if I could find probable cause to

stop the vehicle.

Q.    And do you recall the number of people who were in that

vehicle?

A.    Four.

Q.    Okay.  And what were their--their gender?

A.    There was a female driver, male passenger and two male

rear passengers.

Q.    And did you recognize any of those occupants in the

vehicle?

A.    Yes.

Q.    Okay.  Which one did you recognize?

A.    Dale Brown.

Q.    Did you know the other ones?

A.    No.

Q.    And where was Dale Brown seated?

A.    He was in the rear.

Q.    Okay.  So what happened after you pulled the vehicle

over?

A.    Made approach to the vehicle; approached the driver,

Williams - Direct

spoke to her; advised her that I was a Morgantown Police
Officer; why I was stopping her.  Asked her for her license,
registration, insurance; observed the other passengers in
the vehicle.  All the windows were down in the vehicle so I
could see in the back and just conducted traffic stop from
there.

Q.   Okay.  Now at some point in time, sir, was a search
conducted of that vehicle as well as the occupants?

A.   Yes ma'am.

Q.   And do you know if anything was recovered?

A.   Yes.

Q.   And--and what was recovered?

A.   Some heroin was recovered--suspected heroin at that
time.

Q.   And who actually located the heroin?

A.   Officer Bloniarz.

Q.   And what did he do with it?

A.   After he located it he showed it to me and
handed--handed it off to me.

Q.   And was anything else recovered?

A.   As far as drugs, no, not--not on that stop.

Q.   Was any currency recovered?

A.   Yes ma'am.

Q.   And who actually recovered the currency?

A.   Officer Bloniarz and myself both recovered some from

                         Williams - Direct

each person.  I don't recall which person.

Q.    And where were the occupants seated where the money was
recovered from?

A.    In the rear.

Q.    And what did you do with the money that was recovered
as well as the heroin?

A.    Transported it to station and then a Task Force Officer
took custody of it from me.

Q.    And was it ultimately provided to Detective Forbes?

A.    Yes ma'am.

Q.    Task Force Officer?

A.    Yes ma'am.

          MS. WESLEY:  I have nothing further of this
witness, Your Honor.

          THE COURT:  Cross-examination?

          MR. CURRY:  No questions for the gentleman, Your
Honor.

          THE COURT:  Okay.  Officer Williams, you may step
down.  You're excused as a witness.

     (Witness excused)

          THE COURT:  The Government may call its next
witness.

     (Pause)

          THE COURT:  The name of the witness, please.

          MS. WESLEY:  Oh, I'm sorry.  He went to go get

Beatty - Direct

him.  Lieutenant Jeff Beatty, Your Honor.

        THE COURT:  All right.  Lieutenant Beatty, would

you please approach the Clerk who will administer the oath

to you before you take the witness stand.

        JEFF BEATTY, GOVERNMENT'S WITNESS, SWORN

        THE CLERK:  Thank you.  You may take the witness

stand.  The witness is Jeff Beatty.  Last name, B-e-a-t-t-y.

                DIRECT EXAMINATION

BY MS. WESLEY:

Q.   Where do you presently work?

A.   I'm employed by the Monongalia County Sheriff's

Department, currently assigned to the Mon Valley Drug Task

Force.

Q.   And how long have you been employed in law enforcement?

A.   Since 1991.

Q.   And how long have you been assigned to the Mon Valley

Drug Task Force?

A.   Since the last--approximately 15 years.

Q.   Sir, were you involved in the investigation with

Sergeant Forbes concerning Herbert DeVaughn and others?

A.   I was.

Q.   And were you working surveillance in that investigation

as well as assisting in handling evidence?

A.   Yes.

Q.   I'm going to direct your attention then to July the

Beatty - Direct

21st of 2010.  I'm sorry, July 27th of 2010.

A.   Yes.

Q.   What role were you performing on that day in this
investigation?

A.   On that particular day I was performing a surveillance
operation during a buy.

Q.   And was it a buy/bust scenario?

A.   Yes.

Q.   Okay.  And at some point in time was there an actual
search conducted of either a vehicle or individuals?

A.   Yes.

Q.   Okay.  Let's--just for some back drop.  What
individuals were involved in this buy/bust scenario in terms
of targets?

A.   On that particular circumstance there was a vehicle
involved in a buy/bust situation where a controlled buy had
been arranged and law enforcement had converged on the
vehicle during the buy--the actual buy activity.

Q.   Okay.  And who were the individuals involved in the
vehicle?

A.   There was four individuals involved in that vehicle at
the time including the--not including the informant.  Those
were--Justin Miller was the driver, his girlfriend Chelsea
and in the back seat of the vehicle was Grace McLaughlin and
Darrell Upshur.

Beatty - Direct

Q.   And was there a search of that vehicle?

A.   There was.

Q.   And was anything recovered during the search of that vehicle?

A.   Yes.  During the--during the search of the vehicle a--a large quantity of heroin was seized and retrieved from that vehicle.

Q.   And who actually seized that heroin?

A.   Myself and Detective Miranov, also of the Mon Valley Drug Task Force, participated in the search of that vehicle.

Q.   Okay.  And what did you do with the heroin after it was seized?

A.   After the heroin was seized I returned to our office and processed it and placed it into evidence for holding.

Q.   Okay.  At some point in time was that heroin sent to the State Police Laboratory?

A.   It was.

Q.   Okay.  And was the heroin received back from the State Police Laboratory?

A.   It was.

        MS. WESLEY:  Your Honor, may I approach this witness?

        THE COURT:  Yes you may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government

Beatty - Direct

Exhibit Number 11.  What is that sir?

A.   That would be the drug evidence that was submitted
consistent with the seized substance that was sent to the
lab and returned.

Q.   Okay.  And it's in the same condition as when you sent
it--recovered it and sent it to the State Police Laboratory?

A.   Yes.

        MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 11 admitted into evidence.

        THE COURT:  Is there any objection to the
admission of United States Exhibit 11?

        MR. CURRY:  No objection.

        THE COURT:  All right.  Government Exhibit 11 is
admitted.

     (Government Exhibit Number 11 admitted.)

BY MS. WESLEY:

Q.   Now, sir, were you also working on August the 24th of
2010?

A.   Yes.

Q.   And were you working surveillance in this same
investigation with Sergeant Forbes on that day?

A.   Yes.  As I recall there was a series of controlled buys
done that day on August 24th.

Q.   Okay.  And I want direct your attention to the last
controlled buy that took place on that day.  Was Jolie Lang

Beatty - Direct

the confidential informant involved in that last controlled

drug purchase?

A.    Yes she was.

Q.    Okay.  And after she purchased the heroin do you know

who she gave it to?

A.    Yes.  I maintained surveillance on the information to a

designated location at which time she turned the drug

evidence over to me.

Q.    And what did you do with the drug evidence after you

received it?

A.    I secured it in our evidence storage unit.

Q.    And what did you do after that?

A.    Immediately after that I returned to the operation that

was taking place and participated in a surveillance and

operation of the arrest of Herbert DeVaughn.

Q.    Now in terms of processing the evidence, who were the

individuals of the Mon Valley Drug Task Force that actually

processed the evidence and shipped it off to the State

Police Laboratory?

A.    That would have been myself and First Sergeant Todd

Forbes, obtained that evidence from our evidence lock up; we

processed it; completed the proper paperwork and submitted

it to the West Virginia State Police Lab.

        MS. WESLEY:  Your Honor, may I approach this

witness?

272

Beatty - Direct

THE COURT:  You may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government

Exhibit Number 29.  Does that contain the drugs that you

received from Ms. Lang after that last controlled drug

transaction?

A.   Yes.

Q.   And of course when you--you sent it off to the State

Police Laboratory and they mailed it back to you, correct,

sir?

A.   Yes.

Q.   Is it in the same condition as when you sent it other

than the fact of course they performed their analysis?

A.   Yes.

        MS. WESLEY:  Your Honor, I would move to have

Government Exhibit 29 admitted into evidence.

        THE COURT:  Is there any objection?

        MR. CURRY:  No objection, Your Honor.

        THE COURT:  Government Exhibit 29 is admitted.

    (Government Exhibit Number 29 admitted.)

        MS. WESLEY:  I have nothing further of this

witness, Your Honor.

        THE COURT:  All right.  Cross-examination.

        MR. CURRY:  Thank you, Your Honor.

                        CROSS EXAMINATION

Beatty - Cross

BY MR. CURRY:

Q.   Sir, you indicated that you participated in the arrest
of Mr. DeVaughn?

A.   No, I observed the arrest of Mr. DeVaughn.

  MR. CURRY:  I have no other questions, Your Honor.

  THE COURT:  All right.  Thank you.  Is there any
redirect?

  MS. WESLEY:  No, Your Honor.

  THE COURT:  Thank you.  Then Detective Beatty may
step down.  Or Lieutenant Beatty, excuse me.

 (Witness excused)

  THE COURT:  You may call your next witness.

  MS. WESLEY:  Your Honor, the Government calls
Detective Rob Miranov.

  THE COURT:  All right.  Detective Miranov.  Here
are the exhibits, Ms. Wesley.

  MS. WESLEY:  Thank you, Your Honor.

 (Pause)

  THE COURT:  All right.  Detective Miranov, would
you approach the Clerk who will administer the oath to you
before you take the witness stand.

  ROB MIRANOV, GOVERNMENT'S WITNESS, SWORN

  THE CLERK:  Thank you.  You may take the witness
stand.  The witness is Rob Miranov.  Last name
M-i-r-a-n-o-v.

Miranov - Direct

THE COURT:  All right, Ms. Wesley.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.   Where do you work sir?

A.   Excuse me?

Q.   I'm sorry.  Where do you work?

A.   I'm assigned to the Mon Valley Drug Task Force.

Q.   How long have you been employed in law enforcement?

A.   Nine years.

Q.   And how long have you been assigned to the Mon Valley Drug Task Force?

A.   Approximately three and a half years.

Q.   Sir, were you working on August the 24th of 2010 as a task force member with the Mon Valley Drug Task Force?

A.   Yes ma'am.

THE COURT:  Could you state that date again?  I missed it.

MS. WESLEY:  I'm sorry.  August the 24th, 2010.

THE COURT:  All right.  Thank you.

BY MS. WESLEY:

A.   Yes ma'am.

Q.   In what capacity were you working that evening?

A.   I was on surveillance.

Q.   And is a part of the surveillance also basically doing errands or things that need to be done to facilitate a drug

Miranov - Direct

transaction?

A.   Yes ma'am.

Q.   Did you have any errands that you had to run on the
24th, around that time, of August?

A.   Yes.  Yes I did.

Q.   And what was the errand that you needed to take care of
for the consummation of the drug transaction?

A.   I had to purchase a case of beer for the confidential
informant to deliver to the source of supply that night
before the deal.

Q.   Okay.  And where did you go to purchase the--the beer?

A.   Kroger grocery store.  It was Corona.

Q.   And did you actually get the receipt from that
transaction--I mean from your purchase of the beer?

A.   Yes ma'am.

          MS. WESLEY:  Your Honor, may I approach this
witness?

          THE COURT:  Yes you may.

          MS. WESLEY:  Your Honor, I'm going to approach
this witness with Government Exhibit 31 and 31A.

BY MS. WESLEY:

Q.   What is Government Exhibit Number 31?

A.   It is a Kroger receipt for Corona beer.

Q.   is that a copy of the actual receipt that you received
that night from Kroger's?

Miranov - Direct

A.   Yes ma'am.

Q.   And what is Exhibit 31A, if you know?

A.   It's the receipt to the beer.

Q.   Okay.  And so 31A is actually the original and 31 is a copy of it?

a.   Yes.

Q.   Okay.  Can you read anything on the original receipt at this time?

A.   No, just the back with the advertisements and stuff.

Q.   Okay.  Was the copy of the receipt produced at the time that the original, after it went back to the evidence?

A.   Yes ma'am.

        MS. WESLEY:  Your Honor, I'd move to have Government Exhibits 31 and 31A admitted into evidence.

        THE COURT:  Yes.  Is there any objection?

        MR. CURRY:  I have no objection, Your Honor.

        THE COURT:  All right.  Then the Court admits Government Exhibit 31 and 31A.

     (Government Exhibit Number 31 admitted.)

     (Government Exhibit Number 31A admitted.)

BY MS. WESLEY:

Q.   Sir, what did you do with that receipt--I'm sorry.  After you got the beer and the receipt, what did you do with it?

A.   I transported it back to our task force office and it

Miranov - Direct

was turned over to First Sergeant Forbes.

Q.   And after you--you took care of the errand where did you go in terms of doing your surveillance?

A.   Brockway Avenue.

Q.   And did you see anything after you got to that location?

A.   Just heard the audio from--from that area.

Q.   Could you see the confidential informant from where you were located?

A.   No.

Q.   Could you see any individuals walking up and down that--that area of the street at the time you were there?

A.   Not during this particular buy, no.

Q.   Now were you also working surveillance during some of the other buys that took place--the controlled buys that took place that night?

A.   Yes ma'am.

Q.   Okay.  Were you in a position to see any of the confidential informants as they were engaged in the drug transactions on the 24th?

A.   Yes.

Q.   And--and which transaction was that, sir?

A.   It was--we did numerous buys on that particular day The confidential informant met a black male there at Brockway Avenue at the intersection of Arlington where the

Miranov - Direct

deal happened.  I observed that.

Q.   And--and what were you actually able to see from where
you were located?

A.   I seen a black male dressed in all black walking on
Arlington and the confidential informant and the black male
interacted for a very brief second and then they split
apart.

Q.   Now were you close enough to the black male that the
confidential informant met with that you would--that you
could identify or see his features?

A.   No.

Q.   What was one of your roles in conducting surveillance
that night?

A.   Ah, attempting to find where the source of supply for
the heroin were staying.

Q.   Did you know at this time where the individuals who
were distributing the drugs were coming from?

A.   We had the general area idea but at this particular
time, no, but the buy that you were just talking about gave
us a better idea of where they were staying at.

Q.   Okay.  And why did that buy give you a better idea?

A.   I was on--I was on foot during this buy and after the
buy transaction took place I proceeded to walk on foot and
the individual who delivered the heroin to the confidential
informant actually got on the same sidewalk as me, was

Miranov - Direct

walking behind me in the same direction and, ah, after a period of time I kind of just looked behind my shoulder and he was gone so we kind of narrowed down the actual--within a few houses or a few apartments possibly where they were staying at where he ducked in between an alley way.

Q.    So what happened after--after that transaction?  Let me say, what did you do next after you saw the--the person that you saw make the transaction duck down between some houses?

A.    I walked down a little bit further to get away from the area and Lieutenant Beatty picked me up and transported me back to my vehicle and we regrouped back at the office.

Q.    And so was the decision made to make another controlled purchase as a result of that?

A.    That is correct.

Q.    And where were you when the next controlled purchase took place?

A.    To get a better idea of possibly where they were staying at, I parked my task force vehicle on Decker's Creek Boulevard, exited and conducted surveillance from a wooded area below Pennsylvania Avenue which gave me a view of the backside of the houses where we narrowed it down to from Brockway Avenue.  Brockway and Pennsylvania run parallel with each other.

Q.    Okay.  And so what were you able to see from that location?

Miranov - Direct

A.    From that location I was able to see some individuals
moving around.  I did observe a black male dressed in all
black come down an alleyway in between a couple of these
houses and he actually wrapped around one house, started
going back up towards Brockway Avenue in another alleyway,
then into an apartment there.

Q.    Okay.  And how long did you stay there after you saw
that individual wrap around that house to go to a location?

A.    I was--I was in a wooded area approximately 15 minutes
or so probably watching.

Q.    And so what did you do after you left the wooded area?

A.    I went back to my Jeep.  I stayed there until we had a
buy going and then after our buy I stayed there for a little
bit and then I started to move out after our confidential
informant left.

Q.    Okay.  And did you encounter any one as you started to
move out?

A.    Yeah.  After--when I started to exit the area and I go
back to my Jeep, an individual outside of that apartment or
house saw me and started yelling at me, asked me what I was
doing and stuff so I backed out and just continued to my
task force vehicle and that individual continued after me on
Pennsylvania and he ended up coming to me on--at the
intersection of Decker's Creek and Pennsylvania Avenue.

Q.    And what do you mean he ended up coming to you?  What

Miranov - Direct

did he say?

A.   He just--just asked me what I was doing, trying to get me to stop or, you know, just to find out why I was in the woods, you know, in that area.

Q.   Did you stop?

A.   No, I just went to my vehicle and got in.

Q.   And what did--did you see this person do anything?

A.   Yeah, as I was moving out of the way, he was walking away but he turned around and kind of held his hand up in like, you know, sort of like a gun and kind of moved his thumb like he was pretending to shoot at me or something.

Q.   Okay.  So the person raised their hand and simulated like a--a gun or a firearm at you?

A.   That is correct.

Q.   Where were you when this individual did this to you?

A.   I was in my Jeep backing up.  I was pulled in and I was backing out of my spot when it happened.

Q.   Now the person who--who did that to you, who approached you and did the simulation with the hand with the gun, ah, had you seen that person before?

A.   Just on that day.  Just on that day, just when that--just when that happened.

Q.   Did you see that person any other time later that day?

A.   Yes I did.

Q.   And what were the circumstances of you seeing that

Miranov - Direct

person?

A.   He was detained down the road on Brockway Avenue by some Morgantown police officers and he ended up being arrested.

Q.   And is that person in the courtroom today?

A.   Yes ma'am.

Q.   And please identify that person by what they're wearing.

A.   Wearing a white and appears to be a black striped shirt.

MS. WESLEY:  Your Honor, may the record reflect that he's identified Mr. DeVaughn as the person who approached him?

THE COURT:  Yes it may.

BY MS. WESLEY:

Q.   And so it was this person who actually followed you and simulated the hand?

A.   Yes ma'am.

Q.   What did you do once you got back in your Jeep?

A.   I contacted the other agents and let them know what happened and we just regrouped and got a hold of some officers and they detained the suspect and another individual down there at Quick Mart and Buck's Bar.

Q.   After that happened is that when everyone was arrested?

A.   Yes.

283

Miranov - Cross

        MS. WESLEY:  I have nothing further of this
witness, Your Honor.

        THE COURT:  All right.  Cross-examination.

        MR. CURRY:  Yes, Your Honor.

                    CROSS EXAMINATION

BY MR. CURRY:

Q.   Why is it we need a copy of the beer receipt?

A.   Excuse me sir?  Can you repeat that?

Q.   Do you know why we need a copy of the beer receipt?

A.   Yes--yes I do.

Q.   Why?

A.   After your client was arrested, the receipt was found
in his pocket.

Q.   What happened to the original?

A.   Well I would say these things are--I believe when
they're printed, they're printed on like heat so after a
while the heat turns the whole piece of paper black so
that's why it's good to make copies of that stuff.

Q.   When you came out of the woods, how were you attired?

A.   I don't really remember what I was wearing that day but
just a normal, ah, maybe shorts and a t-shirt or maybe jeans
and a t-shirt, something to that sort.

Q.   You were working undercover?

A.   Yes sir.

Q.   So you just looked like an ordinary guy?

Miranov - Cross

A.    Yes.

Q.    An ordinary guy lurking in the woods?

A.    Sure.  Yeah.

Q.    Have you been accosted by other people when you've been lurking around doing your official duties?

A.    No sir.

Q.    When the individual pointed his finger at you like a gun, did you know it was his finger?

A.    Ah, not particularly.  I mean he just, you know, lifted up and he was definitely pointing at me and I saw his thumb go like that (indicating) so I just assumed that's what it was.

        MR. CURRY:  Okay.  I have no other questions of the gentleman, Your Honor.

        THE COURT:  All right.  Is there anything further?

        MS. WESLEY:  No, Your Honor.

        THE COURT:   Then the witness may step down.

     (Witness excused)

        THE COURT:  Who's your next witness?

        MS. WESLEY:  Last witness, Your Honor.

        THE COURT:  I was thinking it might be and that we ought to take the recess before Mr. Forbes testifies. Ladies and Gentlemen, I think the Government is coming to the close of its case in chief and that the next witness may be somewhat long so it would be advisable, I believe, to

have the mid-afternoon recess and be prepared to return at three o'clock to the courtroom.  Please do not discuss the case among yourselves during the recess.  Please follow the Court Security Officer and leave your notebooks facedown on your chairs.

(Jury Out at 2:43 p.m.)

THE COURT:  All right.  Are we going to have any more potential 404(b) issues that I could take up now outside the presence of the jury?  No?

MS. WESLEY:  I don't think so.

THE COURT:  That took care of it?

MS. WESLEY:  It should have been because he wasn't present on that incident in March.

THE COURT:  Okay.  All right.  This Court stands in recess until three o'clock.  Thank you.

(Recess from 2:45 p.m., until 3:00 p.m., 08-24-2011)

THE COURT:  Okay.  Thank you. Harrison is printing out the--please be seated.  Harrison is printing out the draft out for you all and will have it to you all.  The question becomes, before we bring the jury in, what is it that we should be planning toward schedule wise?  I'm not committing you to an absolute certainty, Mr. Curry.  I'm just looking for estimates here.  Assuming you all rest today--is that what your expectation is?

MS. WESLEY:  It is, Your Honor.

THE COURT:  I'll let--if I know what the schedule is, I can prepare the jury.

MR. CURRY:  I think it's real likely we'll also rest today, Your Honor.

THE COURT:  All right.  Well, I'm not going to say that to the jury but I will tell the jury that I expect that they may be getting the case tomorrow.  All right.  Now the question becomes then when do you want to do this Charge Conference?  I guess depending on when you rest and then we have to--I'll clear the courtroom, we'll take up the motions, then you can tell me if you're putting on any witnesses or resting and I'll bring the jury back in and we can--you can rest in front of the jury if that's what you're going to do.  I can let the jury go and if we're at least a half an hour shy of five o'clock I will conduct the Charge Conference with the final part tomorrow morning and my suggestion would be that maybe if we're going to argue it tomorrow, I could tell the jury to come at nine-thirty which would give us a final opportunity to meet and then I can get it printed before the jury comes in or, if you want, I could bring them in--I mean if it helps you all prepare, I could bring them in at ten tomorrow morning.  I assume you're going to want forty-five minutes to an hour to argue the case.  I don't think the defendant is going to want that but I'm looking at what the Government's got in here and what it

may take.

          MR. CURRY:  I was really hoping to agree to
something much shorter to hold them down.

          THE COURT:  I think in fairness to the number of
witnesses and the number of exhibits that it would have to
be at least forty-five minutes but you all can talk about
that further and if that's the case and the jury's going to
get the case from both sides with say most generously two
hours of closing argument, they would still have it by noon.
Okay.  So do you just--nine-thirty, ten?  It's up to you
all.

          MR. CURRY:  It doesn't matter to me.

          MS. WESLEY:  Nine-thirty is fine, Your Honor.

          THE COURT:  Okay.

          MR. CURRY:  That's fine with me.

          THE COURT:  Then you should be ready to be here at
eight-thirty for the final part of the Charge Conference.

     Mr. DeVaughn, do you understand what I mean by the
Charge Conference?

          THE DEFENDANT:  Yes ma'am.

          THE COURT:  Okay.  Thank you.  We can bring the
jury in.

     (Jury In at 3:05 p.m.)

          THE COURT:  All right.  Ladies and Gentlemen,
welcome back.  As we get underway, I understand that the

Forbes - Direct

next witness will be the Government's last witness and that the Government intends to rest its case in chief following the conclusion of his testimony.  I've also, before bringing you back in, taken a couple of moments to talk to the lawyers and their best estimate is that you will get the case some time--probably tomorrow morning at some point. All right.  So for planning purposes, we'll see how things go this afternoon but that's our expectation.  All right.

Ms. Wesley, you may call your next witness.

MS. WESLEY:  Your Honor, we call Sergeant Todd Forbes.

THE COURT:  All right.  Sergeant Forbes, would you approach the Clerk who will administer the oath before you take the witness stand.

TODD FORBES, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  You may take the witness stand.  The witness is Todd Forbes, last name, F-o-r-b-e-s.

THE COURT:  All right, Ms. Wesley.

DIRECT EXAMINATION

BY MS. WESLEY:

Q.   Where do you presently work?

A.   I'm employed by the Monongalia County Sheriff's Department, currently assigned to the Mon Valley Drug and Violent Crimes Task Force.

Q.   How long have you been employed in law enforcement?

Forbes - Direct

A.    Twelve (12) years.

Q.    and how long have you been a member of the Mon Valley
Drug Task Force?

A.    Six years.

Q.    And as a member of the Mon Valley Drug Task Force, are
you involved in narcotic investigations in the Monongalia
County area?

A.    Yes ma'am.

Q.    In the course of your duties as a member of the Mon
Valley Drug Task Force, were you involved in an
investigation concerning an individual known to you as Wop?

A.    Yes ma'am.

Q.    Okay.  And when did you first become acquainted with
the name of Wop?

A.    In 2006, 2007.

Q.    And did you--in the course of your investigation did
you develop a person who you felt could make a controlled
purchase from the person that you knew as Wop?

A.    Yes ma'am, several.

Q.    At this point in time early in your investigation, sir,
did you know Wop by his true name?

A.    No ma'am.

Q.    The person that you believed that could initially get a
controlled buy from Wop, who was this person?

A.    Debbie Long.

290

Forbes - Direct

Q.   And why were you of the impression that Debbie Long
could get a controlled buy from Wop?

A.   We had intelligence.  Several sources had told us that
she had involvement with Wop, as well as a few other people
that had involvement with Wop and then I was able to speak
to her to confirm that.

Q.   Okay.  Now I want to direct your attention to September
the 16th of--of--of 2009.  Did you work with Debbie Long as
a confidential informant on that day?

A.   Yes, ma'am.

Q.   And did Ms. Long make a controlled drug purchase for
you on that day?

A.   Yes ma'am she did.

Q.   And who did she make the undercover buy against?

A.   An individual by the name of Debbie Bolden.

Q.   And what type of drug did she purchase from Debbie
Bolden?

A.   She purchased seven stamps of heroin for one hundred
and forty dollars.

Q.   Now at this point in time in your investigation do you
have any information that would link Debbie Bolden to Wop?

A.   Yes ma'am.  We had information that Mr. DeVaughn--at
that point I only knew him as Wop.  Wop was selling heroin
from Debbie Bolden's residence.

Q.   Now after that transaction had took place between

Forbes - Direct

Debbie Long and Debbie Bolden, how did you arrange to try
to--to get her to make another buy, Debbie Long of course?

A.   We brought her in--we had hoped on that first buy that
we would be--that we would encounter Wop.  He would either
be involved in the deal more or perhaps even show up but
that did not work out, so we instructed her just to call Wop
directly as his number.

Q.   Now what was the basis of Debbie Long cooperating?

A.   Why was she cooperating?

Q.   Yes.

A.   She was in trouble.

Q.   Do you know what type of trouble she was in?

A.   I don't recall at that time why she was in trouble.

Q.   But she was certainly trying to work something off?

A.   Yes ma'am.

Q.   And so you--you said you had her--

A.   Oh, I'm sorry, I do recall.  She was involved in a
previous drug investigation that we had been doing.

Q.   Okay.  So it was drug related?

A.   Yes ma'am.

Q.   Okay.  Now what happened during the--the next
transaction with Debbie Long as a CI?

A.   Ms. Long was directed to contact Wop on the 28th of
September and arrange to buy a brick of heroin from him.

Q.   And was that in 2009?

292

Forbes - Direct

A.   2009, yes ma'am.

Q.   And when she contacted him, where was she?  When Debbie
Long contacted Wop, where was she?

A.   She was in our office.

Q.   The Morgantown Police Department?

A.   Yes ma'am.

Q.   Okay.  And could--how did she initially contact him?

A.   She just placed a call to him which was monitored by
me, which means that I listened in on the conversation as
well and she asked if she could buy a brick and he said,
yeah.  He said he was--he was getting ready to--

            MR. CURRY:  Objection, hearsay.

            THE COURT:  Sustained.

BY MS. WESLEY:

Q.   Based upon--were you able to hear the conversation that
took place?

A.   Yes.

Q.   Okay.

            THE COURT:  Okay.  If you can hear the
conversation and it's with the defendant, overruled.

BY MS. WESLEY:

Q.   What--what did you hear when you listened in on the
phone conversation, sir?

A.   Debbie asked the male voice, which she identified as
Wop--

Forbes - Direct

THE COURT:  Well, now I think that's hearsay.

MS. WESLEY:  I agree.

BY MS. WESLEY:

Q.   What did you hear the other person on the line say
other than Debbie Rogers?  I'm sorry, Debbie Long.

A.   That he was getting ready to leave and that he had a
couple of bricks left and that he would sell her one and
wanted her to hurry and come to the Mall because he wanted
to leave.

Q.   And so what did you all do after the phone conversation
ended?

A.   We prepared Ms. Long for the controlled buy, which
meant we searched her, provided her with an electronic
recording device and transmitter and recorded Government
funds.

Q.   And where did you transport Ms. Long?

A.   Detective Miranov actually began to transport her to
that location but she received a phone call before we got to
the location we were headed and the location was changed to
the Dairy Mart in Westover.

Q.   And so what happened after the location was changed?

A.   Detective Miranov dropped Debbie Rogers off at the
bottom side of lower Lane Street, which is the street where
ultimately they had met--they would end up meeting.  She
began walking up Lane Street toward the Dairy Mart.

Forbes - Direct

Q.   Did you observe this?

A.   I observed some of this.

Q.   Okay.  Just tell us what you able to observe, sir.

A.   I was able to observe the two--I was able to observe--I could hear the audio of her walking up the street and I was able to observe, ah, as--as she went through one section of the street I could see her walking past and then she was out of my sight again.

Q.   Okay.  Now based upon the monitor, you were able to hear things as they were occurring?

A.   Yes ma'am.

Q.   Okay.  And please explain to the--to the jurors basically how the electronic monitoring works.

A.   It's just a transmitter that enables the officers to hear what's going on and it's recorded as best as it can be for evidentiary value but it--the transmitter is there to provide safety so that we can understand if something's wrong.  If they need assistance. if we need to respond and get in there, that gives us the ability to hear that so we can do that if necessary.

Q.   Okay.  And what did you observe next after you saw her cross the intersection?

A.   I heard two voices on there; one was Ms. Long and the other was a male voice.

Q.   Now was it--had you heard that male voice before?

Forbes - Direct

A.   I was unable to distinctly tell at that point.

Q.   Had you--did you listen--let me ask you this.  As you heard the voices, could you tell where the transaction was going to take place?

A.   I knew that it had to be on Lane Street because I could see the top of Lane Street and Mrs. Rogers did not come out where I could see her at that point.  Also I was instructed by radio by Detective Ammons or Miranov that somebody had walked from the Stars Casino and down Lane Street right before I started hearing the conversation.

Q.   Where was the Stars Casino in comparison to where you were?

A.   I was--I was on the north side of the Dairy Mart in Westover and the Stars Casino is the next business south of the Dairy Mart and there's a street between that which is Lower Lane Street.

Q.   Who were the other officers that were assisting in surveillance during this transaction?

A.   Detectives Miranov and Ammons were located in the vicinity.  Detective Ammons, I believe, was across the street and Detective Miranov was parked in the plaza where the Stars Casino is located.

Q.   Now how much money was provided to--to Debbie Long for this transaction?

A.   Four hundred and seventy-five dollars.

296

Forbes - Direct

Q.   Is that a typical amount to purchase a brick of heroin?

A.   That's a good--yeah, that's a fair price.

Q.   And from listening in through the monitor, could you

tell when the transaction was completed?

A.   Yes.  I could hear Debbie--the sound of Debbie walking

again and then shortly after I heard her walking I was again

notified by radio that the male had returned into the Stars

Casino.

Q.   Okay.  And what did you do after you realized that the

transaction was completed?

A.   I drove down Lane Street and picked up Debbie.

Q.   Now what happens immediately after a controlled

transaction takes place?

A.   Immediately upon returning to my vehicle, Ms. Long

provided me with the drugs that she purchased and she was

driven--and I deactivated the recording device and

electronic monitoring system and took her to a location and

in this case while that location was my office, while

transporting her there I asked her who she had met--

Q.   Don't tell us who she said she met.

A.   Right.

Q.   But what else happened?

A.   I asked her about a vehicle.  She gave me a description

of a vehicle that she was familiar with but that she did not

see on this occasion and she described clothing of the

Forbes - Direct

individual in whom she had met with.

Q.   So you had a description of a vehicle and clothing?
Okay.

A.   Certainly clothing and a vehicle in which she was
familiar with.

Q.   Now are CI's typically--cooperating individuals
typically searched following this transaction--

A.   Yes, when she got back to our office she was searched.
The evidence was secured.  Ah, she gave a summary of what
happened in her opinion or from her perspective and then she
was released.

Q.   Now let me--and I'm sorry, I hate to go back in time
but prior to sending Ms. Rogers off to--to make this
transaction, what is the protocol that officers follow in
terms of preparing someone to go to make a controlled drug
purchase?

A.   They're searched to make sure that they don't have any
contraband or weapons.  They're provided with the electronic
recording device and transmitter and provided with
Government funds and oftentimes if they're driving
themselves, which was not the case in this instance, their
vehicle is searched for similar things, contraband, weapons,
drugs, anything.

Q.   Okay.  Now was Ms. Rogers searched prior to going off
on this transaction?

Forbes - Direct

A.    Yes she was.

Q.    Now you said they're also given Government funds?

A.    Yes ma'am.

Q.    Is anything done to the Government funds prior to
providing it to a confidential informant to make a purchase?

A.    Yes ma'am.  It's Xerox copied so we can keep track of
the serial numbers.

Q.    And what is the purpose of actually copying the
Government money?

A.    In some instances the suspects will have the money--we
will find the money on them later and we're able to verify
that it was money that we used for the purchase of the
drugs.

Q.    Now after Ms. Rogers is back in your office following
the--the transaction, what do you do?

A.    I respond back to the Stars Casino.  Detectives Miranov
and Ammons had stayed there on that location and watched the
car that they suspected was the car involved and also noted
that nobody had come in and out since the male went back in
immediately following the deal.

Q.    And what type of car were they observing?

A.    A gold--

          MR. CURRY:  Objection, hearsay.

          THE COURT:  Ask the question again.

          MS. WESLEY:  Okay.

Forbes - Direct

BY MS. WESLEY:

Q.   What type of vehicle were the officers observing for
surveillance?

           MR. CURRY:  And that's a--

           THE COURT:  The answer would have to be what he
knows, I think.

           MS. WESLEY:  Okay.

BY MS. WESLEY:

Q.   Do you know the type of vehicle that was under
surveillance at this time?

A.   Yes ma'am.

Q.   Okay.  And what type of vehicle was it?

A.   A gold Ford four-door vehicle with Pennsylvania
registration.

           MR. CURRY:  Same objection unless he saw that
vehicle, Your Honor.

           THE COURT:  Overruled.

BY MS. WESLEY:

Q.   Did you join in the officers in terms of trying to
figure out the identity of the individuals involved?

A.   Yes ma'am.  As I was communicating with them from the
time that I left my office and responded back to the Stars
Casino, approximately a two minute drive, I advised them to
maintain their positions, that I was going to go inside the
Casino to see if I could identify or see who was in there.

Forbes - Direct

Q.   Okay.  And did you observe any individuals once you entered the Stars Casino?

A.   Yes ma'am.

Q.   And who--how many people were in there?

A.   There was myself.  There was a clerk and/or attendant, whichever how you refer to them and then two males.

Q.   Ah, were any of the males that you observed of interest to you?

A.   Yes ma'am.  One of the males--both the males were sitting at the same--at the bar talking to the attendant and one of the suspects was wearing the exact clothes that the Informant had described to me in her summarization of her buy.

Q.   And so what did you do after you realized that one of the individuals matched the clothing that was identified to you by Ms. Rogers?

A.   Well, I just sat in front of one of those machines and I was communicating by telephone to Detective Ammons and Miranov that I thought our suspect was inside and that I would let them know when he left, which ultimately happened a few minutes later.

Q.   Okay.  And so after you communicated that information to Detective Miranov, how long after that did the subject leave?  I'm sorry.

A.   Approximately 10 minutes.  It was just a few minutes;

Forbes - Direct

not very long.

Q.   And how long did you stay in the Stars Casino after the person left?

A.   I started to leave immediately but I was--I was instructed by Detective Miranov to wait inside because they were--the suspects that they had observed walking out of the Casino had gotten into the gold car but that they hadn't left yet.  They were sitting there with the dome light on.

Q.   Okay.  so how long did you actually stay inside?

A.   Approximately five more minutes, maybe less than five minutes before I was able to get to my car.

Q.   Okay.  Did you pick up any type of surveillance with the officers after you left the Stars Casino?

A.   Yes ma'am.  I caught up to--they were doing a mobile surveillance operation, which is just to say that they were following the vehicle, following where it went and trying to be invisible themselves, trying not to be conspicuous that they were following them and I was able to catch up to them a short time later.

Q.   And were they at the time when you were able to catch up to them?

A.   They were somewhere near the Richwood Avenue Dairy Mart--I'm sorry, the Dorsey Avenue--I'm way wrong, Willey Street Dairy Mart going up around to Richwood Avenue.

Q.   Okay.  And at some point in time did you end the

Forbes - Direct

surveillance?

A.    Yeah, Detective--Detective Ammons indicated that he thought that it was a possibility that he was burnt, which would have just meant that they had figured out we were following them and at that point we decided to stay back a couple of blocks and just wait to see if they went mobile again, which they didn't seem that they were going to and we just left in fear of foiling the case.

Q.    And the drugs that you got from Debbie Long, you lodged them into your evidence?

A.    Yes ma'am.

Q.    Okay.  And at some point in time you sent them off to the State Police Laboratory?

A.    Yes ma'am.

Q.    Okay.  And did you receive them back from the State Police Laboratory?

A.    Yes ma'am.

Q.    Are they basically in the same condition as when you received them?

A.    Yes they are.

         MS. WESLEY:  Your Honor, may I approach?

         THE COURT:  Yes.

BY MS. WESLEY:

Q.    I'm handing you what's been marked as Government Exhibit Number 1 for identification.  Are those the drugs

Forbes - Direct

you received from Debbie Rogers?

A.   Yes ma'am.

Q.   Or Debbie Long.  I believe the name is Debbie Rogers
Long, is that her true name?

A.   That's--yes, we know her as both.  It's the same
person.

Q.   Are those the same drugs that you received back from
her?

A.   Yes ma'am.

Q.   Are they in the same condition other than the fact that
they were analyzed by the State Police Laboratory?

A.   Yes ma'am.

          MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 1 admitted into evidence.

          THE COURT:  Is there any objection?

          MR. CURRY:  Yes, Your Honor, materiality.  This
witness cannot connect those to this defendant.

          MS. WESLEY:  Your Honor, the only issue, I
believe, that he wants to argue is identity.  Identity has
nothing to do with the chain of custody and the fact that he
took those drugs from Debbie Rogers.

          THE COURT:  The Court overrules the objection and
will admit United States Exhibit 1.  I think the
Government's argument is spot on.

     (Government Exhibit Number 1 admitted.)

Forbes - Direct

BY MS. WESLEY:

Q.   Sergeant Forbes, did you, in the course of this investigation, develop a second confidential informant?

A.   Yes ma'am.

Q.   And who was the next confidential informant that you dealt with?

A.   The next confidential informant that we used was Marcus Gamble.

Q.   And how was it that you were able to secure Marcus Gamble's assistance as a confidential informant?

A.   Marcus had gotten into some trouble for a theft or some larceny and he was referred to me from a different detective from another unit.

Q.   Now what were your intentions in this investigation when you utilized Marcus Gamble as a confidential informant?

A.   On speaking to Marcus, I was informed that he was able to buy drugs off of Wop and that he had previously done so.

Q.   And I want to direct your attention then to July the 15th of 2010.  Were you working with Marcus Gamble as a confidential informant on that day?

A.   Yes ma'am I was.

Q.   Okay.  And was Mr. Gamble brought to the police department prior to utilizing him as a confidential informant?

A.   Yes he was.

Forbes - Direct

Q.   And what happened while he was there at the police department?

A.   Actually before he arrived at the police department he contacted--he called me and told me that he had spoken to Wop and that it would be fine to meet with Wop for the purpose of buying heroin.

Q.   And so after he arrived at the station, what type of protocol or procedures did you go through with Marcus Gamble?

A.   He arrived and he made a second call which was monitored, which means that I listened to that, to Wop but at that point Wop indicated that he was not in the Morgantown area, that he was on his way back from Pittsburgh and that he would meet him but it would have to be later when he was back, so he was sent back home.  However, an hour or so later he was brought back in to the Mon Valley Drug Task Force Office and again made a phone call to Wop and it was determined that everything was good; he was back and it could go.  Actually when he called--this time when he called the same number, which was the number he had contacted Wop before, he spoke to a female.

Q.   At some point in time were you able to identify who the female was that he spoke to?

A.   Yes ma'am, the female was Grace McLaughlin.

Q.   And was a purchase price negotiated for the purchase of

Forbes - Direct

heroin?

A.    Yes it was.  It was determined that we were going to
buy one brick of heroin for five hundred dollars.

Q.    And was a location arranged for where the transaction
should take place?

A.    Yes.  The deal was initially set up for the Burger King
in Westover.

Q.    And was Mr. Gamble searched and--and basically gone
through the appropriate protocol before going out as a
confidential informant?

A.    He was searched, provided with electronic recording
device and transmitter, provided with Government funds and
given a list of instructions of what to do by me.

Q.    And what--how did Mr. Gamble arrive at the location
where the transaction was supposed to take place?

A.    He was a passenger in my vehicle.  I drove him to the
loca--to Burger King.  However, on our way to the Burger
King the female called him and said to come across the
street to the Microtel.

Q.    From where you were parked could you observe where Mr.
Gamble went after he left your vehicle?

A.    I could see that he went into the Microtel parking lot;
however, there were a lot of people there and the parking
lot was quite full.  I had to rely on the other agents who
had better vantage points then I did.  I could hear the wire

Forbes - Direct

certainly.

Q.   Okay.  so you still can hear what's going on?

A.   Yes ma'am.

Q.   So did--did Mr. Gamble actually meet with Grace?

A.   Yeah, eventually they did meet up.  They were walking around on opposite sides of the building.  A phone call was made and the female advised Marcus to come around to whichever side she was on and ultimately they did meet and exchange the five hundred dollars for the brick of heroin.

Q.   And what happened to the--the heroin that Mr. Gamble purchased?

A.   He came immediately back to my vehicle and I took possession of those and secured them.  Mr. Gamble was taken to a secure location, debriefed, searched and later released.

        MS. WESLEY:  Your Honor, may I approach this witness?

        THE COURT: Yes.

BY MS. WESLEY:

Q.   I hand you what's been marked as Government Exhibit Number 4.  What is that sir?

A.   This would be the brick of heroin that was purchased on 7/15 by Marcus Gamble from Grace McLaughlin.

Q.   And you sent it off to the West Virginia State Police Laboratory for analysis?

Forbes - Direct

A.    Yes ma'am.

Q.    Is it in the same condition as when you sent it basically?

A.    Yes.

        MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 4 admitted into evidence.

        MR. CURRY:  No objection, Your Honor.

        THE COURT:  All right.  There being no objection, the Court admits Government Exhibit 4.

    (Government Exhibit Number 4 admitted.)

BY MS. WESLEY:

Q.    Now did you use Marcus Gamble as well on another controlled purchase?

A.    Yes ma'am.

Q.    Okay.  And when was the next time that you utilized Mr. Gamble as a confidential informant?

A.    July 19th of 2010.

Q.    Okay.  And who did Mr. Gamble contact to make a drug purchase from?

A.    Mr. Gamble called the same phone number and the phone was answered by the female identified as Grace McLaughlin. Initially she agreed to sell Marcus a brick of heroin but wanted to charge him six hundred dollars but I instructed Marcus that that was too much so we agreed to buy two buns of heroin for two hundred and fifty dollars.

Forbes - Direct

Q.    And was Mr. Gamble searched and gone through the
appropriate protocols prior to going out to make a
transaction?

A.    Yes ma'am.  He was searched, provided with electronic
recording device and transmitter and given recorded
Government funds.

Q.    And where was the transaction going to take place?

A.    At the BFS on--at the Glenmark Center.  It was
initially scheduled for Wendy's but later changed next door
at the BFS.

Q.    And that's in Morgantown?

A.    That is on the outskirts of Morgantown in Monongalia
County, yes.

Q.    Now had did Mr. Gamble arrive at the meeting location?

A.    He was driven by me in my vehicle.

Q.    And once--who did Mr. Gamble meet with at that
location?

A.    Once he arrived at the location he made another--a
second phone call to the female identified as Grace.  She
said in about five minutes somebody else would be bringing
it and he didn't know who it was going to be.  It ended up
being somebody else that was later identified as Darrell
Upshur.

Q.    And what did--did Mr. Gamble actually purchase the
heroin from Mr. Upshur?

Forbes - Direct

A.   Yes he did.  He provided the two hundred and fifty
dollars and was given two buns or twenty bags of heroin.

Q.   And what did Mr. Gamble do with the heroin after he
received it?

A.   He returned to my vehicle; handed it over to me.  It
was secured.  Mr. Gamble was taken to a secure location,
searched, debriefed and later released.

        MS. WESLEY:  Your Honor, may I approach this
witness?

        THE COURT:  Yes.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government
Exhibit Number 7 for identification.  What is that, sir?

A.   This is the two bundles, or 20 bags, however you refer
to it that was purchased that night from Darrell Upshur by
Marcus Campbell.

Q.   And it's the same heroin that you submitted to the
State Police Laboratory for analysis?

A.   Yes ma'am.

Q.   And is it in the same condition?

A.   Yes ma'am.

        MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 7 admitted into evidence.

        THE COURT:  Any objection?

        MR. CURRY:  No, Your Honor.

Forbes - Direct

THE COURT:  Government Exhibit 7 is admitted.

(Government Exhibit Number 7 admitted.)

BY MS. WESLEY:

Q.   Now did you utilize Mr. Gamble in any other controlled buy situations when he was working as a confidential informant?

A.   Yes, ma'am.

Q.   And when was the next time that you utilized him?

A.   July 20th, 2010.

Q.   And where was that transaction arranged to take place at?

A.   At the Wonder Bread Store on Greenbag Road in Morgantown.

Q.   And what was going to be the purchase price?

A.   We were buying one brick of heroin for five hundred dollars.

Q.   And who actually drove Mr. Gamble to the transaction location?

A.   He drove with me as a passenger in my vehicle.

Q.   And did Mr. Gamble meet with someone after he arrived at that location?

A.   He did.  Upon arriving there--after--shortly--actually we got there, we made a second phone call and they said it would be a couple minutes and then Darrell Upshur arrived. The male from the previous deal that we identified later as

Forbes - Direct

Darrell Upshur arrived in a vehicle with Justin Price.

Q.   And who is Justin Price?

A.   Justin Price was somebody that we had had knowledge of that was involved in--in drug trafficking in the Morgantown area and then we had several individuals tell us that he was tied or in someway linked to Wop.

Q.   Now what type of vehicle did they arrive in?

A.   I'm not sure.

Q.   Now what happened after the transaction?

A.   Following the transaction Marcus got back into the car with me.  He turned over the heroin.  It was secured. He was searched, debriefed and later released.  Subsequently the vehicle that was involved, and actually I remember now, it was a silver SUV, was followed by Detectives Miranov--Detective Miranov and Dukovich and subsequently it was stopped a couple miles away.

Q.   Let me ask you this.  The transaction that just took place that you just detailed between Mr. Gamble and Darrell Upshur, where were you when the transaction was actually occurring?

A.   I was in the parking lot just a few parking spots away from where the deal took place.

Q.   Could you observe the transaction from where you were parked and seated?

A.   Yes ma'am.

Forbes - Direct

Q.   And when--when I'm asking you can you observe it, what exactly did you see?  Did you see the hand-to-hand or could you just tell by their movements that that's what was going on?

A.   Well, I saw the two of them meet and I saw them exchanging but I wouldn't be honest to say I could see anything change hands but clearly I could see that they met and both of--both of them extended their arm at one point.

Q.   And after Mr. Gamble entered your car, where did the two of you go?

A.   We went back to the--to our office, where he was searched and debriefed and released.

Q.   Okay.  And what did you do with the drugs that you received from Mr. Gamble?

A.   The drugs that I got.  I'm sorry?

Q.   The drugs that he gave you from--

A.   They were secured into evidence.

          MS. WESLEY:  Your Honor, may I approach this witness?

          THE COURT:  Yes.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government Exhibit Number 9 for identification.  What is it sir?

A.   This would be the brick of heroin that was purchased on that day from Darrell Upshur and provided to me by Marcus

Forbes - Direct

Gamble.

Q.   And is it in the same condition--and it's the same drugs that you sent away to the State Police Laboratory for analysis?

A.   Yes ma'am.

Q.   And same condition sir?

A.   Yes ma'am.

        MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 9 admitted into evidence.

        THE COURT:  Any objection?

        MR. CURRY:  No, Your Honor.

        THE COURT:  All right.  The Court admits Government Exhibit 9.

    (Government Exhibit Number 9 admitted.)

BY MS. WESLEY:

Q.   Now, I'm sorry, you were starting to tell me that after that transaction the vehicle was--was followed?

A.   Yes ma'am.

Q.   Okay.  And what happened after that vehicle was followed?

A.   That vehicle was stopped by Morgantown Police Department.

Q.   And based upon that stopping of that vehicle were you able to identify the occupants in that vehicle?

A.   Yes ma'am.  The police were able to identify both

Forbes - Direct

passengers--both parties in the vehicle and relay that
information to me.

Q.   Okay.  And who were the--the actual occupants in that
vehicle?

A.   Justin Price was the driver and the passenger was
Darrell Upshur.

Q.   Now at this point in time, sir, what direction are you
trying to take this investigation?

A.   At this point we're trying to get Wop.  We're not sure
if he's in town, out of town, in town but not at the same
location where the deals are happening because we're getting
multiple sources tell us that he's got people running the
drugs and that he himself is not necessarily present where
the drugs are.  So we're--at this point we're just trying to
get to where he was, get the drugs and him in the same
location if we could do that.

Q.   So what did you attempt to arrange next?

A.   Approximately a week later--well actually it was
approximately three or four days later my undercover phone
rang and it was Grace McLaughlin.  Actually at that point I
didn't know that it was but later have determined that it
was Grace McLaughlin that called.  She was actually looking
for Marcus, who had called her from my phone at some point
on one of the other deals so I made up a story about Marcus
not being there and that I would prefer to deal with her and

Forbes - Direct

told her--you know, I made up a name of who I was and just
asked her if I could with her directly and cut Marcus out of
the equation and she agreed to do that.

Q.   So when--when Grace called you, what was the purpose of
her calling you?  I mean it's clear she thought you were
Marcus, but why was she calling you?

A.   Just to say that she was good.  Everything was good.
They had heroin.

Q.   Okay.  And so what did you do now that you're able to
deal with Grace directly?  What happened next?

A.   On the 27th, which is approximately a week after the
previous buy and a couple of days after our conversation I
contacted her about buying a brick of heroin and she agreed
and actually I wasn't sure--I was trying to figure out how
much heroin they had and so that I could gauge when they may
be next in contact with Wop, thinking if they were low they
would probably be seeing him sooner than later, so I then
called back and tried to get a little bit more a couple of
different times until ultimately she was going to sell us
two brick and two buns.

Q.   For how much money?

A.   For twelve hundred and fifty dollars.

Q.   And where did you arrange or the two of you arrange for
the transaction to take place?

A.   Initially it was set up to go at Kroger in Sabraton but

Forbes - Direct

I went to that location and waited and she didn't show up
and so I called her and she said it would be a few minutes
and this kind of drug on for a little while and then she
stopped answering my calls so I started texting her and
she--it didn't appear that she was going to show up so I
called Marcus and asked Marcus to call her and see what the
deal was, why she wouldn't call me back and then Marcus said
she had agreed to meet me if Marcus was there but that she
didn't know me and that she would feel more comfortable if
Marcus could be there.  So we then went and picked up
Marcus.

Q.   Okay.  And after you picked up Marcus, did you
reconnect with Grace to try to find a location where the
transaction could take place?

A.   Yeah, once we got with Marcus, Marcus called and she
said, yeah, that's fine, I'll meet you at Wendy's on--at the
Glenmark Center.

Q.   And that's in Morgantown of course?

A.   It's just on the outskirts of Morgantown in Monongalia
County.

Q.   And so what happened when you--well let me ask you
this.  So what are you planning to do during this--this
transaction?

A.   At this point--we're planning on doing a buy/bust.  We
were never intending on giving them the money.  We were just

Forbes - Direct

going to take the drugs that they had and arrest anybody
that was involved in that transaction.

Q.   So please explain to--to the jurors what exactly is a
buy/bust?

A.   It's essentially the same thing as a buy but instead of
us giving them the twelve hundred and fifty dollars we
will--we will identify ourselves as police officers and take
certainly any drugs or contraband that they have and--and
place them under arrest for the activity.

Q.   Now do you inform uniformed police officers whenever
you're doing a buy/bust?

A.   Most times.  In this instance, yes we did.

Q.   And so who arrived at the Glenmark Center location
first?  Was it you or was it the individuals that you were
attempting to arrest?

A.   It was us and we had to wait a little while.  We--you
know, Marcus called a couple of times to see when they would
be there and then a while later they did arrive.

Q.   And where did they drive to when they finally arrived?

A.   They drove to Wendy's and we had parked at the BFS and
just had Marcus in the car with Detective Miranov waiting to
see if they were going to come.  We were skeptical that they
would come at this point but then they did arrive and they
told Marcus to walk over and said what kind of vehicle they
were in.  So as soon as we saw that vehicle pull in and

Forbes - Direct

Marcus walked up to the vehicle, officers converged on the vehicle.

Q.    And the officers that converged on the vehicle, about how many officers were involved in this buy/bust scenario?

A.    There was--there were about six officers.

Q.    And were you one of the officers that was involved?

A.    Yes ma'am I was.

Q.    And how many individuals were in the vehicle?

A.    There were four people in the vehicle and Marcus just outside the vehicle.

Q.    And who were these individuals inside the vehicle?

A.    Inside the vehicle was Justin Miller, who was driving, Chelsea Kennedy, Grace McLaughlin and Darrell Upshur.

Q.    Okay.  Do you recall which type of vehicle they were in?

A.    They were in a Jeep.

Q.    Now what happened when the officers converged on this vehicle?

A.    Initially I was responsible for the people in the back seat and we had different assignments for other officers. We were--I was with officers getting people out of the back seat and as we were instructing them to get out of the vehicle I could observe the male passenger putting something between the seat.  Of course we weren't sure--I wasn't sure at that point if it was--what it was.  I figured maybe it

Forbes - Direct

was a weapon.  So we got him out of the car immediately and secured him and then I could look there between the seat and the door in plain view and there was a brick of heroin.

Q.   And was that individual arrested at that time?

A.   Yes he was.

Q.   And who was that individual that you found the brick of heroin on?

A.   Darrell Upshur.

Q.   And was Mr. Upshur searched then?

A.   At that point he was pat searched, which means I just rubbed across him to make sure he didn't have any weapons and there was a large sum of money in his pocket that was taken.

        MS. WESLEY:  May I approach, Your Honor?

        THE COURT:  You may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government Exhibit Number 13.  What is that, sir?

A.   This is the money that was in Darrell Upshur's pocket at the time he was arrested on the 27th.

Q.   And how much money is it?

A.   Twenty-seven hundred dollars.

Q.   And did you seize that money then maintain it in your evidence custodian locker?

A.   At that point on scene, Lieutenant Beatty was--was

Forbes - Direct

managing the evidence and it was turned over to him but

later I--I retrieved it from the safe and processed it.

          MS. WESLEY:  Your Honor, I would move to have

Government Exhibit Number 13 admitted into evidence.

          MR. CURRY:  No objection.

          THE COURT:  All right.  Government Exhibit 13 is

admitted.

     (Government Exhibit Number 13 admitted.)

BY MS. WESLEY:

Q.   Now later, sir, were any other occupants in the vehicle

searched?

A.   Yes.  Grace McLaughlin was also taken into custody at

that point and she was subsequently searched.

Q.   And was anything found on her person when she was

searched?

A.   There was U.S. currency on her as well.

          MS. WESLEY:  Your Honor, may I approach this

witness.

          THE COURT:  Yes.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government

Exhibit Number 13A.  What is it, sir?

A.   This is money that was taken from Grace McLaughlin.

Q.   It was taken from her during the processing, sir?

A.   While she was being searched at the Processing Center,

Forbes - Direct

which is the Sheriff's Department's holding facility before
they transport them to the Regional Jail.

Q.   And has that money been basically then maintained by
the Drug Task Force then subsequent to its recovery?

A.   Yes ma'am.  I picked it up that evening and have
secured it since.

            MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 13A admitted into evidence.

            MR. CURRY:  No objection.

            THE COURT:  All right.  There being no objection,
Exhibit 13A is admitted.

      (Government Exhibit Number 13A admitted.)

BY MS. WESLEY:

Q.   Now, sir, after Grace McLaughlin and Darrell Upshur
were arrested, did you have any information as to whether or
individuals were still able to obtain heroin from--from Wop?

A.   Yes.

Q.   And how did you become aware that individuals could
still buy heroin from Mr.--from--from Wop?

A.   Informants and other contacts I had continued to say
that Wop's presence was there, whether it be he or somebody
that he--at his direction.

Q.   Did you develop a third confidential informant then?

A.   Yes.

Q.   And who's the next confidential informant that you

Forbes - Direct

developed?

A.   The next confidential informant that we used was Jolie
Lang.

Q.   And was Ms. Lang able to arrange a drug transaction on
August the 4th of 2010?

A.   Yes she was.

Q.   And how was that transaction initially arranged?

A.   The confidential informant contacted--Jolie contacted
Wop and asked about buying a couple of buns of heroin.

Q.   What happened after that?

A.   Wop instructed her to go to McDonald's and call him
when she was ready--when she was there and that he would
send someone over.

Q.   And did that occur?

A.   Yes.

Q.   And who actually met with--with Jolie Lang to sell her
heroin?

A.   Dale Brown.

Q.   And how much money was Jolie provided with to make the
heroin purchase?

A.   Two hundred and ten dollars.

Q.   And how much heroin did she receive?

A.   Two buns, which is 20 bags.

Q.   And how did Jolie get to the--to the location to make
that drug purchase?

Forbes - Direct

A.   She was driven by her husband and they were followed
and surveilled by myself and other agents.

Q.   Were they searched, Jolie Lang and Todd Lang, prior to
the transaction?

A.   Yes they were.  Also their vehicle was searched prior
to them leaving.

Q.   And could--and Dale Brown, of course, could anyone from
their surveillance position observe Dale Brown going to the
transaction?

A.   Yes.  I was notified by detectives that they observed
Dale walking from the area of the Econo Lodge and all the
way until he got in the car with the Langs.

Q.   Now what happened after the transaction concluded?

A.   Mr. Brown got out of the vehicle and the Langs left.
They were followed by me to a designated location where the
heroin was immediately recovered and secured by me.  They
were both searched, debriefed and later released.  Their car
also was searched in that process.

Q.   And what did you do with the heroin that you received
from Jolie Lang?

A.   It was sent to the State Police Lab.

        MS. WESLEY:  Your Honor, may I approach this
witness?

        THE COURT:  You may.

BY MS. WESLEY:

325

Forbes - Direct

Q.   I'm handing you Government's Exhibit Number 14.   What
is that?

A.   This is the heroin that was purchased by Jolie Lang
that day from Dale Brown.

Q.   And what did you do with it after you received it?

A.   After I received it--after it was sent to the State
Police Lab?

Q.   Yes.

A.   It was sent to the State Police Lab.

Q.   And so is it basically in the same condition as it was
when you first received it?

A.   Yes.

          MS. WESLEY:   Your Honor, I would move to have
Government Exhibit Number 14 admitted into evidence.

          MR. CURRY:   No objection.

          THE COURT:   All right.   Government Exhibit 14 is
admitted.

     (Government Exhibit Number 14 admitted.)

BY MS. WESLEY:

Q.   Now, Sergeant Forbes, did you arrange another
controlled drug transaction with Ms. Lang later that day?

A.   Yes we did.

Q.   And she still is working as your confidential
informant?

A.   Yes she is.

Forbes - Direct

Q.   And how was that transaction arranged between Ms. Lang and--and the intended target?

A.   In a very similar fashion.  She--she contacted Wop and Wop instructed her to go to McDonald's and that he would send someone over.

Q.   And was Ms. Lang searched prior to the transaction?

A.   She was searched, provided with electronic recording equipment and transmitter and provided with recorded Government funds.  Her vehicle was not searched in this instance because she was driven to the location by me.

Q.   Now how much money was she provided with?

A.   A hundred and ten dollars.

Q.   And how much was she supposed to buy?

A.   One bun or 10 bags.

Q.   And what happened after you drove Ms. Lang to the designated location?

A.   She was dropped off close to McDonald's and she walked to that location.  She was under surveillance from me as well as the other agents and we were able to monitor the wire.  She made several calls to Wop and she waited what seemed like forever.  I think it was about 45 minutes with no response.  She finally got a hold--she actually got a hold of Wop and he told her to start walking toward the Econo Lodge but as she started to walk away from McDonald's she received a call from a different individual and

Forbes - Direct

instructed her that they in fact were going to drive out there and meet her, for her not to come down to the Econo Lodge.

Q.   Who eventually met Ms. Lang for the transaction?

A.   An individual by the name of--known only as Ty.

Q.   Do you know this individual's true name or anything else about this person?

A.   No ma'am.

Q.   How what happened when Ms. Lang met with--with Ty?

A.   Before he even got out of the car he was screaming at her for, I guess, standing where she was standing but he did eventually give her the heroin.  In fact he gave her too much.  She had to return some of it and she gave him the money.

Q.   This transaction, when it occurred, was it daylight?

A.   It was dark.  It was--it was late in the evening.

Q.   And so when he was yelling at her about where she was standing, was there a lot of traffic in that area where she was waiting?

A.   There was not a lot of traffic and I'm sure what had led to this is that a police car just drove through there on a routine patrol or something earlier and it kind of made everybody a little weird.  Everybody was nervous.

Q.   So what happened after Ms. Lang--where did Ms. Lang go after she met with--with Ty?

Forbes - Direct

A.   She started walking back to my vehicle but on the way she made a phone call to Wop and conveyed her grievances to how she was treated.  She thought she was mistreated by Ty and she didn't like to have to wait that long and that went on for several minutes until she arrived at my car.

Q.   And what did she do after she entered your car?

A.   She handed me the heroin that she had purchased.

Q.   I'm handing--

          MS. WESLEY:  May I approach, Your Honor?

          THE COURT:  Yes.

BY MS. WESLEY:

Q.   I'm handing you what has been marked as Government Exhibit Number 16.  What is it?

A.   This would be the drugs that she purchased from Ty on that evening.

Q.   Did you send those drugs off to the State Police Laboratory for analysis?

A.   Yes I did.

Q.   And are in the same condition as when you sent them off?

A.   Yes they are.

          MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 16 admitted into evidence?

          THE COURT:  Is there any objection?

          MR. CURRY:  No objection.

329

Forbes - Direct

THE COURT:  All right.  There being no objection, the Court admits Government Exhibit 16.

(Government Exhibit Number 16 admitted.)

BY MS. WESLEY:

Q.   Now Sergeant Forbes, at some point in time were you made aware that individuals were--were selling heroin from Ms. Lang's residence?

A.   Yes ma'am.

Q.   And who made you aware of that?

A.   Jolie Lang.

Q.   And where was she residing at that time?

A.   Above Lang Monuments on South University Avenue.

Q.   And did she indicate who the individuals were that were selling the heroin from her residence?

A.   Initially she told me that Wop had brought these guys to her residence and she identified them as Jules and Dale.

Q.   And would Dale be Dale Brown.

A.   Dale would be Dale Brown.

Q.   What--what steps did you decide to take upon learning that information?

A.   Well, it was a Sunday evening so it took me a little while to assemble the other detectives.  We went down to that location and started a surveillance operation just to see what was going on and I decided to--if I could get Jolie to leave, I decided to meet her and try to get a wire on her

Forbes - Direct

and try to get a better feel from her about what was going

on.

Q.   So were you able to meet privately with the other

officers and Ms. Lang?

A.   Well, yes.  One other officer was with me when I met

Ms. Lang and the other officers remained on surveillance at

the residence.

Q.   And what did you do upon your meeting with Ms. Lang?

A.   Well we tried several times to call Wop to see--because

she was under the impression--she conveyed to me that she

was under the impression that he was supposed to pick them

up and take them elsewhere by a certain time and that that

time had come and gone so we gave her the wire.  After

we--it didn't appear that we were going to make any progress

through Wop to get them out of there, I sent her back down

there and she was going to take them because from her

conversation with--with Wop he said--he instructed her to

take them to a hotel somewhere rather than him coming and

picking them up.

Q.   And so was Ms. Lang provided with any type of recording

device when you were taking her back--well when she went

back to her residence?

A.   Yes, she was equipped with a recording device and

transmitter.

Q.   And were you able to listen in on the transmitter?

Forbes - Direct

A.   Yes we were.

Q.   And at some point in time did Ms. Lang leave her residence with any of those individuals?

A.   Yes.  She--four people left the residence; her, her husband, Todd Lang and a male later identified as Julian Sims and Dale Brown.

Q.   Is Julian Sims the Jules that she had previously referenced?

A.   Yes it is.

Q.   And what instructions did you give other officers upon them leaving that residence?

A.   We had contacted Morgantown Police Department Officers Williams--Officer Williams and instructed him that when that vehicle pulled out, if he observed any infractions at all for them to stop that vehicle so that we could identify the people and possibly, if there were contraband in the car, get the contraband.

Q.   Now was Ms. Lang advised that if at all possible that there was going to be a traffic stop, that it would occur?

A.   Yes she knew that was certainly a possibility.

Q.   Now did, in fact, Officer Williams pull over that vehicle driven by Jolie Lang?

A.   Yes he did.

Q.   And was anything recovered from that vehicle during that--that traffic stop?

Forbes - Direct

A.   Yes there was.

Q.   And was any drugs recovered?

A.   Yes, a little over three bricks of heroin.

Q.   And who actually recovered that heroin?

A.   That was recovered by Officer Bloniarz of the
Morgantown Police Department.

Q.   And what did Officer Bloniarz do with the heroin?

A.   His chain of custody was to give that to Officer
Williams who was the Field Officer for that stop.

Q.   And what did Officer Williams do with the heroin?

A.   He later turned it over to me.

          MS. WESLEY:  Your Honor, may I approach this
witness?

          THE COURT:  Yes.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government
Exhibit Number 18.  What is that sir?

A.   This would be the heroin that was seized from the
vehicle on that day.

Q.   And did you send that heroin off to the State Police
Laboratory?

A.   Yes ma'am.

Q.   And is it back in the same condition as when you sent
it?

A.   Yes ma'am.

Forbes - Direct

MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 18 admitted into evidence.

MR. CURRY:  No objection.

THE COURT:  All right.  Government Exhibit 18 is admitted.

(Government Exhibit Number 18 admitted.)

BY MS. WESLEY:

Q.  Now was anything else recovered from those occupants in the vehicle during that traffic stop?

A.  Yes ma'am, there was U.S. currency on both parties in the back seat.

MS. WESLEY:  May I approach this witness, Your Honor?

THE COURT:  Yes.

BY MS. WESLEY:

Q.  I'm handing you what's been marked as Government Exhibit Number 20 and Government Exhibit Number 21.  First Number 20.  What is that sir?

A.  This is the U.S. currency that was in the possession of Julian Sims at the time of the stop, six hundred and fifty-seven dollars.

Q.  What about Government Exhibit Number 21?

A.  Government Exhibit 21 is the U.S. currency in the possession of Dale Brown at the time of the stop, one thousand and five dollars.

Forbes - Direct

Q.   And the money was turned over to you for basically safe keeping and processing?

A.   Yes, as part of our investigation.

        MS. WESLEY:  Your Honor, I would move to have Government Exhibit 20 and 21 admitted into evidence.

        MR. CURRY:  No objection.

        THE COURT:  All right.  The Court admits Government Exhibits 20 and 21.

     (Government Exhibit Number 20 admitted.)

     (Government Exhibit Number 21 admitted.)

BY MS. WESLEY:

Q.   Now, sir, subsequent to the arrest of--were they arrested, sir, I assume?

A.   The two back seat passengers were in fact arrested, yes.

Q.   And that would have been--

A.   Julian Sims and Dale Brown.

Q.   Now subsequent to the arrest of Julian Sims and Dale Brown, did you receive information that individuals could still obtain heroin from Wop?

A.   Yes ma'am we did.

Q.   And I want to direct your attention then to August the 24th of 2010.  What's going on in Morgantown about this time?

A.   I'm sorry, I didn't--

Forbes - Direct

Q.   I'm sorry.  What's going on in Morgantown about this
time, August the 24th, 2010?

A.   That's the same day as Fall Feast that the University
hosts which is basically a controlled block party that they
have for their students.

Q.   Is it a nightmare for police officers?

A.   It is.

Q.   Now on that day, sir, were you able to arrange a
controlled drug transaction through Wop?

A.   Yes ma'am.  We had received information from multiple
sources that Wop was going to be in town that day or at
least that evening.

Q.   And who was the first confidential informant that you
worked with on the 24th of August of 2010?

A.   Jolie Lang.

Q.   And what happened--did Jolie Lang repeat--report to the
police department?

A.   She did.  We contacted her very late on the 23rd and
she arrived at some point on the 24th early in the morning,
maybe one o'clock, twelve-thirty.

Q.   And what happened when she got to your--your
department?

A.   She was instructed to contact Wop.  She revealed to me
at that time that she had received text messages from Wop
saying that he was in town and that she had spoken to him

Forbes - Direct

and he was good to go.  He had heroin and also advised her
that he had crack on this visit.

Q.   So was Ms. Lang searched?

A.   She was searched.

Q.   And were there--the buy money, was it photocopied?

A.   The buy money was photocopied but while in the process
of doing this she received another call from Wop who
instructed her to bring a 30 pack of beer and they could
deduct that from the amount that they would owe for the
heroin.

Q.   Okay.  And so did anyone purchase the beer?

A.   Yeah, Detective Miranov went and got two--two 12 packs
and brought back the beer and the receipt and gave to me.

Q.   And so how much money was Ms. Lang actually provided
with?

A.   She was provided with eighty-five dollars of Government
funds and thirty-five dollars worth of beer.

Q.   And where was Ms. Lang supposed to go for the
transaction?

A.   After she and her husband were searched, and their
vehicle, they were provided with electronic recording
device, transmitter and the Government funds as well as the
beer.  They were instructed to come to the area near Studio
101 which is on Brockway Avenue.  Unfortunately Jolie has no
sense of direction and she drove around aimlessly for a few

Forbes - Direct

minutes, making several calls to Wop, until we were finally able to--to find the individual that we met with in the vicinity of Arlington Avenue, which is about one block away from Studio 101.

Q.   Okay.  And where were you when this transaction was actually taking place?

A.   I was in the vicinity.  I was a couple of blocks away from there listening to the wire.

Q.   Okay.  And were any of the individuals able to observe the person who actually met with Jolie for the drug transaction?

A.   Yes ma'am.

Q.   Okay.  And what identifying features were made known based upon what this person looked like?

        MR. CURRY:  Objection, hearsay.

        THE COURT:  Repeat the question.  I didn't hear it.

BY MS. WESLEY:

Q.   What identifying features did you know of based upon the person who met with Ms. Lang?

        THE COURT:  Overruled.

BY MS. WESLEY:

A.   The other agents advised me that the--the--the individual looked young and that he was all dark--all black clothes or very dark clothes.

Forbes - Direct

Q.   Now following that transaction, where did--where did Ms. Lang go?

A.   Immediately following that transaction she responded back to my office.  I followed her from the location back to our officer where she and her husband were both searched. The vehicle was searched and the heroin was secured.

          MS. WESLEY:  May I approach, Your Honor?

          THE COURT:  Yes.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government's Exhibit Number 23.  What is it?

A.   This is the heroin that was purchased from the individual that day by Jolie Lang.

Q.   And did you send that heroin off to--or suspected heroin off to the State Police Laboratory for analysis?

A.   Yes ma'am.

Q.   And when you received it back it was in the same condition?

A.   Yes it was.

          MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 23 admitted into evidence.

          THE COURT:  Is there any objection?

          MR. CURRY:  No, Your Honor.

          THE COURT:  All right.  Government Exhibit 23 is admitted.

Forbes - Direct

(Government Exhibit Number 23 admitted.)

BY MS. WESLEY:

Q.   Did you decide to make any additional controlled transactions on the 24th of August of 2010?

A.   Yes ma'am.  It was actually--there was some sleep in there but that transaction had transpired like at two o'clock in the morning, between one and two in the morning and sometime the next morning, late morning, early afternoon, we decided to use--to make another--use a different confidential informant to make a controlled buy.

Q.   Now which confidential informant are you using at this time?

A.   Amanda Borrow.

Q.   And so what is the first thing you did when you met with Ms. Borror that--that morning?

A.   She was searched.  She was debriefed about her--the conversation she said she had with Wop and she was prepared for a controlled buy.  She was provided with electronic recording device, transmit and Government funds.

Q.   The Government funds that she was provided with, were they photocopied prior to giving to her?

A.   Yes ma'am they were.

Q.   Now where did--where was Ms. Borror directed to go for this transaction?

A.   Upon speaking to Wop he instructed her to go to--down

340

Forbes - Direct

around the car wash on Brockway Avenue.

Q.   This is also Morgantown?

A.   Yes.

Q.   And how did she get to that location?

A.   I took her--she rode with me, but not to that location, to a nearby location and then walked, which would be the case if she met and I wasn't involved.  If she had just met him, she would have had to walk so we gave the impression that she was walking that day as well.

Q.   Okay.  And so where did she ultimately meet the person that she was going to do the transaction with?

A.   Along Brockway Avenue.

Q.   And so what did she do immediately following the transaction?

A.   She turned and was walking back and somewhere along the way when I did not see the suspect around, I picked her up, secured the drugs, took her back to our office.  She was searched, debriefed and later released.

Q.   Now how much money was she actually provided with for this transaction?

A.   She was given tow hundred dollars.

Q.   And what type of drugs was agreed upon for this transaction?

A.   She was buying 10 bags of heroin or one bun and one gram, an approximate gram of crack cocaine.

Forbes - Direct

Q.   And after she met back with you and she was debriefed, did you obtain the drugs from her?

A.   Yes I did.

Q.   And did you send them away to the State Police Laboratory for analysis?

A.   Yes I did.

Q.   I'm handing you what's been marked as Government Exhibit Number 25 for identification and what is it, sir?

A.   That is the controlled substance that was purchased that day by Amanda Borror.

Q.   And is it in the same condition now as when you sent it off to the State Police Laboratory?

A.   Yes.

          MS. WESLEY:  Your Honor, I would move to have Government Exhibit Number 25 admitted into evidence.

          MR. CURRY:  No objection.

          THE COURT:  All right.  Government Exhibit 25 is admitted.

     (Government Exhibit Number 25 admitted.)

BY MS. WESLEY:

Q.   Now I'm going to direct your attention then to that same day.  Were there other transactions that took place using a confidential informant?

A.   Yes there were.

Q.   And what time did the next drug transaction take place?

Forbes - Direct

A.   This was in the early afternoon.

Q.   How many hours had elapsed from your previous
transaction and this one?

A.   Less than two.

Q.   And who was going to be the confidential informant on
this transaction?

A.   Jolie Lang.

Q.   And what was--how was this transaction arranged?

A.   Jolie Lang made a recorded phone call to Wop and asked
if she could meet him.  He said yes.  He told her a
location.  She was searched, provided with electronic
recording device, transmitter, provided with Government
funds and driven to the--and taken to the location by her
husband, who also had been searched and the vehicle had been
searched.

Q.   The Government funds that was provided to Ms. Lang,
were they photocopied prior to handing them over to her?

A.   Yes they were.

Q.   And so what location was she driven to?

A.   In the same vicinity near Arlington Avenue.

Q.   And what happened after she arrived at that location?

A.   She met with a person that was not Wop and exchanged
the U.S. currency for 10 stamps of heroin, 10 bags of
heroin.

Q.   And how much money did she provide the person?

Forbes - Direct

A.   One hundred dollars.

Q.   And where did she go following the transaction?

A.   She was followed by me back to the Mon Valley Drug Task
Force Office where I immediately secured the drugs.  She was
searched, debriefed; as well as her husband searched and
debriefed and later released.

Q.   And what did you do with the drugs that you--you took
from her?

A.   They were secured and later sent away to the State
Police Lab.

          MS. WESLEY:  Your Honor, may I approach?

          THE COURT:  You may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government
Exhibit Number 27 for identification.  What is that, sir?

A.   This would be the drugs that were purchased by Jolie
Lang on the 24th, the case we just spoke of.

Q.   And are they basically in the same condition now as
when you sent them off to the State Police Laboratory?

A.   Yes ma'am.

          MS. WESLEY:  Your Honor, I would move to have
Government Exhibit 27 admitted into evidence.

          MR. CURRY:  No objection.

          THE COURT:  All right.  Government Exhibit 27 is
admitted.

Forbes - Direct

(Government Exhibit Number 27 admitted.)

BY MS. WESLEY:

Q.   Now, sir, how many total controlled buys took place on the 24th of August of 2010?

A.   There were a total of four buys, including the one that was in the wee hours of the morning, so three later that day.

Q.   And what happened after the conclusion of the last controlled buy?

A.   Well, we continued to make those buys because we were very confident that Wop was--was actually at the location and we were narrowing our scope of where he could be at, which apartment, so we continued to do the buys until we felt more confident of where the location was and by doing that, Detective Miranov was actually placed--placed himself in the wood--in a wooded area very near where the apartment ended up being and that led to his--him being detected by individuals later identified as--as Mr. DeVaughn.

Q.   And after Detective Miranov was identified by Mr. DeVaughn, he was arrested?

A.   Mr. DeVaughn was arrested a short time thereafter.

Q.   What happened after Detective Miranov was detected?

A.   Well, we--we had to deal with the informant.  We needed to get the informant back to our office, which Lieutenant Beatty took care of that, met her there, met the informant

Forbes - Direct

and secured the evidence.  At that time we decided--I
decided that it was entirely too dangerous to send any other
informants in that location.  I feared that Mr. DeVaughn
either suspected that the police were on to him or that
perhaps somebody was going to rob him.  Either way I felt it
was too dangerous to continue that sort of investigation so
we made the decision to--to detain them and verify who they
were.

Q.   Were they detained immediately upon their encounter
with Detective Miranov or did some time lapse between the
encounter with Detective Miranov and them actually being
arrested?

A.   A short amount of time.  Detective Miranov was able to
give a clothing description of the individual who he
encountered and a short time later we observed that
individual walking down Brockway Avenue toward Buck's Lounge
or the Quickie Mart.  They're right beside each other.

Q.   And is that when you arrested that individual?

A.   At that point we had uniformed officers approach them
and they were arrested subsequently from that stop.

Q.   Now was Mr. DeVaughn searched subsequent to his arrest?

A.   Yes he was.

Q.   Okay.  And was anything recovered from his person when
he was searched?

A.   Yes.

Forbes - Direct

Q.   What were some of the items that was recovered from his person when he was searched?

A.   They was U.S. currency.  There was a receipt for the beer.  We recognized that to be the beer that we had purchased the night before and there was a bottle cap from a Corona beer bottle and there was other miscellaneous receipts.

          MS. WESLEY:  Your Honor, may I approach this witness?

          THE COURT:  Yes you may.

BY MS. WESLEY:

Q.   I'm handing you what's been marked as Government Exhibit Number 30 for identification.  What is it, sir?

A.   This is U.S. currency that was in the possession of Herbert DeVaughn at the time he was arrested.

Q.   now, sir, you testified previously that you would make a copy of the buy money prior to giving it to one of the confidential informants to purchase drugs.  Is that correct?

A.   Yes ma'am.

Q.   Okay.  What do you do after you recover money from an individual who's under investigation?

A.   We always cross reference it with our files on that person of all the money that we have spent over the course of however long it's been to see if any of that money is money that we provided to an informant.

Forbes - Direct

Q.   And did you do that with the buy money that you
recovered from Mr. DeVaughn on the 24th of August of 2010?

A.   Yes we did.

Q.   And were you able to cross reference--well let me--let
me do this first.  Let me hand you a copy of Government
Exhibit Number 33 and 34.  What is Government Exhibit Number
33?

A.   Government Exhibit 33 is a copy of the money--copy that
I made before I provided the money to the confidential
informant and this was before a buy that was on the 24th of
August last year.

Q.   Is that copy of the buy money that you made, is it in
the same condition now as when you made it?

A.   Yes.

        MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 33 admitted into evidence.

        THE COURT:  Any objection?

        MR. CURRY:  No objection, Your Honor.

        THE COURT:  Government Exhibit 33 is admitted.

    (Government Exhibit Number 33 admitted.)

BY MS. WESLEY:

Q.   And what is Government Exhibit Number 34?

A.   Likewise 34--Government Exhibit 34 is buy money that
was provided to a confidential informant on 8/24 of last
year before the controlled buy occurred.

Forbes - Direct

Q.   Is it in the same condition as when you prepared it?

A.   Yes ma'am.

          MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 34 admitted into evidence.

          THE COURT:  Is there an objection?

          MR. CURRY:  No objection, Your Honor.

          THE COURT:  All right.  Government Exhibit 34 is
admitted.

     (Government Exhibit Number 34 admitted.)

BY MS. WESLEY:

Q.   Sir, what results, if any, did you find when you cross
referenced the money seized from Mr. DeVaughn with the buy
money?

A.   Some of the money--

Q.   I'm sorry, with a photocopy of the buy money, to be
clear.

A.   Yes.  Some of the money that was recovered on Mr.
DeVaughn also appears on the--the copied money sheet that we
had made before the deals.

Q.   Which monies were the result?

A.   There were two fifty dollar bills that was on Mr.
DeVaughn's person at the time he was arrested that were in
conjunction with a controlled buy made by Jolie Lang earlier
on the 24th and also there was two twenty dollar bills from
a buy made earlier in the day by Amanda Borror, both in the

Forbes - Direct

possession of Mr. DeVaughn at the time of his arrest.

Q.   And so those would have been two separate drug
transactions?

A.   Yes.  In fact two--two different individuals had
provided the drugs to our informants on those occasions.

Q.   And those two transactions that we're referencing with
Ms. Land and Ms.--and Ms. Borror, did they also receive
drugs from two separate individuals?

A.   Yes ma'am they did.

Q.   When did you--at some point in time in your
investigation did you realize Mr. DeVaughn's true name and
he wasn't just Wop to you?

A.   Yes, at some point I was on the phone with a
confidential informant who instructed--or not instructed,
but advised me that Wop had a court hearing coming up.

Q.   Let me ask you this sir.  At some point in time did you
determine Mr. DeVaughn's date of birth?

A.   Yes ma'am.

Q.   And what is Mr. DeVaughn's date of birth?

A.   Mr. DeVaughn's date of birth is September--I'm sorry,
October 19th, 1984.

Q.   And was he at least 18 years of age then on August the
24th of 2010?

A.   Yes ma'am, he was.

Q.   Now when Mr. DeVaughn was arrested on that night, were

Forbes - Direct

there any other individuals who were arrested as well?

A.   Yes, later that night two other individuals were arrested.

Q.   And who were the other two individuals that were arrested?

A.   Tyrell Brown and Mariek Payne.

Q.   Okay.  Let's--let's talk about Mariek Payne first.  Who is Mariek Payne?

A.   Mariek Payne is an individual that made two--three of the deliveries on the 24th, all to Ms. Lang in conjunction with our controlled buys.

Q.   And what is Mr. Payne's date of birth?

        MR. CURRY:  Objection, lack of foundation.

        THE COURT:  Sustained.

BY MS. WESLEY:

Q.   After Mr. Payne was arrested were you able to determine his date of birth?

A.   Yes ma'am I was.

        MR. CURRY:  Objection.  She's asked the same question differently.

        THE COURT:  Overruled.

BY MS. WESLEY:

Q.   Did you meet with Mr. Payne after he was arrested?

A.   Yes ma'am I did.

Q.   And of course he was processed after he was arrested?

Forbes - Direct

A.   Yes ma'am.

Q.   Did you learn his date of birth after he was arrested and you processed him?

A.   Yes ma'am.

Q.   What is Mr. Mariek Payne's date of birth?

A.   3/26/1994.

Q.   How old was he on August the 24th of 2010?

A.   Sixteen (16).

Q.   Now let's talk about Tyrell Brown, the other individual.  Was he arrested that night?

A.   Yes ma'am he was.

Q.   And was he processed?

A.   He was processed.

Q.   And did you meet with him?

A.   I did.

Q.   And after he was processed and you met with him, were you able to determine his date of birth?

A.   Yes ma'am.

Q.   And what was his date of birth?

A.   August 2nd, 1993.

Q.   And so old was Tyrell Brown on August the 24th of 2010?

A.   Seventeen (17).

Q.   Now what did you have--what happened next upon the realization that those two individuals--let me ask you this. Was Mr. Brown involved in any of those drug transactions

Forbes - Direct

that took place on the 24th of August?

A.   Yes ma'am.  He made a delivery of heroin to Amanda
Borror and a delivery of crack cocaine to Amanda Borror on
the 24th.

Q.   So what happened upon the realization that those two
individuals were juveniles?

A.   Well, I made an attempt to contact their parent or
legal guardian.

Q.   And who was Mariek Payne's parent or legal guardian?

A.   His uncle--the information he provided me was that his
uncle was his legal guardian, John Cruz of Pittsburgh,
Pennsylvania.

Q.   Is that where Mr. Payne was from?

A.   He was from the Pittsburgh area, yes.

Q.   And what happened--were you able to contact his legal
guardian?

A.   I was able to contact Mr. Cruz who he indicated was his
legal guardian.  Mr. Cruz was an uncle that he does stay
with but he was unable to come down and pick him up.

Q.   And so what did you--what then happened to Mariek Payne
when no one was able to come pick him up?

A.   Ultimately he had to be transported to a Juvenile
Detention Center for the evening.

Q.   And what about Tyrell Brown; did you contact or attempt
to contact his legal guardian?

Forbes - Direct

A.   Yes ma'am, I spoke to his mother, Renee Brown.  Her address was Homestead, Pennsylvania, which is in the general Pittsburgh area.  Likewise, she was unable to come down and pick her son up; therefore he also was transported to a Juvenile Detention Center for the evening.

Q.   Now based upon your appearance of Mariek Payne and Tyrell Brown--let's do Mariek Payne first.  Based upon your--your meting with Mariek Payne and being able to see and observe him, were you surprised that he was under 18 years of age?

A.   No I was not.

Q.   And why not?

A.   When he said he was 16 I was surprised actually that he was that--I mean he looked to me, my opinion, that he was much younger than that.  I--I was sure he was going to say he was 12 or 13 but in fact he was 16.

Q.   And what about Tyrell Brown, when you met him and you observed his appearance, were you surprised that he was younger than 18 years of age?

A.   I was a little surprised but he looked a lot more like he could potentially have gone in the 16 to 19 range.  I was not shocked that he was 17.

        MS. WESLEY:  May I have a moment, Your Honor?

        THE COURT:  Yes.

    (Pause)

354

Forbes - Direct

MS. WESLEY:  Your Honor, may I check with the
Clerk for just one second?

THE COURT:  Yes.

(Pause)

BY MS. WESLEY:

Q.   Mr. Forbes, do you have Exhibit Number 30, the money
that was seized from Mr. DeVaughn?

A.   Yes ma'am.

Q.   Is it basically in the same condition now as when you
seized it from him?

A.   Well, it's packaged a little different now but
it's--essentially yes.

Q.   Okay.  Who packaged it differently, was it you?

A.   Yes ma'am.

MS. WESLEY:  Your Honor, I would move to have
Government Exhibit Number 30 admitted into evidence.

THE COURT:  Is there any objection?

MR. CURRY:  No, Your Honor.

THE COURT:  Government Exhibit 30 is admitted.

(Government Exhibit Number 30 admitted.)

MS. WESLEY:  Your Honor, I have no further
questions from this witness.

THE COURT:  Cross-examination?

MR. CURRY:  Thank you, Your Honor.

CROSS EXAMINATION

Forbes - Cross

BY MR. CURRY:

Q.   Sergeant Forbes, your first controlled buy from the
individual you have identified as Wop was on the 28th of
September of 09, is that correct, sir?

A.   One second please.   September the 28th, is that what
you said, sir?

Q.   Correct.

A.   Yes 2009.

Q.   Now when was it through, I believe you said informants,
that you connected the name Herbert DeVaughn with the
nickname Wop?

A.   It was later--it was after that.   It was in 2010 at
some point in the spring or summer.

Q.   Well, was it before the July 15th, 2010 purchase was
made by Marcus Gamble?

A.   I believe that we had made that connection before then,
yes sir.

Q.   And your last controlled buy, subject of this
prosecution, was the 24th of August of 2010, is that
correct?

A.   Yes.

Q.   And that's the date that you arrested Mr. DeVaughn?

A.   Yes sir.

Q.   Were you present personally when Mr. DeVaughn was
arrested?

Forbes - Cross

A.    I was--I could see it.  I was in the vicinity.

Q.    Okay.  Were you in charge of the--of the group of police officers?

A.    I was in charge of the operation that we were doing.  I suppose I told them that he was to be placed in custody; however, on the scene of where they attended to him, they were in charge of that scene.

Q.    And you or other police officers carefully searched Mr. DeVaughn, correct?

A.    He was searched by the officers on scene and then again once he was back at the Morgantown Police Department for processing.

Q.    And no drugs were found on his person, is that correct?

A.    That's correct.

Q.    Did you ascertain the residence in that neighborhood which was connected with Mr. DeVaughn?

A.    I'm sorry, I did not hear that question.

Q.    Did you figure out what house he had been staying at?

A.    Yes sir.

Q.    Did anybody ever go search that house?

A.    Yes sir.

Q.    Were drugs found in that house?

A.    No sir.

Q.    Was a careful search made?

A.    Yes sir.

Forbes - Cross

Q.   Did you all figure out any automobiles that were
connected to Mr. DeVaughn, such as they were registered to
him, that were in the neighborhood?

A.   On the 24th?

Q.   On the 24th.

A.   No sir.

Q.   So you have never seen drugs in the hands of
Mr. DeVaughn, correct sir?

A.   Correct.

Q.   Now you have a number of investigative tools available
to you and you've used some of them in this case.  You can
use audio recorders, is that correct?

A.   Yes sir.

Q.   And they are small so the people you're recording don't
know you're recording them, correct?

A.   Correct.

Q.   And the results are what we've heard in the courtroom,
correct?

A.   Correct.

Q.   You likewise have small videorecorders, is that also
correct?

A.   Yes sir.

Q.   And so if you utilize one of those we could watch up on
the screen the transaction and see who's involved.  Is that
also correct?

Forbes - Cross

A.   That could be correct, yes sir.

Q.   There are some old fashioned methods such as fingerprinting.  You're familiar--obviously you're familiar with that?

A.   Yes sir.

Q.   And you've heard testimony that Mr. DeVaughn or Wop occasionally sold single stamps?

A.   Yes sir.

Q.   Now another old fashioned technique is the use of undercover police, is that correct?

A.   Yes sir.

Q.   And apparently you would undercover at times?

A.   Yes sir.

Q.   Pardon me.  You don't look like a typical drug person.  Can you really buy drugs?

A.   You'd be surprised.

Q.   Okay.  And am I also correct that some of the undercover police officers are, well let's say less while groomed than you are to better fit in with the drug crowd?

A.   Yes sir.

Q.   No real police officers were used to make buys in this investigation, is that correct, sir?

A.   That is incorrect.

Q.   We have not heard of any real police officers who made buys connected to the individual identified as Wop in this

Forbes - Cross

case, is that correct?

A.   I believe that I have testified that I was involved in the buy/bust with Grace McLaughlin and Dale Upshur.

Q.   Okay.  Other than that testimony, and I stand corrected on that, anybody else?

A.   No sir.

Q.   I assume you have talked to a lot of witnesses as you developed your case, correct?

A.   Yes sir.

Q.   You were here in the courtroom when David DeBerry testified, is that correct?

A.   Yes sir.

Q.   Did he accurately give an account of your talk with him something about a triangle?  It was in a triangle.

A.   We talked about a triangle, yes sir.

Q.   What's that all about?

A.   Well at that point I had a lot of information that Mr. DeBerry was involved with Wop and that Mr. DeBerry was involved in selling heroin, but I had absolutely no evidence of that.  I had no controlled buys on him.  He had never been caught with any heroin and basically I was telling him that there was a lot of people saying that he was involved in this and that he would be better served perhaps being a witness then trapped in the triangle with the people who were involved in selling the heroin.

Forbes - Cross

Q.   So you told him that by cooperating he could take
himself out of the triangle?

A.   I did tell him that.  However, as I mentioned, he was
not subject to be in the triangle.  I had no evidence of any
sort against him at that point, just a lot of people saying
that he was involved with Mr. DeVaughn.

Q.   You have talked to others who did get charged, such as
Marcus Gamble, Jolie Lang, Amanda Borror, is that correct.

A.   Mr. Gamble is--maybe I don't understand the question
perhaps.

Q.   You talked with those three individuals, is that
correct?

A.   Yes sir.

Q.   When you talked with those three individuals did you
encourage them to help you out?

A.   They were afforded that opportunity of course.

Q.   Well, you didn't sit there and say I now afford you the
opportunity to help me out, did you?

A.   I don't remember the exact verbiage but I'm sure that
it was given to them in the form of an opportunity, not a
requirement.

Q.   You don't threaten them, right?

A.   Correct.

Q.   Do you encourage them?

A.   To be honest a lot of times I don't care if they

Forbes - Cross

cooperate or not.

Q.   Do you point out that it's to their advantage
potentially to cooperate?

A.   I certainly will let them know my opinion of what--what
could help them in regard to the investigation that I'm
doing, yes.

Q.   And is that opinion pretty consistent from case to
case?

A.   No.  I mean it's a case by case analysis of that.

Q.   Do you recall what opinions you gave those three
individuals about cooperation and its effects on this case?

A.   Mr. Gamble was not affiliated with this case.  He
wasn't in trouble from this case.  He wasn't in trouble from
this case.  He was referred to me for another issue so his
situation is certainly different than the other two
pertinent to your question but Mr. Gamble was afforded the
opportunity to work with me, which was certainly going to
change his position with his other issues, yes.

Q.   Okay.  What about Jolie Lang?

A.   Jolie Lang agreed to work voluntarily.  She was not in
any trouble either.  It was her husband who had gotten into
some trouble and she had agreed to help because their common
practice of buying drugs required both of them so she
volunteered to help him in that situation.

Q.   What about Amanda Borror?

Forbes - Cross

A.    Amanda Borror was in trouble with a different agency
and referred to me as well.

Q.    And you point out to these people that if they do
cooperate it--it can help them out?

A.    Yes sir.

Q.    And you have to follow through with that because you
have to keep a reputation in the community as--as following
up on your word?

A.    Yes sir, but I make them no promises.  I just--I merely
tell them what my position is and what my recommendation to
the prosecutor and/or U.S. Attorney would be and they know
from the beginning that it is not my decision to be made on
what their fate is.

Q.    Did you provide the same kind of, let's call it
encouragement, is that a fair word?

A.    I'm not sure it is a fair word, because as I mentioned,
sometimes I don't care if they cooperate or not.  The
investigation will go on with or without them.

Q.    How about representation that it can help, is that
fair?

A.    Yeah, that would--that's--

Q.    Okay.  Did you provide that same representation that it
can help to Debbie Long?

A.    Yes.

Q.    And she made a controlled buy for you, is that correct?

Forbes - Cross

A.   That's correct.

Q.   Where is she?

A.   I have no idea.

Q.   And this is one of the people you trusted, correct?

A.   I trust--I don't trust any informants that I use, no sir.

Q.   Okay.  Let's talk about a few other individuals whose names have come up.  Have you pursued the investigation as to the individual known as Stacks?

A.   Do I know his identity?

Q.   Yes sir.

A.   Yes, I believe so.

Q.   Has he been prosecuted?

A.   He is not part of this investigation sir.

Q.   Has Jolie's husband, Todd, been prosecuted?

A.   For any crime?  He was not involved--

Q.   For any drug crime?

A.   No sir.

Q.   What about Justin Price, his name's come up.  Has he been prosecuted for any drug crimes?

A.   I'm not--I don't know if I can comment on that at this time.

Q.   Because you don't know or other reasons?

A.   I believe that he's the subject in a different investigation that's being investigated currently.

Forbes - Cross

Q.   Does that same provision apply to Chelsea Kennedy?

A.   No sir.

Q.   All right.  Is Chelsea Kennedy--has she been prosecuted for anything related to drugs?

A.   No sir.

Q.   Wendell was Debbie Long's live-in person?

A.   So I heard today.

Q.   Okay.  Does that mean you didn't know him before?

A.   Had never heard his name before this--recently.

Q.   Did you know anything about Amanda Borror's sister?

A.   Yes sir.

Q.   Has she been charged with anything drug related?

A.   No sir.

Q.   How about the sister's boyfriend, do you even know his name?

A.   Yes sir.

Q.   Has he been charged with anything drug related?

A.   No sir.

Q.   There was a Mark Powell who introduced Wop to Sara Triplett.  Do you know Mark Powell?

A.   No sir.  Oh, I'm sorry, yes sir, I know him.

Q.   Okay.  Has he been charged with anything related to the drug trade?

A.   Not--not as pertinent to this investigation.

          MR. CURRY:  Your Honor, I have no other questions

Forbes - Redirect

of the gentleman.

        THE COURT:  Is there any redirect?

        MS. WESLEY:  Yes, Your Honor.

            REDIRECT EXAMINATION

BY MS. WESLEY:

Q.   Sergeant Forbes, in reference to the house that you identified that Mr. DeVaughn was utilizing on August the 24th of 2010, were there other people in the house other than Mr. DeVaughn and Mariek Payne and Tyrell Brown?

A.   Yes ma'am.

Q.   When you went back to the house to try to search that residence, were the other people still in that residence?

A.   There were some people still there, yes sir--yes ma'am.

Q.   So would it make sense to you that if there were drugs in that residence they would have kept them there after the arrest took place?

A.   There was quite amount--there was quite an amount of time that had gone by from the time that Mr. DeVaughn was arrested and the time we were able to get back there.  It wouldn't have made sense for drugs to still be there in my opinion, no ma'am.

Q.   Now do you know anything about fingerprinting?

A.   I know how to take them and I have very limited knowledge on how to read them.

Q.   Do you know anything about, despite what we all see on

Forbes - Redirect

TV, about how viable it is to take prints off of something
if it went from person A to person B to person C, to be
smashed in people's personal belongings?  Do you know
anything about that and whether or not those prints were--if
there were any prints that they would survive all of that
contact?

A.   It's my experience that when you're dealing with stamps
of heroin or perhaps Baggies that contain any other drug,
it's just not realistic to think that the Lab can get those
prints.  I've never had any success with the Lab being able
to retrieve any prints off of that kind of material in that
kind of environment.

Q.   Now you were questioned about Amanda Borror's sister
and why you haven't charged her.  Do you have any recordings
that are involving Amanda Borror's sister?

A.   No ma'am.

Q.   Do you have any controlled buys of Amanda Borror's
sister?

A.   No ma'am.

Q.   Has Amanda Borror's sister been arrested with any of
your drug money?

A.   No ma'am.

Q.   Has she been arrested in a buy/bust situation?

A.   No ma'am.

Q.   And the other individuals that he's discussed, I guess

Forbes - Redirect/Recross

1  Amanda Borror's sister's boyfriend, do you have information

2  that they were arrested and had possessed drug money on

3  their person?

4  A.   No ma'am, that's David DeBerry and I've already

5  testified that I have no evidence against him.

6  Q.   And so when you were talking to David DeBerry, at that

7  time you frankly had no evidence against him at that point

8  in time?

9  A.   Correct.

10 Q.   Now you testified of course that you also didn't

11 have--that you also, you know, didn't make any promises to

12 any of the witnesses who cooperated?

13 A.   That's correct.

14 Q.   Was it made clear to them that whatever decision would

15 be made in their case would be made by someone other than

16 you?

17 A.   Yes.

18          MS. WESLEY:  I--I have nothing further, Your

19 Honor.

20          THE COURT:  Further cross-examination?

21          MR. CURRY:  Yes, Your Honor.

22                  RECROSS EXAMINATION

23 BY MR. CURRY:

24 Q.   When you start an investigation against a target, the

25 purpose of the investigation is to get evidence, is that

Forbes - Recross

1    correct?

2    A.   Yes sir.

3    Q.   So when you start the investigation you're not ready

4    to--to charge them normally, correct?

5    A.   Correct.

6    Q.   So when you start the investigation you don't have

7    evidence against them, true?

8    A.   I could have testimony or word of mouth but before the

9    investigation starts it is not likely, though it is possible

10   that you could have some evidence but it's not likely that

11   we did in this case.

12   Q.   All right.  So you brought in David DeBerry and at that

13   point you didn't have any evidence against him, correct?

14   A.   Correct.

15   Q.   But you chose to talk to him rather than open an

16   investigation to get evidence against him, correct?

17   A.   That's correct.

18   Q.   Have you ever tried to get fingerprints off of waxed

19   paper?

20   A.   Yes sir.

21   Q.   Has it ever been successful?

22   A.   No sir.

23   Q.   Has it ever been from heroin stamps?

24   A.   Yes sir.

25   Q.   How many times have you tried that?

Forbes - Recross

1    A.    Once.

2    Q.    Now have you ever tried to get any evidence from Amanda

3    Borror's sister--or on Amanda Borror's sister?

4    A.    No sir.

5    Q.    So it's no surprise you don't have evidence against

6    her?

7    A.    No sir.

8              MR. CURRY:  I have no other questions, Your Honor.

9              THE COURT:  All right.  Anything further from the

10   Government?

11             MS. WESLEY:  No, Your Honor.

12             THE COURT:  All right. Then the witness may step

13   down and return to his seat.

14        (Witness excused)

15             THE COURT:  Does the Government have any other

16   witnesses to call?

17             MS. WESLEY:  No, Your Honor, the Government rests

18   at this time.

19             THE COURT:  All right.  The Government has rested,

20   Ladies and Gentlemen.

21        (End of Government Testimony)

22        (Defendant offered no witnesses)

23        (End of All Witness Testimony)

24

25

P R O C E E D I N G S

(08-25-2010, 11:15 o'clock a.m., defendant present)

(DEFENDANT CLOSING ARGUMENT)

MR. CURRY:  There's a friend of mine who is a lawyer who always quotes a lot of Shakespeare in his closing arguments but I don't know very much Shakespeare.  One line I do know is from Midsummer Nights that says: "If we shadows have offended, think but this, and all is mended".

If I have done anything in this trial that you have found annoying, please know that Mr. DeVaughn didn't tell me to do it.  Please don't hold that against him.

The first question to answer is can you possibly convict Herbert DeVaughn?  If I tell you no, you can't do it, you're going to think I'm an idiot.  You're going to shut down and not going to listen to a word I say because the truth is based on the evidence of course it's possible for you to convict him.  That's not the question I'm addressing with you.  The question I'm addressing with you is should you convict Herbert DeVaughn.  To convict Herbert DeVaughn you have to choose to believe criminals, where does the law lead you, where does your judgment lead you. Nobody has said I saw heroin, drugs in Herbert DeVaughn's hand unless that person was a criminal.  The very best lawyer can't change that.  The most persuasive lawyer can't change that.  We can't change the facts and let me say that

1    Ms. Wesley is one of the best lawyers I've ever known.  Mr.

2    DeVaughn is still entitled to a presumption of innocence.

3    The burden is still on Ms. Wesley to overcome that

4    presumption.  The standard is still she had to do it beyond

5    a reasonable doubt and the policy reason still there and

6    they have to be reassured.  That's the purpose of the

7    standard beyond a reasonable doubt.

8         Now the fact that these are criminals is one of the

9    places I want you to look and one of the places I want you

10   to think about and I want to talk about, not unlike Ms.

11   Wesley did.  She did it and I will.

12        The first of the criminals you met was Jolie Lang.

13   She's not a good citizen, did not have a sudden attack of

14   consciousness, I've been doing wrong.  I will now come to

15   the foot of the cross and go to the police.  Her husband was

16   in trouble and she knew that if you cooperate that helps you

17   out, so she helped him out.  She also was a distributor of

18   heroin.  She was also an addict.  Now we just plain caught

19   her in a lie.  You know from your own experience the day you

20   really kick an addiction is a wonderful day.  It's an

21   important day and you really remember that day and when I

22   asked her when did you get clean, the very first of August.

23   Well then she had to acknowledge that when she testified

24   before the Grand Jury on the 8th of September, she wasn't

25   clean; she was still using.  She covered that a little bit

1    but the damage was done there.  Her memory was kind of
2    interesting.  She testified in some detail about the
3    controlled buy she had done.  She told in great detail about
4    the controlled buy she had done a month before that on the
5    4th of August but remember she also said she had bought
6    heroin illegally for herself the same day but she didn't
7    remember how much heroin she had bought.  I don't know, does
8    it trouble you that the people are using, still selling or
9    both?  I wonder if it troubles the investigators and the
10   Government?  And Jolie Lang, ah, she sounded kind of proud.
11   I was asking her, you know, are you in trouble, you've done
12   all these bad things?  No, I'm not in trouble.  They don't
13   have anything on me.  That was inappropriate.
14        David DeBerry.  Through him we get an insight into how
15   some investigation is done and it's not a bad thing.  I'm
16   not going to look at Sergeant Forbes and say you're a bad
17   guy.  I don't mean to do that.  I don't mean to imply that.
18   David DeBerry was in trouble.  Sergeant Forbes called him.
19   Now Sergeant Forbes chose to use him to--to use a Star Wars
20   term, turn him away from the dark side, to help out against
21   others.  Sergeant Forbes could have chosen not to talk to
22   him and talk to other people to get evidence about
23   Mr. DeBerry who was distributing heroin.  What was
24   Mr.Berry's result?  Well, he wasn't charged.  So his
25   impression that Sergeant Forbes was correct that he was in a

1    triangle and he could get himself out of the triangle, that

2    was exactly correct and Sergeant Forbes was right that if he

3    gets the--the reputation that--that he'll talk to people and

4    get them help and then he doesn't really help them, people

5    will quit talking to him.

6         Debra Bolden.  Debra Bolden has really one of the top

7    lawyers in the state representing her.  In fact it's my

8    friend that knows all the Shakespeare and she simply knows

9    and hopes that her testimony is going to get her a lighter

10   sentence but she is in trouble.  She let her house be used

11   for distribution of heroin.

12        Grace McLaughlin.  She's--she's troublesome to me and I

13   don't mean so much troublesome in the case.  She's kind of a

14   tragic figure.  She distributed heroin and she distributed a

15   lot of it and she knows that that puts her in a lot of

16   trouble.  She's only 21 and she has to be very--very

17   frightened and she has to be trying to do anything she can

18   to--to lighten the hammer that's going to come down on her.

19   So she knows that coming in and testifying was one of the

20   things that would benefit her and one thing was curious and

21   I didn't understand it.  I don't want to always try to

22   figure out what people's motives are.  I'm not that smart.

23   She said she didn't know what the status of--of the romance

24   was that she and Mr. DeVaughn had and I just don't know if

25   she was incredibly naive or if she was doing the poor me

1    really to make herself look more innocent because if you're

2    in court testifying against your boyfriend, I think the

3    relationship is probably pretty much in trouble.

4        Amanda Borror.  Now all the lawyer trial books, they

5    say you're not supposed to say nice things at all about

6    witnesses, but I don't believe very much of that.  I kind of

7    liked her and here's the reason.  I like people who fly

8    their own flag, who don't try to pretend so much.  When

9    somebody's a pirate, by all means just hoist that Jolly

10   Roger and say, yeah, I'm a pirate.  She was very up front

11   with all of us.  She--she distributed a lot of heroin.  She

12   knew she was in big trouble.  In those days she was always

13   high.  Why are you testifying here?  To help myself.  Well,

14   at last, a little bit of candor from somebody.

15       And finally Marcus Gamble.  Now that's a boy that got

16   his second chance under youthful offenders.  I hope he turns

17   his life around.  He was a bad addict and he distributed

18   heroin.  His result?  Remember he's in a Youthful Offender

19   Center for a state charge.  He didn't get charged in this

20   case.  Why not?  Because he cooperated.

21       So the question we need to ask is why did these people

22   come here?  And the answer is to help themselves out and

23   that gives them a reason, a motive to shade the truth, to

24   exaggerate or to lie and that creates a doubt.

25       There are--there are some good questions for us to ask.

1    I would like to ask about where are some people?  Where are

2    some of the people that have been mentioned as doing bad

3    things?  Where's Chelsea Kennedy?  Ah, she made all those

4    trips to Pittsburgh to get drugs and apparently no

5    consequences to her.  Where's Amanda Borror's sister?

6    Sergeant Forbes says he knows her.  Apparently no

7    consequences to her.  About the sister's boyfriend?  He was

8    involved in drugs.  Sergeant Forbes knows him.  No

9    consequences to him.  Mark Powell.  Sergeant Forbes says he

10    knows him.  No consequences to him.  How about Debbie Long?

11    Now Debbie Long was--

12          MS. WESLEY:  Objection, Your Honor.

13          THE COURT:  Overruled.

14          MR. CURRY:  Because Debbie Long is the one that

15    did the controlled buy in Count Three but you didn't hear

16    directly about that buy.

17      The prosecution has made a good bit about the money and

18    the beer receipt?  Where's the kid?

19      Permit me to remind you, a defendant doesn't have to

20    prove anything.  If somebody says Roger, I think you're

21    involved in a stolen car ring in Charleston and you have

22    been for the last two years and bring me some exhibits to

23    show that you're not.  I tell you if I have to do that to

24    stay out of trouble then I'm going to stay in trouble

25    because I don't have any clue how to come up with an exhibit

1    or with witnesses to say he's not in that stolen car ring.

2    I can't come up with tapes of whatever quality and I can't

3    go bugging people and they'll say that Roger, he's ot in a

4    stolen car ring and here's how I know it even though I'm not

5    with him all the time.

6        There are the tapes and you all make of them whatever

7    you will.  I think--well, you know, Wop blah blah, Wop blah,

8    blah.  I don't think they are worth very much.  If you

9    disagree with me, you have the power to do that but the

10   identifications of the voice, here we go, made by, guess

11   who?  Criminals.

12       There are so many blank spaces in this case and so many

13   things which could been provided and which, as a jury, maybe

14   you would like to have seen.  Sergeant Forbes talked about

15   the availability, not just of little audio devices, but of

16   video devices, particularly a buy where Mr. DeVaughn was

17   supposed to have been present.  That might have been

18   helpful.  Then you would've seen who was there or if

19   Sergeant Forbes was afraid Debbie Long would lose it, maybe

20   he could have had it with him going into that casino.  Then

21   we would know what he saw in the casino.  We know there was

22   something else and honestly I didn't think of it until this

23   morning.  That was kind of dumb of me.  If Sergeant Forbes

24   recognized Mr. DeVaughn from seeing him in the casino, he

25   would have stood right up there or sat right up there and

1    said, yeah, that's the guy I saw in the casino but he didn't

2    do that.

3        They knew about the phone numbers and that's the last

4    we heard of that.  We didn't hear about anything from the

5    phone companies.  We didn't even hear about what cell towers

6    that were hitting.  If they were hitting cell towers in

7    Pittsburgh, well that would have been a--a damning piece of

8    evidence, but we don't know where they were.

9        The Government put heroin into Mr. DeVaughn's hands.

10   Poof.  There goes the defense.  We talked a little bit about

11   fingerprints and you heard Sergeant Forbes testify that the

12   heroin is packaged in--in slick wax paper and then I asked

13   well, have you ever used fingerprinting on wax paper?  Yes

14   and it doesn't work, I don't think.  I asked him how many

15   times have you tried it?  Once.  Well, okay, there's a new

16   concept, if at first you don't succeed, heck with it, quit.

17   How many--I mean you have just heard the Government say that

18   there were thousands and thousands and thousands of stamps,

19   packages of heroin that came from Mr. DeVaughn.  Put his

20   finger print on any one of them and I have to sit down and

21   quit talking.  Apparently they didn't even look.

22       There's so much missing here and I can't fill it in and

23   Ms. Wesley can't fill it in or she would have for you.

24   She's not going to hold back.

25       Now there's something I don't want to talk about but I

1    do need--do need to just for a minute and that's this amount

2    of drug weight.  I don't want to talk about it because I

3    don't want you to convict Mr. DeVaughn, okay?  The

4    presentation on the computer from Ms. Wesley's paralegal,

5    you know, garbage in and garbage out.  To buy those amounts

6    you have to believe the source of that information and it's

7    from, guess who, criminals who are just giving off the cuff

8    major guesstimates sitting up there.  I don't think that's

9    trustworthy.  Now from what Ms. Wesley admits is a weight of

10   less than one one-hundredth of a gram of heroin per--per

11   dosage unit, you'd have to have a lot of dosage units to run

12   it up to a hundred grams and I think you'll find they didn't

13   do that.

14        Now maybe I was asking impolite questions.  That's

15   really kind of what courts are about, trials are about is

16   asking impolite questions.  Sometimes I think that juries

17   worry that we're here challenging the Government.  Well, I

18   kind of have a secret for you and it's a little bit sad that

19   it is a secret.  Are you ready for it?  Here's the secret.

20   They're not the Government.  They won't govern anybody.

21   You're the Government.  All of us are the Government.  You

22   are part of the Government.  You have been selected as all

23   of our representatives to make this important decision in

24   the life of one of our citizens.  You are acting for all of

25   us.  You are applying the law for all of us.  You're not

1    going against anybody.  You are the Government.  You're

2    representing the Constitution.  You're deciding if the

3    prosecution has satisfied the law.

4        Now these are hard decisions.  You don't have to like

5    it and if I hear third hand--I'll never talk to you about

6    this case, never ever, ever, ever but I were ever to hear

7    third hand that some juror in this case were to say, oh, I

8    had a wonderful time, I don't think I would believe it

9    because I don't think any of you have enjoyed being here; I

10   sure haven't but is a job and it is a duty and you are the

11   Government and maybe your reaction will be, you know, it was

12   okay to find that guy not guilty; the Government didn't

13   prove their case or maybe your reaction will be like the

14   person I told you in opening statement, I hated to have to

15   find that guy not guilty.  I'm telling you that's the right

16   thing to do.

17       Now in those--where they teach lawyers how to try

18   cases, they tell you how to end your closing and there's one

19   ending that has found its way into literature, it's kind of

20   so hokey I guess and one of my--one of my favorite authors,

21   a British guy, has put it in some of his stories and

22   his--his barrister character uses it all the time and he

23   says it kind of a deep voice, members of the jury this has

24   been three days in my life and your life but it's everything

25   to the defendant and we get to go back and lead our normal

1    lives but it's everything for the defendant and he pulls out

2    a red bandana and he wipes his brow to show how hard he's

3    working.  Well, a little of that's true but certainly this

4    is the most important event in Mr. DeVaughn's life so far

5    but it's not an insignificant event in the rest of our

6    lives.  My dad was on a jury in Buckhannon in 1960 and for

7    the rest of his life now and then he would talk about being

8    on a jury, what that experience was like.  See that was a

9    part of the story of his life.  That was the time I was on a

10   jury.  And this--these last three days and the rest of the

11   time you deliberate, this is part of the story of your

12   lives.  This is the time or one of the times I was on a

13   jury.  This is part of the story of my life.  This is the

14   time I defended Herbert DeVaughn.  So I tried to do my job.

15   Now it's time for you to finish your job and then we'll all

16   be done.  Thank you.

17              (END OF DEFENDANT'S CLOSING ARGUMENT)

18

19

20

21

22

23

24

25

CERTIFICATE


I, Linda L. Bachman, Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on August 23 and 24, 2011, as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 7th day of February, 2012.


    /s/ Linda L. Bachman

    Linda L. Bachman, CCR, CVR
    Official Reporter, United States
    District Court for the Northern
    District of West Virginia